*In the*

# United States Court of Appeals

*For the*

# Federal Circuit

COZY COMFORT COMPANY LLC,

*Plaintiff-Appellant,*

v.

UNITED STATES,

*Defendant-Appellee.*

*Appeal from the United States Court of International Trade*
*Case No. 1:22-cv-00173-SAV · Judge Stephen A. Vaden*

## APPELLANT'S OPENING BRIEF

CHRISTOPHER J. DUNCAN, ESQ.
ELON A. POLLACK, ESQ.
**STEIN SHOSTAK SHOSTAK POLLACK
& O'HARA, LLP**
445 S Figueroa Street, Suite 2388
Los Angeles, California 90071
Telephone: (213) 630-8888
cduncan@steinshostak.com
elon@steinshostak.com

*Attorneys for Appellant,*
*Cozy Comfort Company LLC*

August 26, 2025

 

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### AMENDED  <u>CERTIFICATE OF INTEREST</u>

**Case Number**  2025-1889

**Short Case Caption**  Cozy Comfort Company LLC v. U.S.

**Filing Party/Entity**  Cozy Comfort Company LLC Plaintiff-Appellant

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: August 25, 2025

Signature:

Name:  Christopher J. Duncan, Esq.

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☒ None/Not Applicable |
| Cozy Comfort Company LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| See Entry of Appearance | Isaac S. Crum, Esq.<br>Messner Reeves LLP<br>7250 N. 16th Street, Suite 410<br>Phoenix, AZ 85020 | |
| Gregory P. Sitrick, Esq.<br>Messner Reeves LLP<br>7250 N. 16th Street, Suite 410,<br>Phoenix, AZ 85020 | Sharif Ahmed, Esq.<br>Messner Reeves LLP<br>7250 N. 16th Street, Suite 410<br>Phoenix, AZ 85020 | |
| Robert H. Dunikoski II, Esq.<br>Castaneda + Heidelman LLP<br>2626 Cole Avenue, Suite 300, Dallas, TX 75204 | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☒ Yes (file separate notice; see below)    ☐ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable          ☐ Additional pages attached

| | | |
| | | |
| | | |

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, no appeal in this civil action has been before this or any other appellate court. The following cases in the U.S. Court of International Trade (CIT or lower court) will be affected by the Court's decision in this matter: 22-00173 and 22-00003.

## JURISDICTIONAL STATEMENT

Cozy Comfort Company LLC (Cozy Comfort) seeks review of the lower court's June 16, 2025, decision in CIT Case No. 22-00173 classifying The Comfy®, a novel wearable blanket, as a pullover under Harmonized Tariff Code of the United States (HTSUS) Heading 6110 and issuing a judgment in favor of the government. On June 25, 2025, pursuant to 28 U.S.C. § 1295(a)(5), Cozy Comfort timely appealed the final judgment to this Court, which has exclusive jurisdiction over an appeal from the CIT. The lower court had subject matter jurisdiction over the case because U.S. Customs and Border Protection (Customs) denied Cozy Comfort's protest regarding classification of The Comfy® under the HTSUS and Cozy Comfort timely filed a summons and complaint in the CIT challenging the denied protest. *See* 28 U.S.C. § 1581(a); 28 U.S.C. §2636(a)(1).

**STATEMENT OF THE ISSUES**

1.      Did the lower court err by misinterpreting *Rubies Costume Co. v. United States*, 922 F.3d 1337, 1346 (Fed. Cir. 2019) (*Rubies Costume II*) to mean that an article is excluded from Heading 6110 only if is capable of being used in freezing temperatures rather than if it has an insulating layer for extra warmth.

2.      Did the lower court err by misinterpreting *Rubies Costume II* to mean that a Heading 6110 article can cover more than the upper body.

3.      Did the lower court err by misinterpreting *Arnold v. United States, 147 U.S. 494 (1893) (Arnold)* not to require that an article of apparel be worn or recognized as an article of dress.

4.      Did the lower court err by misclassifying The Comfy®—which has a sherpa lining for extra warmth, covers the lower body to one's knees, and is generally worn and recognized as a blanket—as a pullover under Heading 6110.

**STATEMENT OF THE CASE**

A.      <u>Description of Subject Merchandise – The Comfy® Wearable Blanket</u>

In February 2017, two brothers, Michael and Brian Speciale, invented The Comfy®, the world's first truly wearable whole-body blanket. Appx1. The Comfy® was inspired by Brian's 9-year-old son Jaxson, who Michael observed sitting on a couch on a very cold morning with his knees and arms pulled up to his chest, his

body completely cocooned inside Brian's adult extra-large hoodie. *Id.* Michael then saw a sherpa blanket lying next to Jaxson and asked Brian whether anyone makes a wearable sherpa blanket large enough for an adult to cocoon their whole body inside to keep warm from the cold like Jaxson. Appx1937. The brothers searched the Internet but could not find a wearable whole-body sherpa blanket on the market, so they decided to invent one themselves. *Id*. This is the origin of The Comfy®. *Id*.

The two brothers hired a local textile manufacturing company to construct a prototype of The Comfy® using the same type of sherpa blankets that inspired it. *Id*. They intended The Comfy® to be large enough to cover the whole body of an adult, allowing the adult to cocoon inside for warmth as a blanket like 9-year-old Jaxson. *Id*. The initial version of The Comfy® was too small to cover an entire adult's whole body, so the brothers instructed manufacturers to make a larger version designed for full body coverage. *Id*. To ensure that one's whole body, including one's head, hands, and feet, are covered for warmth, The Comfy® also includes a large hood, baggy sleeves that allow a person to easily pull their arms inside, a wide circumference for cocooning, a marsupial pocket for keeping one's hands extra warm, and an extended length reaching the knees of a typical user even while standing upright. *Id*. The Comfy® is designed and intended to cover both one's upper and lower body from the head to the knees or below while standing upright, and

whole body while cocooned, unlike a pullover or similar article, which are designed and intended to cover only a person's upper body from the neck to the waist no matter how they are worn. *Id.* The Comfy®'s back panel is 8 inches longer than the front panel to allow a person's whole body, including one's feet, to be covered when sitting down or cocooning. Here are images from The Comfy® website of typical customers (*i.e.*, females) wearing The Comfy® while standing upright and cocooning inside as Cozy Comfort designed and intended:




https://thecomfy.com/products/the-comfy (last visited August 12, 2025).

The Comfy® is made using two separate knitted polyester fabrics, like a two-sided blanket, unlike a pullover or similar article which include only one type of fabric, usually fleece or jersey. Appx7. The outside layer of The Comfy® consists of a standard microfleece fabric. *Id*. The Comfy®'s distinctive interior layer consists of a separate, one-inch thick insulating sherpa fabric lining that provides extra warmth against cold weather, like a sherpa blanket, and unlike a pullover or similar article, which are not designed with insulation for extra warmth from the cold. *Id*. The Comfy®, like any other blanket, is reversible, one-size-fits-all, and gender-neutral, whereas pullovers are not reversible, come in standard sizes (small, medium, large, extra-large), and are gender-specific. *Id*.

In April 2017, the Speciale brothers founded Cozy Comfort to produce, market, and sell The Comfy® whole-body wearable blanket as a novel product new to the blanket marketplace. Appx6. In December 2017, the brothers took their invention to the television show "Shark Tank" and received an investment from entrepreneur Barbara Corcoran, who commented that The Comfy® is like another successful new wearable whole-body blanket product, the Snuggie®. Appx12; Appx1943. In response, during the broadcast, Michael Speciale pointed out that while the Snuggie® also has sleeves and is worn, it only covers the front of the body,

whereas The Comfy® is an improved wearable blanket that covers the full upper and lower body all the way around for extra warmth and portability. *Id*.

In 2019, before this litigation, Cozy Comfort obtained trademarks and design patents for The Comfy® from the U.S. Patent and Trademark Office (USPTO) to protect their invention. Appx8-Appx9. At the specific direction of a USPTO examiner, the USPTO-approved trademark categorizes The Comfy® as a "blanket throw, namely whole-body blanket," not a pullover or similar article of wearing apparel. Appx9; Appx2015, Appx2041, Appx2064. The USPTO-approved patents likewise categorize The Comfy® as a "blanket throw" and a "whole-body blanket" to be specifically used as a blanket on very cold days or nights, not as a pullover or similar article intended for general use as apparel in normal weather conditions, during which The Comfy® would be uncomfortably warm. Appx8; Appx2015, Appx2041, Appx2064. The patents include a sketch prominently depicting a seated adult uniquely cocooned inside The Comfy® as a whole-body blanket, just as the child Jaxson who inspired The Comfy® was cocooned. *Id*. The adult's knees are pulled up to the chest and arms are pulled inside, a position a pullover or similar article is not generally large enough to accommodate. Appx8-Appx10; Appx2015. Here is the sketch from Cozy Comfort's patent application of a person wearing The Comfy® as Cozy Comfort primarily intended in the cocoon position:



**FIG. 10**

Appx2015. The patents specifically describe The Comfy®'s primary purpose and intended use: to replace a traditional blanket by providing extra warmth from the

cold but allowing the wearer to get up from a cocooned, seated, or curled up position on a couch or bed to grab food from the refrigerator, check the mail, or walk the dog without leaving the warming blanket behind, so the wearer's whole body remains protected from the cold during this brief interlude. Appx1938; Appx2015, Appx2041, Appx2064. The patents demonstrate that The Comfy®'s novelty lies in solving the "left behind blanket" problem by its portability for continuous, uninterrupted extra warmth. *Id*. They also underscore that The Comfy® is not a pullover or similar article of apparel, which, if it were, would make it ineligible be patented as an invention. Appx19.

The Comfy® is shrink-wrapped and packaged for retail sale in a cardboard box like a blanket, not folded on a shelf or hung on a rack using a hanger like a pullover or similar article. Appx6-Appx7; Appx1941; Appx1991. It is sold in the blankets and home furnishings sections, not the apparel sections, of retail and online stores. Appx1941. The Comfy® is described as a "wearable throw/blanket," not a pullover or similar article, in licensing agreements with Disney, Marvel, the National Hockey League (NHL), the State of New York and other major third-party retail business and government partners. *Id*.; Appx2082.

B.    <u>Factual Background</u>

1.    <u>Customs' Longstanding Official Published Position is that Heading 6110 Excludes All Articles with a Sherpa Lining for Extra Warmth or that Cover Below the Vicinity of the Waist.</u>

Heading 6110 of the HTSUS covers "Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted." Twenty-five years ago, in 2000, Customs developed and published a comprehensive "Informed Compliance Publication" for classifying apparel and interpreting apparel heading terms, including those in Heading 6110, entitled "What Every Member of the Trade Community Should Know About: Classification: Apparel Terminology under the HTSUS" (Apparel ICP). Appx2383. Customs' Apparel ICP is "intended to provide guidance and information to the trade community." *Id.* In 2008, Customs revised its Apparel ICP to its current form. *Id.* According to its own terms, the current 2008 version of Customs' Apparel ICP "reflects the position on or interpretation of the applicable laws or regulations by U.S. Customs and Border Protection (CBP) as of the date of publication." *Id.* at p. 2.

Customs' Apparel ICP provides the following interpretation of terms in Heading 6110:

**Sweaters** (6110, 6111) - are knit garments that <u>**cover the body from the neck or shoulders to the waist or below (as far as the mid-thigh or slightly below the mid-thigh)**</u>. Sweaters may have any type of pocket treatment or any type of collar treatment, including a hood, or no collar, or any type of neckline. They may be <u>**pullover style**</u> or have a full or partial front or back opening…

> This term <u>**excludes**</u> **garments that have a** <u>**sherpa lining**</u> or a heavyweight fiberfill lining (including quilted lining), **which are used to provide** <u>**extra warmth to the wearer.**</u> Such garments, whether or not they have a sweater stitch-count, are classified in heading 6101 or 6102. This term also excludes cardigans that are tailored. Such garments are classified in heading 6103 or 6104. See also "Anoraks, windbreakers, ski-jackets and similar articles".

Customs Apparel ICP, Appx2404 (emphasis added).

Customs' Apparel ICP's very specific and precise language excluding from Heading 6110 sweaters with a sherpa lining that provides extra warmth parallels similar language in the Explanatory Notes to Heading 6110, which also exclude padded waistcoats (vests) from Heading 6110 due to the presence of this extra layer of warmth against cold weather:

> **61.10 RUL - Jerseys, pullovers, cardigans, waistcoats and similar articles, knitted or crocheted (+).**
>
> *****
>
> The heading also **excludes** <u>**padded**</u> waistcoats generally worn over all other clothing for <u>**protection against the weather**</u>, of **heading 61.01** or **61.02 RUL.**

Explanatory Notes, Heading 6110 (emphasis added).

Customs' Apparel ICP also mirrors language found elsewhere in Chapter 61 that differentiates articles that are "insulated, for cold weather protection" from classification with like articles that lack this extra warming physical design feature. *See, e.g.,* Subheading 6104.62.1010 (Bib and overalls); Subheading 6114.20.0042 (Coveralls, jumpsuits and similar apparel). It also tracks with a recent Customs binding ruling on a polyester knitted sherpa blanket reiterating its official position that a sherpa lining protects against the cold: "[t]he [sherpa] materials used for these blankets indicate they are designed for protection against the cold." N345888 (2025).

Customs' Apparel ICP, the Explanatory Notes, and Chapter 61 headings focus exclusively on such cold-weather insulation materials like sherpa, fiberfill, or padding, not other materials like vinyl or nylon designed for repelling rain or wind, respectively. In *Rubies Costume II*, this Court similarly stated that an article of Heading 6110 "provides some warmth to the wearer but does not protect against wind, rain, or extreme cold." *Rubies Costume II,* 922 F.3d at 1346. Given extra insulation does not necessarily protect against wind or rain, the phrase "some warmth" refers to the limitation on protection against "extreme cold." Thus, if an article provides more than "some warmth" (*i.e.*, "extra warmth"), it necessarily also protects from extra cold weather (*i.e.*, "extreme cold"), and is excluded from Heading 6110 on this basis. Accordingly, consistent with the HTSUS, the

Explanatory Notes, this Court's holding in *Rubies Costume II*, Customs' interpretation in its Apparel ICP confirms that the presence in an article of an insulating layer made from sherpa, fiberfill, or quilted padding materials categorically disqualifies the article from classification in Heading 6110 because this physical characteristic is designed and included solely to protect from extreme cold.

2. <u>Cozy Comfort Classified The Comfy® as a Blanket Under Heading 6301 Consistent with Customs' Official Position, the Explanatory Notes, the HTSUS, CIT Case Law in *Allstar*, and This Court's Binding Precedent in *Rubies Costume II.*</u>

In 2018, ten years after the release of the 2008 Apparel ICP, Cozy Comfort began importing The Comfy®. Appx2. Cozy Comfort relied on Customs' 2008 Apparel ICP and followed Customs' official interpretation of Heading 6110 to classify The Comfy®, which contains a sherpa lining for extra warmth and covers the lower body below the waist to the knees, outside of Heading 6110. Appx2-Appx3. Instead, Cozy Comfort classified The Comfy® as a blanket of Heading 6301, consistent with the CIT's decision in *Allstar Mktg. Grp., LLC v. United States*, 211 F. Supp. 3d 1319, 1337 (Ct. Int'l Trade 2017), which held that the similar Snuggie® is a blanket of Heading 6301, not a garment of Heading 6114 or another Chapter 61 heading, because wearable blankets are not ordinarily worn or recognized as a type of clothing. *Allstar Mktg. Grp., LLC v. United States*, 211 F. Supp. 3d 1319, 1337 (Ct. Int'l Trade 2017). Appx3. Cozy Comfort did not classify

The Comfy® as a jacket, coat, or similar article under Headings 6101 through 6104, which the Apparel ICP interprets to apply only to articles covering only the upper body and/or have a front opening, and not to articles like The Comfy® that cover the lower body and lack a front opening:

> Jackets, which are garments designed to be worn over another garment, for protection against the elements. **Jackets cover <u>the upper body from the neck area to the waist area</u>**, but are generally less than mid-thigh length. **They normally have a <u>full front opening, although some jackets may have only a partial front opening.</u>**
>
> ****
>
> **Overcoats, carcoats, capes, cloaks and similar garments** (6101, 6102, 6201, 6202) - is a group of outerwear garments which cover both the upper and lower parts of the body, and which are normally worn over other garments for warmth and protection from the weather. Overcoats and carcoats are thigh length or longer, with sleeves, with or without a means of closure, and **with a full-front opening.**

Customs Apparel ICP, Appx2393, Appx2399 (emphasis added). Thus, Cozy Comfort classified The Comfy® as a blanket of Heading 6301, not a Heading 6110 article, or other article in Chapter 61, consistent with Customs' longstanding official published position in its Apparel ICP, the HTSUS, the Explanatory Notes, the only CIT case involving a similar wearable blanket (*Allstar*), and this Court's binding precedent in *Rubies Costume II*.

3. <u>Customs' Reclassified The Comfy® Under Heading 6110 Contrary to its Own Longstanding Official Published Position that Articles Like The Comfy® are Excluded from Heading 6110.</u>

For nearly 20 years, Customs consistently applied its published Heading 6110 sherpa-lining exclusion in classification decisions, which include binding rulings that classify articles with a sherpa interior lining that provides extra warmth from the cold like The Comfy® outside of Heading 6110. *See, e.g.,* N160104 (2011); N258001 (2014). Initially, Customs even correctly applied its sherpa-lining exclusion to The Comfy® when, in late 2019, Customs Import Specialist Joy Davies, who is assigned to Customs' specialized Apparel, Footwear and Textiles Center of Excellence, properly applied Customs' official interpretation of Heading 6110 and classified The Comfy® as an "other garment" in Heading 6114, not as a pullover or similar article of Heading 6110. Appx1191-Appx1194; Appx1944-Appx1945; Appx3125.

However, just months later in early 2020, Customs abruptly reversed its position. It disregarded its own published official interpretation that articles like The Comfy® are excluded from Heading 6110 and overruled Import Specialist Davies' resulting classification of The Comfy® in Heading 6114. Appx3. Customs instead reclassified The Comfy® as a pullover under Heading 6110 even though it has a sherpa interior lining for extra warmth and it covers the lower body to the knees,

which are both disqualifying physical characteristics according to Customs' official published interpretation in its Apparel ICP. Appx3. In a March 21, 2021, Customs headquarters ruling letter adopting its new classification position, Customs cited to its Apparel ICP as support for its definition of "pullover." Appx3; Appx2413. However, it notably failed to acknowledge, let alone explain, its contrary language in the same publication excluding sherpa-lined articles like The Comfy® from Heading 6110. *Id*. Customs also failed to address or reconcile that its own apparel and textile specialist, Import Specialist Davies, followed its official published directive and classified The Comfy® outside of Heading 6110 accordingly. *Id*.

4. At Trial, the Government's Top Heading 6110 Witness Admitted that Customs' Longstanding Official Published Position is that Articles Like The Comfy® with a Sherpa Lining for Extra Warmth are Excluded from Heading 6110.

After Customs reclassified The Comfy®, it assessed Cozy Comfort millions of dollars in additional duties, nearly putting the small family-run company out of business. Appx1946. Unable to afford the cost of challenging all of Customs' assessments at once, Cozy Comfort protested this "test" case contesting Customs' new classification of The Comfy® in a single entry. Appx3. Customs denied the protest and Cozy Comfort filed the instant suit before the CIT. Appx3. The lower court denied the government's motion for summary judgment and held a bench trial in October 2024. Appx3-Appx4.

At trial, the government called Customs' top official responsible for interpreting Heading 6110, National Import Specialist Renee Orsat. On cross examination, National Import Specialist Orsat testified that Customs' official published position is that "all garments" otherwise classifiable under Heading 6110, including pullovers and similar articles, are excluded from Heading 6110 if they have a sherpa lining for extra warmth like The Comfy®, clarifying that the term "sweaters" in the Apparel ICP encompasses "all garments" under Heading 6110:

> Plaintiff's Counsel: Okay. Do you see the second paragraph where it says, "This Term"?
>
> Customs Specialist Orsat: Yes.
>
> Plaintiff's Counsel: "This term" means the term sweaters?
>
> Customs Specialist Orsat: Yes. Well, **it actually means all garments**. So you could have a cardigan-style garment. That would be considered a similar article. **It's not just for sweaters and pullovers. It's "and similar articles."**
>
> Plaintiff's Counsel: Okay. It says that, "Those articles exclude garments that have a sherpa lining or a heavy-weight fiberfill lining including quilted lining."
>
> Customs Specialist Orsat: Uh-huh.
>
> Plaintiff's Counsel: -- "which are used to provide extra warmth to the wearer."
>
> Customs Specialist Orsat: Uh-huh.
>
> Plaintiff's Counsel: Did I read that correctly?
>
> Customs Specialist Orsat: Yes.

Plaintiff's Counsel: So this is saying that if something has a sherpa lining, it is **excluded** from the [Heading 6110] term "sweaters"?

Customs Specialist Orsat: **That's what it says**.

Appx1204-Appx1205 (emphasis added).

As the government started its redirect examination, the lower court interrupted government counsel to question National Import Specialist Orsat on her damaging testimony favorable to Cozy Comfort elicited during cross examination. The lower court gave Ms. Orsat the opportunity to retract or explain her admission that the government's litigation position that The Comfy® is not excluded from Heading 6110 is directly contradicted by Customs' official published position to the contrary. However, instead of retracting her testimony, she reaffirmed her admission that all articles that would otherwise qualify as pullovers or similar articles but have a sherpa lining are thereby excluded from Heading 6110:

Lower court: And that paragraph begins, "This term **excludes** garments that **have a sherpa lining** or a heavy-weight fiberfill lining including quilted lining, which are used to provide extra warmth to the wearer." Do you see that sentence?

Customs Specialist Orsat: I do.

Lower court: And if my memory is correct, and this is what it want to hone in on, I want to make certain I understand what you said correctly, when the attorney, I believe it was Mr. Duncan, said this term, you stopped him and you -- what I took to be, but this is my question -- **I understood you to clarify for him that the term meant by this term is broader than just sweaters?**

Customs Specialist Orsat: **That's correct.**

Lower court: **And that it also encompasses <u>pullovers and other similar garments</u>; is that correct?**

Customs Specialist Orsat: **<u>Similar articles, yes</u>.**

Lower court: **Similar articles.**

Customs Specialist Orsat: **Yes.**

Lower court: **And that would <u>include a pullover</u>?**

Customs Specialist Orsat: **Well, <u>yes</u>.** Because pullovers are stated. What a similar article would be is a cardigan. In the heading, you don't see the term "cardigan." So it would include a cardigan, which would be a similar article.

Appx1223-Appx1224 (emphasis added).

However, Customs' National Import Specialist Orsat then attempted to rationalize this contradiction as it applies to The Comfy® by claiming that, unlike importers and other members of the trade community such as Cozy Comfort, Customs is not required to follow its own official published HTSUS heading interpretations. Instead, she asserted that Customs is permitted to "get around" its own official guidance and interpret a heading differently than its official interpretation in a particular case to achieve a desired result by simply claiming it is relying instead on the broad *eo nomine* language in the text of the heading itself:

Lower court: So, in other words, do I hear you say that this term is -- what this paragraph is doing is limiting the world, to use your terminology, of those

similar articles to say that if you're trying to bring it in under a similar article but **it's got <u>sherpa lining</u> or heavyweight fiberfill, then, you know, it's <u>not gonna be in this land</u>**?

Customs Specialist Orsat: **<u>That could be true</u>**. **But we have a statute that <u>gets us around that</u>**.

Appx1228 (emphasis added).

In sum, National Import Specialist Orsat admitted that Customs' official policy excludes The Comfy® from Heading 6110. Yet, she then claimed that Customs deliberately disregarded its official position in this case to classify The Comfy® under a different heading with a higher duty rate and the agency is allowed to deviate from its position here because the heading doesn't explicitly prohibit this self-serving departure from agency policy. As discussed below, Ms. Orsat's rationale totally undercuts the government's arguments in many other cases before this Court in which it consistently asserts Customs' official interpretations of headings are entitled to deference because Customs specializes in interpreting broad heading language such as that in Heading 6110.

5. <u>The Lower Court Erroneously Decided to Classify The Comfy® as a Pullover Under Heading 6110 Contrary to the HTSUS, Explanatory Notes, and Customs' Longstanding Official Published Position.</u>

On June 16, 2025, nearly eight months after the trial, the lower court issued its written decision. Appx1. As a threshold matter, the lower court analyzed whether

The Comfy® falls within Heading 6110, as Customs claimed. Appx1. The lower court first considered two criteria from this Court's *Rubies Costume II* standard for classification in Heading 6110: (1) whether The Comfy® provides some warmth but not protection against extreme cold; and (2) whether it covers the upper body.

Regarding the first criterion, the lower court held that The Comfy® does not protect against "extreme cold" based on its subjective review <u>without any legal support</u> that "extreme cold" means temperatures "at, near, or below freezing." Appx33. The lower court did not apply an objective test based on The Comfy®'s insulated sherpa lining as directed by the HTSUS, the Explanatory Notes, and Customs' Apparel ICP. Nor did it even acknowledge Customs' admission that its official position is The Comfy® is excluded from Heading 6110 because of its sherpa lining. Appx31-Appx50. Instead of following the objective legal standard for protection from the elements set forth in *Rubies Costume II*, the court crafted a new, subjective legal standard: an article must be capable of withstanding whatever specific temperature that court deems to be "extreme cold." Here, the lower court determined that theoretical temperature is approximately 32 degrees Fahrenheit (zero degrees Celsius) but it could be virtually any temperature before a different tribunal. Appx33. Based on limited and conflicting witness testimony, the lower court concluded The Comfy® is not proven to be effective when actually used at

freezing temperatures and therefore is not excluded from Heading 6110. Appx35-Appx43.

As for the second criterion, the lower court found The Comfy® is not excluded from Heading 6110 even though it covers more than the upper body. It rejected this Court's holding in *Rubies Costume II* that Heading 6110 is limited to upper-body garments. Instead, it claimed that Heading 6110 may include lower or even whole-body garments as well: "Cozy Comfort, however, incorrectly assumes that [H]eading 6110 *only* applies to upper body garments.") (emphasis in original). Appx67. The lower court dismissed The Comfy®'s knee-length coverage design as an "incidental" modification. Appx69. In doing so, the lower court effectively eliminated this Court's "covers the upper body" limitation required by *Rubies Costume II*, implying that Heading 6110 could include articles covering the whole body, like a dress or a robe, as long as they are considered by this lower court to be "oversized," a term not found in the HTSUS or caselaw which the lower court failed to define.

Finally, after determining that The Comfy® is classifiable as a pullover in Heading 6110 of Chapter 61, the lower court considered whether The Comfy® is also classifiable as a blanket or other non-apparel textile of Chapter 63. Appx73-Appx76. Note 2(a) to Chapter 63 precludes classification in Chapter 63 for "[g]oods

of chapters 56-62." Appx54. Applying the U.S. Supreme Court's decision in *Arnold*, the lower court reasoned that The Comfy® is classified as apparel of Chapter 61, which precludes it from classification as a blanket of Chapter 63, because it is "ordinarily worn," albeit indoors while lounging on the couch at home out of the public eye. Appx61-Appx66. However, the lower court failed to apply the critical second part of the *Arnold* test: an article must be "worn or recognized **as an article of dress**" (*i.e.,* a specific type of clothing) to be classified as apparel in Chapter 61. *Arnold,* 147 U.S. at 497, 13 S. Ct. at 408 (emphasis added). By dispensing with the second and more rigorous part of the *Arnold* test, which emphasizes the requirement that the article be generally recognized as an identifiable type of clothing, the lower court created a new, much less exacting *Arnold* standard. Under the lower court's overly expansive interpretation of the *Arnold* test, anything regularly worn, regardless of context, is considered apparel even if, as with The Comfy®, it is universally considered to be a blanket worn almost exclusively at home, and not recognized, sold, or used by the general public, retailers, or textile industry as a type of apparel. Appx35-Appx43.

In sum, the lower court erroneously decided The Comfy® does not meet the *Rubies Costume II* standard for exclusion from Heading 6110 even though it has a sherpa lining for extra warmth and covers the lower body to the knees because, in

the subjective view of the lower court, it is not scientifically proven to keep a person warm at 32 degrees Fahrenheit and is "oversized," neither of which are factors in this Court's *Rubies Costume II* test. The lower court further erroneously decided The Comfy® does not meet the *Arnold* standard for exclusion from Chapter 61 even though it is not a recognized article of dress because it is regularly put on, albeit at home as a blanket and not in public as a type of clothing. Applying these erroneous legal conclusions to The Comfy®, given The Comfy® is pulled on over the head, the lower court found The Comfy® is classified specifically as a "pullover" type of apparel in Heading 6110 even though there is no evidence that anyone except the government's paid witnesses considers it to be a pullover. Appx57.

## SUMMARY OF THE ARGUMENT

The lower court made three reversible legal errors in which it misinterpreted binding precedent. First, in applying this Court's test for classification in Heading 6110 set forth in *Rubies Costume II*, the lower court misinterpreted this Court's criterion that a Heading 6110 article "provides some warmth but does not protect against…extreme cold" to mean a subjective case-by-case analysis whether an article is technically capable of being actually used in freezing temperatures. Contrary to the lower court's decision, the HTSUS, Explanatory Notes, and Customs' ICP uniformly provide that this criterion means an objective analysis

whether the article has an insulating layer of materials designed to provide extra warmth. Second, in applying this Court's *Rubies Costume II* test, the lower court also misinterpreted this Court's criterion that an article "covers the upper body" to mean an article of Heading 6110 can also cover the lower body without any length limitation. This Court's binding precedent in *Victoria's Secret Direct, LLC v. United States*, 769 F.3d 1102 (Fed. Cir. 2014), the exemplars or Heading 6110, Customs' Apparel ICP, and dictionary definitions all demonstrate this criterion means the article covers *only* the upper body from the neck to the vicinity of the waist, not the lower body substantially below the vicinity of the waist to the knees or below. Finally, in applying the U.S. Supreme Court's test for classification of articles as apparel in Chapter 61 set forth in *Arnold*, the lower court misinterpreted the Supreme Court's test by reviewing only whether an article is frequently worn. The lower court omitted the critical second criterion in the *Arnold* test, namely whether an article is "worn or recognized *as an article of dress*." The italicized text of *Arnold* omitted by the lower court indicates the Supreme Court's test for apparel includes whether the article is generally considered by the public to be a known type of clothing, not just expansively that it is frequently put on the body.

The lower court's three legal errors directly and materially caused it to misclassify of The Comfy® as a pullover of Heading 6110 because the lower court

correctly found The Comfy® has a sherpa interior lining for extra warmth and covers beyond the upper body to the knees of typical user, and did not find it is worn or recognized by the public or textile industry as a specific type of clothing. Given these factual findings, if the lower court properly interpreted the legal tests in *Rubies Costume II* and *Arnold*, it would have excluded The Comfy® from Heading 6110, determined it is not apparel of Chapter 61, and classified it as blanket of Heading 6301. Accordingly, this Court should reverse the lower court's erroneous decision and decide that The Comfy® is classified as a blanket of Heading 6301, or, if this Court finds The Comfy® is used or recognized as article of dress, as an "other garment" of Heading 6114.

## STANDARD OF REVIEW

The meaning or interpretation of precedent is a question of law given *de novo* review by the Federal Circuit. *YBM Magnex, Inc. v. Int'l Trade Comm'n*, 145 F.3d 1317, 1320 (Fed. Cir. 1998), *citing South Park Independent School Dist. v. United States,* 453 U.S. 1301, 1304–05, 102 S.Ct. 1, 69 L.Ed.2d 1007 (1981), *overruled on other grounds by Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046 (Fed. Cir. 2002). *See, also, Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 18–19, 144 S. Ct. 1221, 1240, 218 L. Ed. 2d 512 (2024), *citing Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 855, n. 15,

102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (holding that if a lower court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court applies the *de novo*, not the clearly erroneous, standard of review). Accordingly, this Court reviews whether the lower court misinterpreted this Court's precedential legal standard in *Rubies Costume II* for classification of articles under as sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles under Heading 6110, or the U.S. Supreme Court's precedential legal standard in *Arnold* for classification of articles as apparel in Chapter 61, under the *de novo* standard of review.

The proper meaning of tariff terms is also a question of law reviewed *de novo*. *Rubies Costume II*, 922 F.3d at 1342. Although whether the subject merchandise falls within the description of a tariff provision is a question of fact, when, as here, there is no dispute as to the objective physical characteristics of the merchandise, the two-step classification analysis collapses entirely into a question of law. *Id*. (*citing Gerson Co. v. United States*, 898 F.3d 1232, 1235 (Fed. Cir. 2018)). Accordingly, this Court reviews the lower court's classification of The Comfy® under a *de novo* standard of review.

"[T]he entire context of the [HTSUS] must be considered and every effort made to give full force and effect to all language contained therein." *Toy Biz, Inc. v.*

*United States*, 22 CIT 831, 834-35, 19 F. Supp. 2d 1128, 1131-32 (1998). In comparison, the World Customs Organization (WCO) Explanatory Notes "generally indicate the 'proper interpretation' of provisions within the HTSUS . . . [and] are persuasive authority for the Court when they *specifically include or exclude an item from a tariff heading*." *Sabritas, S.A. de C.V. v. United States*, 22 CIT 59, 62, 998 F. Supp. 1123, 1127 (1998) (emphasis added). Finally, Customs' official published interpretation of the criteria required for an article to fall within, or be excluded from, a tariff term, is entitled to deference. *Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1356 (Fed. Cir. 2003) (*Rubies Costume I*). Accordingly, in making its *de novo* decision concerning the classification of The Comfy®, this Court relies primarily on the specific terms in headings, gives persuasive weight to guidance in the Explanatory Notes on the meaning of headings, and affords deference to Customs' official interpretations of heading terms. Here, the lower court erroneously did not rely on any of these sources in making its decision to classify The Comfy® as a pullover of Heading 6110.

**ARGUMENT**

A.   The Lower Court Erred by Misinterpreting the *Rubies Costume II* Criterion that a Heading 6110 Article "Provides Some Warmth but does not Protect Against…Extreme Cold" to Mean a Subjective Test Based on an Article's Principal Use rather than an Objective Test Based on the Article's Physical Characteristics.

1.   The Lower Court Erred by Applying a New, Subjective Test Disfavored by this Court to Determine Whether an Article "Provides Some Warmth but does not Protect Against…Extreme Cold."

HTSUS General Rule of Interpretation 1 (GRI 1) provides that classification is determined according to the terms of the headings and any applicable section or chapter notes. *Carl Zeiss, Inc. v. United States,* 195 F.3d 1375, 1379 (Fed. Cir. 1999*)*. Here, given the ambiguity of some terms in Heading 6110, such as the broad term "pullover," in *Rubies Costume II*, this Court developed a legal standard that lists mandatory objective criteria for classification in Heading 6110 based on the following essential physical characteristics of articles of Heading 6110: (1) "covers the upper body;" (2) worn "over either undergarments or other clothing;" and (3) "provides some warmth to the wearer" but "does not protect against wind, rain, or extreme cold." Appx4. These mandatory physical characteristics govern whether The Comfy® is classified as a pullover under Heading 6110, as the lower court decided, or is excluded from Heading 6110, as Cozy Comfort argues. *Id*.

The first mandatory Heading 6110 criterion the lower court analyzed was whether an article provides some warmth to the wearer but does not protect against extreme cold. The lower court interpreted this criterion to involve a subjective case-by-case analysis of how effectively a given article can be actually used to provide enough warmth to withstand "extreme cold," which the lower court unilaterally defined without any legal support as "a range of temperatures at, near, or below freezing." Appx33. Caselaw, the HTSUS, the Explanatory Notes, and Customs' own published official position demonstrate that the lower court's use of this subjective standard based on actual use, instead of objective physical characteristics, was erroneous.

This Court and other appellate courts disfavor subjective case-by-case legal tests because litigants do not know the legal standard to which a particular lower court will hold them, stifling early resolution, inviting additional litigation, and requiring an exhaustive assortment of expert testimony, which is exactly what occurred here. *See, e.g., Amini Innovation Corp. v. Anthony California, Inc.*, 439 F.3d 1365, 1370 (Fed. Cir. 2006) (disfavoring application of a "subjective-intrinsic" test in the patent context); *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1500 (11th Cir. 1985) (disfavoring "subjective methods of evaluation" in the

discrimination context). The lower court invented and applied a new, disfavored subjective standard, which has no basis in the HTSUS or precedent.

First, the lower court determined without any legal support that this Court's reference to the term "extreme cold" means "a range of temperatures at, near, or below freezing." Appx33. The parties did not know the lower court would settle on this range of temperatures to be key determining factor in the case; therefore, it was virtually impossible for the parties to resolve the case on their own prior to or during trial despite the parties' agreement as to The Comfy®'s physical characteristics. Further, the text of this Court's decision in *Rubies Costume II* belies the lower court's conclusion because the other two terms this Court used for this criterion, *wind* and *rain*, are mild weather conditions. This Court did not include high winds, freezing rain, hail, or snow, which are severe weather conditions. In contrast, the lower court arbitrarily concluded that extreme cold means severe, zero-degree Celsius, or even colder, air temperatures that are far beyond mere wind or rain, which only occur in warmer than freezing temperatures. Given the term "extreme" means simply "a higher degree than normal," another lower court could easily conclude that the term connotes much milder temperatures that may be rare and below normal for a certain locality, such as 40 degrees Fahrenheit, which is extreme in certain parts of the country such as the pacific, southwestern, and southeastern regions. The potential

for inconsistent standards in future cases highlights why the lower court's novel, subjective standard for extreme cold is unprecedented, problematic, and must be rejected.

Relatedly, prior to and at trial, the lower court ordered the parties to produce expert testimony on whether The Comfy® protects against the yet-undetermined range of temperatures that this lower court would ultimately decide after trial constitute extreme cold. Appx4. To prepare for any eventuality, this led both parties to hire and utilize several expert witnesses to opine on how The Comfy® performs in a virtually unlimited set of circumstances. Since none of the expert witnesses called at trial field-tested The Comfy® (because neither party knew at what temperature in which to conduct the test), the collective testimony from these witnesses about The Comfy®'s potential effectiveness in cold weather was unreliable speculation unsupported by scientific methodology that had little if any probative value. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc*., 711 F.3d 1348, 1374 (Fed. Cir. 2013) (*citing Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999), *abrogated by Brumfield , Tr. for Ascent Tr. v. IBG LLC*, 97 F.4th 854 (Fed. Cir. 2024)) (holding that expert opinion derived from unreliable data and built on speculation frustrates a primary goal of expert testimony in any case, which is meant to provide experience from professional specialization, not muddle fact-

finding with unreliability and speculation). Nevertheless, the lower court heavily relied on the government's expert witnesses for nearly all its factual findings. Notably, the court relied on one of the government's experts, Mary Ann Ferro, a fashion professor who only conducted an immaterial and unscientific water test that she was unqualified to perform. Appx1. Given the court set up a vague, unworkable subjective test with a moving target, it created an evidentiary situation in which the parties were left to guess which type of speculative expert testimony the court would find most persuasive instead of being able to focus on a clear, objective standard. This Court should reverse because upholding the lower court's subjective test for protection from extreme cold will make future litigants less, not more, cognizant as to what meets the test, likely burdening the CIT and this Court with unnecessary future litigation to resolve this issue.

      2.    <u>The Lower Court Erred by Failing to Consider the HTSUS, the Explanatory Notes, and Customs' Official Position in its Apparel ICP to Determine Whether an Article "Provides Some Warmth but does not Protect Against…Extreme Cold."</u>

         a.    <u>The Lower Court Failed to Consider HTSUS Language that Articles like The Comfy® that are "Insulated, for Cold Weather Protection" are Excluded from Heading 6110.</u>

The lower court erred by considering "use" rather than the text of the HTSUS when it analyzed classification under Heading 6110. Its rationale that Heading 6110 "suggests a type of use" because a pullover must be "put on by being pulled over the

32

head" is wrong in several respects. Appx57. First, how an article is put on has nothing to do with its intended or actual use. Moreover, the CIT has directly addressed this issue and held that Heading 6110 is an *eo nomine*, not "principal use," provision, with no implication of use, so an article's potential actual use in certain weather conditions is irrelevant to whether it is classified under Heading 6110. *See H.I.M./Fathom, Inc. v. United States*, 981 F. Supp. 610, 617 (Ct. Int'l Trade 1997) (holding that headings in Chapters 61 and 62, are not use provisions but rather *eo nomine* provisions that focus solely on objective criteria such as the articles' materials, design, and construction). Classification in Heading 6110 depends solely on the article's objective physical characteristics, such as the materials of which it is made, not its subjective use. *See id*. Further, contrary to the lower court's claim, the *Rubies Costume II* criteria for Heading 6110 articles <u>do</u> <u>not</u> "relate" to "how the article is used." Appx56. Instead, the criteria relate to the article's objective physical characteristics, such as coverage (upper body, lower body, or whole body), style (undergarment, garment, or overgarment), materials (cotton, fleece, sherpa, fiberfill, vinyl, nylon, etc.), and design (single layer for some warmth or multiple layers for extra warmth).

More specifically, the language Congress included in Chapter 61 headings also <u>does</u> <u>not</u> "relate" to how an article is used. Regarding the "some

warmth/extreme cold" criterion, several Chapter 61 headings other than Heading 6110 have specific provisions classifying articles differently based on whether they are "insulated, for cold weather protection." *See, e.g.*, Subheading 6104.62.1010, HTSUS (Bib and overalls); Subheading 6114.20.0042, HTSUS (Coveralls, jumpsuits and similar apparel). This tariff language underscores that the deciding factor in whether an article protects against extreme cold is whether the article is made with an additional layer of insulating materials designed to provide warmth against cold weather (*e.g.* a sherpa or heavy duty fiberfill interior lining), not, as the lower court erroneously concluded, whether the article is scientifically proven effective when actually used in near subzero weather conditions (or an alternative colder or warmer condition chosen by a different lower court). Indeed, there is no language in Heading 6110 or any other Chapter 61 heading in which classification depends on an article's actual demonstrated use in certain weather conditions.

For example, knitted raincoats and windbreakers are excluded from classification in Heading 6110 because of their design and materials not because they prevent a certain amount of rain from getting through or block wind gusts up to a certain mile per hour. Likewise, an article like The Comfy® with sherpa interior lining is excluded from Heading 6110 and classified elsewhere in the HTSUS because it is designed with an additional layer made with insulating materials that

provide extra warmth, not because it stops the cold down to a certain air temperature. The lower court's application of a subjective "use" standard is erroneous and contrary to the HTSUS and CIT caselaw interpreting the tariff code.

> b. The Lower Court Failed to Consider Persuasive Guidance in the Explanatory Notes that Articles like The Comfy® with Padding to Protect Against Cold Weather are Excluded from Heading 6110.

The Explanatory Notes provide guidance on the meaning of the broad "insulated, for cold weather protection" language in Chapter 61 headings by specifically instructing that certain articles with insulating "padding" to protect against cold weather are excluded from Heading 6110. The lower court acknowledged that the Explanatory Notes, while not binding, are persuasive "super guidance," but then utterly ignored the Explanatory Notes for Heading 6110. In particular, the lower court did not consider that the Explanatory Notes for Heading 6110 provide: "The heading also excludes **padded** waistcoats generally worn over all other clothing for **protection against the weather**" (emphasis added).

This language highlights three important points that show the lower court's decision is erroneous. First, the mere inclusion of a padded layer alone is sufficient to disqualify a vest (waistcoat) from classification in Heading 6110. No evidence of actual use in certain weather conditions is necessary. Second, the padding must be designed only to be worn for protection against "the weather" in general, not a

specific range of near-arctic air temperatures identified by the lower court. Third, the exclusion of padded waistcoats in the Explanatory Notes directly contradicts the lower court's finding (in reliance on the government's expert witnesses) that an article must be "tightly woven," "water repellant," and "have a hood with a drawstring to pull the hood snug against the face," to protect against the extreme cold. Appx35. A knit padded vest has <u>none</u> of these features but is still excluded from Heading 6110. In sum, the Explanatory Notes support the Heading 6110 language that the determinative factor for protection against extreme cold is the inclusion of an insulating layer of materials designed for extra warmth from cold weather, not a subjective opinion of potential performance in freezing temperatures, or other extraneous design features incorrectly identified by the government's expert witnesses upon which the trial erroneously relied.

c.    <u>The Lower Court Failed to Consider or Afford Deference to Customs' Longstanding Official Published Position that Articles like The Comfy® with a Sherpa Interior Lining for Extra Warmth are Excluded from Heading 6110.</u>

As additional guidance to the trade community, Customs provides even greater specificity regarding Heading 6110 terms than the HTSUS headings and Explanatory Notes. In Customs' Apparel ICP, it incorporates the legal framework regarding the *Rubies Costume II* "some warmth/extreme cold" criterion from caselaw, the HTSUS, and the Explanatory Notes into tangible classification

guidance to importers on the exclusion of articles from classification in Heading 6110 based on this criterion. Customs specifically directs that articles designed with an interior insulating lining made from sherpa, fiberfill, or quilted padding to provide "extra warmth" against the cold are categorically excluded from classification in Heading 6110 <u>solely</u> because of this disqualifying physical characteristic. Customs' use of the term "extra warmth" is important because, given this Court previously found that all apparel, even undergarments, provide some basic level of warmth, the addition of a feature providing "extra warmth" beyond this basic level is a key distinguishing characteristic. *See Victoria's Secret,* 769 F.3d at 1104) (holding that even a brassiere and camisole provide some warmth). According to Customs, actual use in freezing conditions, the sole criterion relied upon by the lower court, is not a factor at all. Customs first adopted this policy in 2000 and has consistently applied it in making classification decisions ever since, including initially classifying The Comfy® outside of Heading 6110 before reversing itself and discarding its own official position to allow for assessment of increased duties against Cozy Comfort.

At trial, Customs' top Heading 6110 specialist, National Import Specialist Renee Orsat, confirmed Customs' policy position and admitted that Customs excludes articles such as The Comfy® from classification in Heading 6110. She then tried to backtrack, however, by claiming Customs can deviate from its own policy

at will to achieve a desired classification with a higher duty rate, as it admittedly did here. The lower court followed suit, completely ignoring the Customs Apparel ICP, Customs' longstanding official interpretation of Heading 6110, Ms. Orsat's admission against interest, and Customs' textile Import Specialist Davies' initial classification of The Comfy® outside of Heading 6110. <u>None</u> of this damaging evidence weighing strongly in favor of Cozy Comfort appears anywhere in the lower court's decision. The lower court's failure to consider Customs' longstanding official Heading 6110 interpretation is particularly glaring given the lower court extensively questioned National Import Specialist Orsat on this very subject.

The lower court's failure to consider Customs' conflicting longstanding policy position and Mr. Orsat's in-court admission against interest, or to reconcile Customs' refusal to follow its own policy in classifying The Comfy® also flies in the face of this Court's binding precedent of affording deference to Customs' official interpretations of the tariff code. The U.S. Supreme Court has held that courts <u>must</u> accord so-called *Skidmore* deference to Customs' official publications and other public interpretations of tariff headings and the terms therein. *See United States v. Mead Corp*., 533 U.S. 218, 235, 121 S. Ct. 2164, 2175–76, 150 L. Ed. 2d 292 (2001) (*citing Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S. Ct. 161, 164, 89 L. Ed. 124 (1944)). In *Goodman*, this Court recognized that "in determining the meaning of this

ambiguous [tariff heading], a reasonable interpretation by the agency that implements it [Customs] is entitled to deference." *Goodman Mfg., L.P. v. United States*, 69 F.3d 505, 510 (Fed. Cir. 1995) (explaining the difference between Customs' presumption of correctness on factual findings and Customs' entitlement to deference for longstanding official legal interpretations). In *Rubies Costume I*, the precursor to *Rubies Costume II*, after applying the *Skidmore* factors, this Court held that Customs' interpretation of a tariff term is "entitled" to deference and deference "must" be afforded by the CIT, and reversed the CIT for not affording such deference. *Rubie's Costume I,* 337 F.3d at 1356 (reversing CIT decision for not affording deference to Customs' official legal interpretation of a tariff term).

More recently, in *Rocknel*, this Court held that courts "must," in fact, they have a "responsibility," to give a level of deference to Customs' interpretation of tariff terms in an official Customs publication such as Customs' Apparel ICP:

> Customs has not issued a regulation regarding construction of the terms "bolt" and "screw" in the tariff schedule. However, Customs' policy of applying the ANSI Specification has been established in Headquarters Ruling Letters dating back more than 16 years…and in **a Customs Service publication, Distinguishing Bolts from Screws (April 1995)**. The rulings and the publication contain **detailed guidance** as to the distinction between bolts and screws, consistent [] with the ANSI Specification. Because the classification in this case is supported by thorough analysis in Customs' publications and decisions, and is consistent with prior interpretations of the pertinent provisions of the HTSUS by Customs over a period of years, the Supreme Court's decision in *Mead* indicates that **Customs' decision to interpret the provisions of HTSUS subheadings** 7318.15.20 and 7318.15.80 according to

the definitions contained in the ANSI Specification **must be accorded some deference by the courts**. As the Supreme Court recognized, the regulatory scheme at issue in this case is highly detailed, and Customs "can bring the benefit of specialized experience to bear on the subtle questions in this case." *Mead*, 533 U.S. at ——, 121 S.Ct. at 2175. For that reason, while we recognize our independent responsibility to decide the legal issue of the proper tariff classification in this case, **we also recognize our responsibility to give some deference to Customs' interpretation as we do so**.

*Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1357–58 (Fed. Cir. 2001) (emphasis added).

This Court's holdings in these cases obligate the CIT to afford *Skidmore* deference to Customs' interpretations of the tariff code. For example, in *Park B. Smith*, this Court concluded that Customs' interpretation was afforded *Skidmore* weight even though it was not presented in a formal ruling or publication because of its consistency with the language of the tariff heading and sound reasoning. *See Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 925 (Fed. Cir. 2003). In *Honda*, this Court afforded deference to Customs' interpretation even though it conflicted with subsequent rulings because it was more comprehensive than the rulings. *Honda of Am. Mfg., Inc. v. United States*, 607 F.3d 771, 775 (Fed. Cir. 2010). In *Intercontinental*, this Court afforded deference to Customs' longstanding interpretation even over the objections of the government because it had more persuasive power than Customs' new interpretation brought forth in the instant

litigation. *Intercontinental Marble Corp. v. United States*, 381 F.3d 1169, 1172–74 (Fed. Cir. 2004).

Under this Court's precedent, the question is not whether the CIT must give Customs' published interpretations deference because it absolutely must give some deference. Rather, the question it only how much deference the CIT must give based on the *Skidmore* factors, with more weight being given to longstanding, consistent, well-supported interpretations, even where they conflict with the government's current litigation position. Here, the trial gave <u>no deference</u> to Customs' longstanding, consistent, well-supported published official position that articles such as The Comfy® with a sherpa lining for extra warmth are excluded from Heading 6110. Despite conducting its own extensive examination of a Customs' top Heading 6110 National Import Specialist specifically on this official interpretation in Customs' Apparel ICP, the lower court inexplicably did not even mention the ICP or this compelling government witness testimony strongly in favor of Cozy Comfort in its written decision.

It is true that courts normally afford *Skidmore* deference to Customs official interpretations issued in publications and rulings at the government's request to support its own litigation position. But courts should equally accord deference when, as here, Customs' prior, decades-old interpretation of the tariff code is diametrically

opposed to its current litigation position and its own witness's affirmative admissions against interest. See *United States v. Mar. Inv. Corp.*, 465 F.2d 434, 435-436 (5th Cir. 1972) (holding that an admission against interest by a competent party witness is equivalent to affirmative testimony for the opposing party sufficient to establish a *prima facie* case in the opposing party's favor). Otherwise, *Skidmore* deference would be reduced to a mere litigation tool for the government, to be used only when it helps, and never when it hurts, the government's litigation position. Here, the lower court not only failed to afford Customs deference, which is required under this Court's binding precedent, but it also did not even acknowledge National Import Specialist Orsat's testimony and Customs' longstanding Heading 6110 interpretation and publication upon which it was required to accord deference.

In sum, the lower court ignored the most probative and salient evidence in the case: Customs' admission against interest that its longstanding official published interpretation of the "some warmth/extreme cold" criterion is directly opposite of its litigation position in this case. The lower court violated this Court's binding precedent by not affording some level of deference to Customs' position. The lower court should have at least acknowledged this evidence and applied the objective standard announced by this Court in *Rubies Costume II*. This evidence of Customs' position, which is consistent with the HTSUS, Explanatory Notes, and case law,

should have resulted in judgment for Cozy Comfort because it affirmatively demonstrates by more than a preponderance of the evidence that The Comfy® is excluded from Heading 6110. The lower court's failure to afford deference to Customs' official position proving Cozy Comfort's case constitutes reversible error.

B.    The Lower Court Erred by Misinterpreting the *Rubies Costume II* Criterion that a Heading 6110 Article Must "Cover the Upper Body" to Mean the Article May Cover the Whole Body.

The lower court also erred in interpreting this Court's *Rubies Costume II* criterion that a Heading 6110 article must "cover[] the upper body." In *Victoria's Secret*, this Court held that upper body coverage means "garment[s] worn **above the waist**." *Victoria's Secret,* 769 F.3d at 1104 (emphasis added). Each of the exemplars in Heading 6110 likewise cover one's upper body above the waist. In fact, one exemplar in Heading 6110, "waistcoats (vests)," makes this point in its name. Here are images of one of the other exemplars, "sweaters," in Fairchild's Dictionary of Fashion which demonstrate that they too cover only one's body above the waist and often have a ribbed waistband that prevents coverage below the vicinity of the waist:



FAIRCHILD'S DICTIONARY OF FASHION (Second Edition, Revised, 1998) p. 561. This common and commercial understanding tracks the dictionary definition of "upper body" as "the part of the body **above the waist**." *See* COLLINS DICTIONARY (https://www.collinsdictionary.com/us/dictionary/english/the-upper-body#google_vignette) (last viewed August 1, 2025) (emphasis added). Given this consistency across Heading 6110, this Court's "covers the upper body" requirement for Heading 6110 embraces two related canons of statutory interpretation: (1) the canon of *noscitur a sociis*, which teaches that a word is "given more precise content by the neighboring words with which it is associated," and (2) the related canon of

*ejusdem generis* that "a 'general or collective term' at the end of a list of specific items" is typically "'controlled and defined by reference to' the specific classes ... that precede it." *See Fischer v. United States*, 603 U.S. 480, 487, 144 S. Ct. 2176, 2183–84, 219 L. Ed. 2d 911 (2024).

The lower court ignored this Court's binding precedent, the heading exemplars and the common and commercial dictionary definition of "upper body" as above the waist. Instead, despite specific direction from this Court, the lower court held that Heading 6110 is <u>not</u> limited to "upper body garments." Appx67. The lower court held to the contrary that "oversized" articles of Heading 6110 can cover more than the upper body well below the waist to any length on the lower body without limitation. *Id*.

To be clear, as the lower court observed, an article can extend slightly below the waist and still "cover the upper body" if the additional coverage is "incidental" and does not "substantially exceed" the waistline limitation for upper body garments. Appx68. Indeed, Customs incorporated this concept in its Apparel ICP, interpreting Heading 6110 to apply to articles that cover "as far as the mid-thigh or slightly below the mid-thigh." And in *Rubies Costume II*, for example, this Court classified a Santa Suit that extended just below the waist under Heading 6110.

However, in this case, as the lower court conceded, "The Comfy® falls around a typical user's knees," and covers down to the lower court's own knees. Appx21, Appx67. This near-full-body coverage like a dress or robe (which, the patents show, is by design, not incidental) is substantially in excess of both the waist and the mid-thigh areas. This is significantly more coverage than *slightly* below the waist because it extends far enough downward that, unlike an upper body garment such as a pullover, it restricts leg movement and allows a person to wear it without wearing a companion lower body garment. However, under the lower court's flawed interpretation of the "covers upper body" criterion, there is no coverage limitation and virtually any article of any length, including a dress or robe, is potentially classifiable alongside sweaters and vests in Heading 6110. This interpretation is erroneous because it would violate the canons of *noscitur a sociis* and *ejusdem generis,* "render meaningless" this Court's "covers the upper body" criterion, and lead to absurd results. *See Fischer,* 603 U.S. at 487, 144 S. Ct. at 2183–84.

In sum, the lower court's erroneous interpretation of the *Rubies Costume II* standard effectively eliminates this Court's "covers the upper body" criterion by deciding it does not mean the article covers *only* the upper body. This flawed interpretation must be rejected because it renders a portion of this Court's legal test

meaningless. Accordingly, the lower court's misinterpretation of this Court's "covers the upper body" criterion is reversible error.

C.   The Lower Court Erred by Misinterpreting the *Arnold* Criterion that an Article of Apparel is "Ordinarily Worn—Dress in General" by Failing to Consider Whether The Comfy® is Generally "Worn or Recognized as an Article of Dress."

The lower court held that "The Comfy® is ordinarily worn because users wear it in a variety of everyday, commonplace situations." Appx61. In doing so, the lower court incorrectly only analyzed the first criterion of the *Arnold* test; whether the article is "ordinarily worn—dress in general." Many articles that are not "apparel" of Chapter 61 are ordinarily worn on the body in a variety of everyday, commonplace situations, such as shoes (Chapter 64), hats, (Chapter 65), jewelry (Chapter 71), eyeglasses (Chapter 90), and wristwatches (Chapter 91). Without the second criterion of the test, which is whether the article is "worn or recognized *as an article of dress*," each of these non-apparel articles would qualify as apparel under *Arnold*.

The same logic applies to The Comfy®, which is worn in a commonplace way, but <u>not</u> as an article of dress. The trial evidence shows most people wearing The Comfy® in a solitary position at home (where blankets are most commonly used), at a sporting event (where it is common to bring a blanket), by a campsite (where blankets are ubiquitous), for warmth, with perhaps a brief interlude to check the mail or grab food, but <u>not</u> generally in public for work, engagements, or recreation, as a

person would wear articles of dress. Appx2259. There is no evidence in the record of people wearing The Comfy® in public as a type of clothing, such as a sweater to work, a pullover to a restaurant, or a sweatshirt to the gym. No one wears The Comfy® as clothing in this way because they would look ridiculous, feel uncomfortably extra warm, and be unable to effectively move or function. Rather, people ordinarily wear The Comfy® while lounging as a thick, warming whole-body blanket, not an identifiable type of clothing. Here is a photograph of a customer wearing The Comfy® as designed to cocoon for warmth on the couch:



Appx2259.

Further, The Comfy® is not generally recognized in the textile industry as an article of dress. Rather, the USPTO categorizes The Comfy® as a blanket, Cozy

Comfort packages The Comfy® as a blanket, online and brick-and-mortar stores sell The Comfy® as a blanket, and major retailers and licensors like Disney, Marvel, the NHL, and the New York state government license The Comfy® as a blanket. Appx25-Appx26, Appx29-Appx30. There is <u>no evidence</u> in the record that the textile industry recognizes The Comfy® as a pullover or other article of dress.

In *Rubies Costume I*, this Court held that while articles may "simulate the structural features of wearing apparel," and have "some incidents of clothes or coverings for the human body worn for decency or comfort," they are not "apparel" if they are not "practical" to wear as clothing. *Rubie's Costume I,* 337 F.3d at 1358. Here, The Comfy®'s primary value is as a warming blanket, and the evidence at trial from both the government's and Cozy Comfort's expert witnesses was that it is too thick, bulky, long, warm, and voluminous to wear in public as clothing without serious discomfort and embarrassment. Appx1967-Appx1968. Indeed, even the lower court concedes that, unlike typical clothing, The Comfy® is primarily designed for warmth while lounging on the couch at home or in a solitary position outdoors, like a blanket. Appx19. Accordingly, to the extent that The Comfy®'s "elements have any characteristics similar to 'wearing apparel' to consumers" of wearable blankets, "such features are clearly secondary to" The Comfy®'s value as a warming,

cocooning blanket because it would be impractical and unrecognizable to wear it as a type of clothing. *Cf Rubie's Costume I*, 337 F.3d at 1358.

In sum, by omitting the U.S. Supreme Court's criterion in *Arnold* that the article be generally worn or recognized by the public *as an article of dress*, the lower court materially misinterpreted the *Arnold* legal standard for apparel. If the lower court had properly interpreted the *Arnold* test, it would have found The Comfy® is not a pullover of Heading 6110 or any type of apparel of Chapter 61 because The Comfy® is <u>not worn or recognized an article of dress</u>, and certainly not as a pullover. The lower court's misinterpretation of the *Arnold* test is reversible error.

D.    <u>The Lower Court Erred by Misclassifying The Comfy®—Which has a Sherpa Lining for Extra Warmth, Covers to the Knees, and is Not an Article of Dress—as a Pullover of Heading 6110 Rather than a Blanket of Heading 6301.</u>

As a result of the lower court's misinterpretation of the *Rubies Costume II* and *Arnold* legal standards, it erroneously misclassified The Comfy® as a pullover instead of a blanket. There are no disputes as to the physical characteristics of The Comfy® so this Court reviews the lower court's classification decision *de novo*. This Court's *de novo* application of the *Rubies Costume II* and *Arnold* legal standards will show The Comfy® is excluded from classification as a pullover of Heading 6110 and is properly classified as a blanket of Heading 6301 or an "other garment" of Heading 6114.

The HTSUS scheme "is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category." *Wilton Indus., Inc. v. United States*, 741 F.3d 1263, 1266 (Fed.Cir.2013). The correct classification of merchandise entering the U.S. is governed by the HTSUS GRIs. *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed.Cir.1998). This Court, like the CIT, applies the GRIs sequentially in numerical order, beginning with GRI 1. *La Crosse Tech. v. United States*, 723 F.3d 1353, 1358 (Fed.Cir.2013).

GRI 1 provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." *Id.* Where an "imported article is described in whole by a single classification heading or subheading, then that single classification applies, and the succeeding GRIs are inoperative." *Id*. This Court considers a HTSUS heading or subheading an *eo nomine* provision when it describes an article by a specific name. *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed.Cir.2011). Absent an indication of legislative intent to the contrary, an *eo nomine* designation without terms of limitation includes all forms of the article. *See Lynteq, Inc. v. United States,* 976 F.2d 693, 697 (Fed.Cir.1992). If an

article is not specifically and completely described in a heading or subheading, the Court must proceed to subsequent GRIs in order. *La Crosse*, 723 F.3d at 1358.

Here, The Comfy® has an insulated, padded, approximately one-inch thick sherpa interior lining and covers one's body substantially below the waist down to the knees, which are physical characteristics that categorically exclude it from classification in Heading 6110 under the proper application of this Court's precedential *Rubies Costume II* test. Further, The Comfy® is neither worn by the public, nor recognized by the textile industry, as an article of dress, so it is not classifiable as apparel in other heading in Chapter 61 under the proper application of the Supreme Court's precedential *Arnold* test. Accordingly, under GRI 1, The Comfy® can thus be classified in Chapter 63, which covers other made up textiles not classifiable in Chapter 61, if it falls within the terms of a Chapter 63 heading.

The Comfy® is classified as a blanket of Heading 6301 under GRI 1 because The Comfy® meets the common and commercial definition of blanket and it is designed, intended to be used, and marketed as a blanket. First, The Comfy® meets the CIT's definition of blanket in *Allstar* because it is "a large (possibly oblong) piece of fabric" that is "used as a covering for warmth." *Allstar,* 211 F. Supp. 3d at 1336. The lower court determined The Comfy® may not meet this definition because it its fabric is "sewn shut" around the body rather than remaining a flat, uninterrupted

sheet of fabric. Appx75. However, this artificial limitation appears nowhere in the headings, *Allstar* case, or dictionary definitions of blanket. To the contrary, one reputable dictionary definition of blanket that was accepted by the government's expert, Ms. Ferro, specifically describes a blanket covering a person all the way around the body like a loose outer garment. Appx1548. Further, Customs has issued numerous rulings holding that blanket-like sleep sacks, including wearable baby blankets designed to prevent sudden infant death syndrome (SIDS), which are sewn shut around the body like The Comfy®, are classified in Chapter 63, not Chapter 61. *See* N302193 (2019) (hooded blanket); H243928 (2017) (sleep sacks); N284761 (2017) (sleeping bag liner/sleep sack with carry bag); N116516 (2010) (combination jacket/tent/sleep sack); N012720 (2007) (sleep sack). Finally, as with its analysis of The Comfy® under Chapter 61, in deciding The Comfy® is not classifiable as a blanket of Heading 6301, the lower court erroneously analyzed The Comfy® using a "principal use," not *eo nomine*, analysis. As the CIT has held, The Comfy®'s purported actual use is irrelevant to whether it is classified in Heading 6301 because this is an *eo nomine* provision with no implication of use in the text of the heading ("Blankets and traveling rugs"). Given The Comfy® meets the common definition of the term blanket in Heading 6301, which it does, it is classifiable there under GRI 1

unless another more specific heading also applies, in which case the Court must progress sequentially to GRI 3.

Second, even if the *GRK Canada, Ltd. v. United States*, 761 F.3d 1354 (Fed. Cir. 2014) "use factors" are applicable, as the lower court held, based on the lower court's own factual findings, The Comfy® is classifiable as a blanket because it has the physical characteristics, design, intended use, and marketing of a blanket, <u>not</u> a pullover. The lower court concedes USPTO-approved patents and trademarks demonstrate that Cozy Comfort and the federal government consider The Comfy® to be designed and intended to be a "blanket/throw." Appx8-Appx9. In contrast, the term "pullover" is not found anywhere in these USPTO patent or trademark records (or any marketing other documentary evidence at trial for that matter). The lower court also acknowledges that users "primarily wear The Comfy® during indoor lounging activities like sitting or lying on the couch while watching television…the types of situations one might use a blanket." Appx65. Further, the lower court concedes that evidence of people wearing The Comfy® while seated or reclining on a couch or bed, or outside cheering a sports team" demonstrates intended and actual use as blanket. Appx64-Appx65, Appx70. In contrast, there was <u>no evidence</u> presented at trial showing people using The Comfy® in public as a pullover or similar article of clothing. The lower court also found that "The Comfy® was sold in a box"

"in stores' bedding or blanket sections" and that licensing "[a]greements with companies like Disney categorize the product as a "wearable throw[]… [or] blanket." Appx30, Appx70.

Therefore, even taking the "use factors" into account, the overwhelming evidence demonstrates The Comfy® is properly classified as a blanket in Subheading 6301.40.4020, which provides for "Blankets (other than electric blankets) and traveling rugs, of synthetic fibers; Other." If this Court nonetheless determines The Comfy® is classifiable at a recognized type of clothing in Chapter 61, however, the only applicable alternative classification is Subheading 6114.30.3070, which provides for "Other garments, knitted or crocheted; Of man-made fibers; Other; Other; Women's or girls'" because Note 8 to Chapter 62 provides that that unisex apparel is classified under the provisions for women's garments. The lower court's erroneous misclassification of The Comfy® as a pullover must be reversed.

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

The lower court erred by misinterpreting precedential legal standards for the classification of articles in Heading 6110 and Chapter 61. First, the lower court misinterpreted this Court's criterion in *Rubies Costumes II* that a Heading 6110 article "provide some warmth but not protect against…extreme cold" to mean the article must not be capable of being used to withstand *freezing temperatures*. Instead,

this Court's criterion means that a Heading 6110 article must not have an *insulating layer of materials designed for extra warmth*. Second, the lower court misinterpreted this Court's criterion in *Rubies Costumes II* that a Heading 6110 article "cover the upper body" to mean the article may cover beyond the upper body to any length like a dress or robe. Instead, this Court's criterion means a Heading 6110 article must cover *only* the upper body to the waist or slightly below. Finally, the lower court misinterpreted the Supreme Court's criterion in *Arnold* that an article of apparel be "ordinarily worn—dress in general" to mean the article must be *frequently worn in a variety of commonplace situations*. Instead, the Supreme Court's criterion means an article of apparel must be generally "worn or recognized *as an article of dress*." The lower court's three material misinterpretations of binding precedent are each separate legal errors that independently warrant reversal.

The lower court also erred by misapplying its erroneous legal standards to its classification of The Comfy®. If the lower court had applied the proper precedential legal standards, it would have concluded The Comfy® is: (1) excluded from Heading 6110 because it has a sherpa lining for extra warmth and/or covers more than the upper body to the knees; (2) not apparel of Chapter 61 because it is known as a blanket and not ordinarily worn or recognized as an article of dress; and (3) properly classified as a blanket of Heading 6301 because it meets the common and

commercial definition of blanket, has the physical characteristics of a blanket, is designed and intended to be used as a blanket, is packaged, marketed, licensed, and sold as a blanket, and is actually used as a blanket. The lower court's misclassification of The Comfy® as a pullover of Heading 6110 instead of a blanket of Heading 6301, or, alternatively, an "other garment" of Heading 6114, is also reversible error.

Appellant seeks the following relief from this Court:

1.     Reverse the CIT's judgment in favor of the government;

2.     Enter a judgment in favor of Cozy Comfort;

3.     Order that The Comfy® is classified as a blanket under Subheading 6301.40.4020, or, alternatively, if this Court concludes The Comfy® is a type of apparel, as an "other garment" under Subheading 6114.30.3070.

4.     Award appellant such other relief as this Court deems appropriate.

Dated: August 26, 2025,  Los Angeles, California.

Respectfully submitted,

STEIN SHOSTAK SHOSTAK POLLACK & O'HARA, LLP
Christopher J. Duncan
Elon A Pollack
Attorneys for Plaintiff, Cozy Comfort LLC
445 S. Figueroa Street, Suite 2388
Los Angeles, California 90071
Telephone: (213) 630-8888
By     //Christopher J. Duncan//

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-1889

**Short Case Caption:** COZY COMFORT COMPANY LLC v. U.S.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[x] the filing has been prepared using a proportionally-spaced typeface and includes 12,553 words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: August 26, 2025

Signature: _____

Name: Christopher J. Duncan, Esq.

**ADDENDUM**

**Pursuant to Federal Circuit Rule 28**

# TABLE OF CONTENTS TO ADDENDUM

| Docket Entry | Description | Page(s) |
|---|---|---|
| 118 | *Cozy Comfort Company, LLC. v.United States*, Slip Op. 25-75 (Ct. Int'l Trade 2025) Filed June 16, 2025 | Appx0001 |
| 119 | Judgment Order, Filed June 16, 2025 | Appx0078 |
| | HTSUS GENERAL RULE OF INTERPRETATION 1 | ADD1 |
| | HTSUS GENERAL RULE OF INTERPRETATION 3 | ADD1 |
| | HTSUS SUB-HEADING 6104.62.1010 | ADD3 |
| | HTSUS HEADING 6110 | ADD5 |
| | HTSUS HEADING 6114 | ADD14 |
| | HTSUS HEADING 6301 | ADD18 |
| | HTSUS CHAPTER 62 NOTE 8 | ADD19 |
| | HTSUS CHAPTER 63 NOTE 2 | ADD21 |
| | HTSUS EXPLANATORY NOTES TO 6110 | ADD22 |
| | Customs Ruling HQ H243928 (2017) | ADD23 |
| | Customs Ruling NY N012720 (2007) | ADD27 |

# TABLE OF CONTENTS TO ADDENDUM

**Docket
Entry**   **Description**                                                          **Page(s)**

Customs Ruling NY N116516 (2010)........................................ADD29

Customs Ruling NY N160104 (2011)........................................ADD31

Customs Ruling NY N258001 (2014)........................................ADD33

Customs Ruling NY N284761 (2017)........................................ADD36

Customs Ruling NY N302193 (2019)........................................ADD38

Customs Ruling NY N345888 (2025)........................................ADD39

Slip Op. No. 25-75

## UNITED STATES COURT OF INTERNATIONAL TRADE

COZY COMFORT COMPANY, LLC,

*Plaintiff,*

v.

UNITED STATES,

*Defendant.*

Before: Stephen Alexander Vaden, Judge

Court No. 1:22-cv-00173 (SAV)

## FINDINGS OF FACT & CONCLUSIONS OF LAW

[Resolving disputed facts about the subject merchandise, called The Comfy®, and concluding that The Comfy® is a pullover classifiable under Heading 6110 and Subheading 6110.30.30]

Dated: June 16, 2025

*Christopher J. Duncan* and *Elon A. Pollack* of Stein Shostak Shostak Pollack & O'Hara, of Los Angeles, CA, for Plaintiff Cozy Comfort Company, LLC. With them on the brief were *Gregory P. Sitrick*, *Isaac S. Crum*, and *Sharif S. Ahmed* of Messner Reeves LLP, of Phoenix, AZ, and *Robert H. Dunikoski II* of Castenda and Heidelman LLP, of Dallas, TX.

*Brandon A. Kennedy*, Trial Attorney, and *Beverly A. Farrell*, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for Defendant United States. With them on the brief were *Justin R. Miller*, Attorney-In-Charge, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Michael A. Anderson*, General Attorney, Office of the Assistant Chief Counsel, U.S. Customs and Border Protection.

**Vaden, Judge**:    Cozy Comfort Company, LLC (Cozy Comfort) created a

novel product called The Comfy®, which combines the features of an ordinary throw

blanket with those of an oversized pullover.  The Comfy® is made abroad so that it must be imported into the United States before it is sold to American consumers. Importing The Comfy® presented Cozy Comfort and the United States Government with a problem.  All goods entering the United States must be classified according to the Harmonized Tariff Schedule of the United States (HTSUS) before import duties can be assessed.  The HTSUS is not updated to account for every novel product on the market; it speaks in more general terms about broader categories of products. Importing The Comfy® thus demanded an answer to a classification question:  Is The Comfy® a blanket, a pullover, or something else?

Cozy Comfort brought this lawsuit because it believes U.S. Customs and Border Protection (Customs) answered that question incorrectly.  Customs classified The Comfy® under Subheading 6110.30.30, HTSUS, which covers sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles.  Cozy Comfort contends The Comfy® should be classified under a tariff heading for blankets instead, or in the alternative, under one of two other tariff headings.  The Court conducted a five-day bench trial to resolve lingering factual disputes about The Comfy®.  Based on the following findings of fact, the Court concludes that the Government is correct.  The Comfy® is a pullover classifiable under 6110.30.30, HTSUS.

## BACKGROUND

### I.    Procedural History

Cozy Comfort first imported The Comfy® in January 2018.  *See* Trial Tr. vol. I at 72:17–20, ECF No. 108 (direct testimony of Mr. Speciale).  The company listed the

product as a blanket under Subheading 6301.40.00, HTSUS, on its customs forms and paid the associated duties. *See* Pre-Trial Order, Schedule C ¶ 32 (Jt. Uncontested Facts), ECF No. 107. On March 9, 2020, however, Customs reclassified The Comfy® as a pullover under Subheading 6110.30.30, HTSUS. *See id.* Cozy Comfort responded by filing its first protest with Customs on August 26, 2020. *See id.* ¶ 33. Customs issued Ruling H313594 on May 21, 2021, to resolve the protest. *See id.* ¶ 35. That ruling continued to find The Comfy® should be classified as a pullover under Subheading 6110.30.30, HTSUS. *See id.*

While Customs reviewed Cozy Comfort's first protest, Cozy Comfort imported a new shipment of The Comfy® under Entry No. 442-9233932-0 on January 6, 2021. *See id.* ¶ 34. Cozy Comfort classified the products in that entry as pullovers under Subheading 6110.30.30, HTSUS, as Customs directed. *See id.* This January 2021 shipment is the shipment at issue in this case. *See id.* ¶¶ 34–35. On May 20, 2022, Cozy Comfort timely filed another protest contesting Custom's liquidation of the January 2021 shipment at the higher tariff rate for pullovers. *See id.* ¶ 38. Customs denied that protest on May 31, 2022. *See* Compl. ¶ 24, ECF No. 6.

Cozy Comfort filed the present lawsuit challenging both the May 31, 2022 protest denial and the underlying Customs Ruling supporting it.[1] *See id.* ¶¶ 22–27. The Government moved for summary judgment after discovery concluded. *See* Def.'s Mot. for Summ. J., ECF No. 28. The Court denied the Motion, finding issues of

---

[1] Before this litigation, Cozy Comfort filed an earlier lawsuit in the Court of International Trade challenging Customs' denial of its first protest; but it voluntarily dismissed that lawsuit without prejudice. *See Cozy Comfort Co. v. United States*, Ct. No. 1:21-cv-00404, ECF Nos. 17–18.

material fact remained.  *See* Order, ECF No. 47.  The Court ordered a trial to determine the proper classification of The Comfy® and expressed it was "particularly interested in hearing evidence about three matters: (1) whether The Comfy® protects against extreme cold, (2) how The Comfy® compares to [a similar product,] the Snuggie®, and (3) the use factors identified in [the Federal Circuit's] *GRK Canada* [customs classification opinion] and applied [by the Court of International Trade] in *Allstar Marketing*."  *See* Order at 5, ECF No. 48.

The Court's trial order noted that classifying The Comfy® would require applying the Federal Circuit's legal framework from *Rubies Costume Co. v. United States* (*Rubies Costume II*), 922 F.3d 1337 (Fed. Cir. 2019).  *See* Order at 3–4, ECF No. 48.  *Rubies Costume II* addressed whether a Santa Suit jacket fell under Heading 6110 and Subheading 6110.30.30, HTSUS.  922 F.3d at 1345–46.  The Federal Circuit explained that items in Heading 6110 share certain characteristics: They "cover[] the upper body[,]" are worn "over either undergarments or other clothing[,]" "provide[] some warmth to the wearer[,]" but "do[] not protect against wind, rain, or extreme cold."  *Id.*  These characteristics govern whether The Comfy® can be classified as a pullover under Heading 6110, as the Government requests.  *See* Order at 3–4, ECF No. 48.

The parties filed a proposed pre-trial order listing key information, including uncontested facts, claims and defenses, damages and other relief requested, triable issues, proposed witnesses, and proposed exhibits.  *See* Proposed Pre-Trial Order at 1–3, ECF No. 52.  The Court then held a pre-trial conference to discuss this filing.

*See* Tr. of Pre-Trial Conf., ECF No. 64.  Both parties indicated that they had objections to the other side's proposed exhibits and witnesses.  *See id.* at 67:16–68:4.  The Court set a schedule to hear motions *in limine* on those objections.  *See* Order, ECF No. 58.

The parties filed four Motions.  Cozy Comfort filed a motion *in limine* to exclude the testimony of Patricia Concannon, the Government's fashion marketing expert. *See* Pl.'s First Mot. in Lim., ECF No. 54.  It also filed a motion *in limine* to exclude the testimony of Renee Orsat, a national import specialist at Customs who helped classify The Comfy®.  *See* Pl.'s Second Mot. in Lim., ECF No. 60.  Cozy Comfort did not move to exclude testimony from Professor Mary Ann Ferro, the Government's garment design expert.  The Government filed a motion *in limine* to exclude the testimony of James Crumley, Plaintiff's garment design expert.  *See* Def.'s Second Mot. in Lim., ECF No. 62.  It also filed a motion to exclude certain proposed exhibits. *See* Def.'s First Mot. in Lim., ECF No. 61.  The Court held a hearing on these Motions on October 11, 2024.  *See* ECF No. 80.  It then issued an Order that granted in part Cozy Comfort's two motions *in limine*, denied the Government's motion *in limine* regarding Mr. James Crumley, and reserved ruling on the Government's exhibit-based motion until trial.  *See Cozy Comfort Co., LLC v. United States*, 48 CIT __, Court No. 1:22-cv-00173, 2024 Ct. Intl. Trade LEXIS 115 (Oct. 15, 2024).

The Court held a bench trial from October 21 to October 25, 2024, to decide whether Customs properly classified The Comfy®.  *See* Trial Tr. vols. I–V, ECF Nos. 108–112.  The Court heard testimony from witnesses and considered objections from the parties.  In some instances, the Court struck legally impermissible testimony and

evidence from the record.[2]  The parties submitted proposed findings of fact and conclusions of law after the trial ended.  *See* Pl.'s Proposed Findings of Fact and Conclusions of Law (Pl.'s Br.), ECF No. 114; Def.'s Proposed Findings of Fact and Conclusions of Law (Def.'s Br.), ECF No. 116.

## II.    Stipulated Facts

The Court outlined the uncontested facts in its Pretrial Order.  *See* Jt. Uncontested Facts, ECF No. 107.  The parties stipulated to these facts in their pretrial filings.  *See id.*  These facts establish basic details about The Comfy®'s design, physical characteristics, use, and marketing.  The following stipulated facts are relevant to the issues in this case.

In February 2017, two brothers, Michael Speciale and Brian Speciale, invented The Comfy®.  *See id.* ¶ 19.  A picture of The Comfy® from the box in which it is sold is depicted below.  The product was "inspired by a men's [extra-large] hooded sweatshirt and a sherpa blanket."  *Id.* ¶ 3.  To produce, market, and sell The Comfy®, the two brothers founded Cozy Comfort in April 2017.  *See id.* ¶ 20.  Cozy Comfort manufactures The Comfy®, also known as "The Comfy® Original," in the People's Republic of China.  *Id.* ¶¶ 1–2.

---

[2] In formulating this opinion, the Court gave no consideration to any testimony it struck from the record at trial because of that testimony's legally impermissibility.  This included stricken testimony that (1) the Government erroneously introduced about settlement discussions and (2) the Government erroneously elicited from an expert witness that went beyond the scope of the witness's expert report.  Even if the Court had not stricken and ignored this testimony on the specific evidentiary grounds noted, it would have disregarded the testimony as unduly prejudicial under Federal Rule of Evidence 403.



*See* Ex. P-1 (The Comfy® and its accompanying box).

The Comfy® is made "using two separate knitted fabrics: a microfiber fabric (microfleece) for the exterior and a sherpa fabric for the interior that provides extra warmth to the user." Jt. Uncontested Facts ¶ 5, ECF No. 107; *see also id.* ¶ 4. These fabrics are "100% man-made fibers, specifically polyester." *Id.* ¶ 4. The Comfy® has an "opening for the head, a hood, long sleeves, ribbed wrist cuffs, a wide, un-ribbed, hemmed bottom opening, and a frontal marsupial or kangaroo pocket." *Id.* ¶ 6. It is intended to be worn over clothes or undergarments. *See id.* ¶ 11. It does not protect users from rain or wind. *See id.* ¶ 13.

The Comfy® is reversible and comes in one-size regardless of gender. *See id.* ¶¶ 8, 9, 14. The front panel of The Comfy® measures "approximately 36 inches wide and 33 inches long from the bottom of the neck hole to the bottom of the panel." *Id.*

¶ 7. The back panel of The Comfy® measures "approximately 36 inches wide and 41 inches long from the bottom of the neck hole to the bottom of the panel." *Id.*

Cozy Comfort has numerous design patents for The Comfy®. On September 19, 2019, the U.S. Patent and Trademark Office (USPTO) issued Design Patent No. D859,788 to Cozy Comfort for an "ENLARGED OVER-GARMENT WITH AN ELEVATED MARSUPIAL POCKET." *Id.* ¶ 26. That patent refers to the product as an "enlarged over-garment" and does not describe the product as a blanket. *Id.* ¶ 27. On September 24, 2019, USPTO issued Patent No. 10,420,431 to Cozy Comfort for an "OVERGARMENT WITH AN ELEVATED MARSUPIAL POCKET." *Id.* ¶ 28. In that patent, Cozy Comfort described the invention as relating to blankets or large, wearable blankets, and the product was referred to as a "garment" or an "overgarment" throughout the patent. *Id.* ¶ 29. No patents for The Comfy® "include a description that it is for 'protection against extreme cold.'" *Id.* ¶ 31. On November 15, 2022, after the start of the present tariff classification dispute, USPTO issued Design Patent No. D969,458 to Cozy Comfort for a "WHOLE BODY BLANKET." *Id.* ¶ 40.

Cozy Comfort has marketed The Comfy® in different ways. It has been described as a "blanket that's a sweatshirt," "a giant blanket that's really a giant sweatshirt," and "The Blanket … That's A Sweatshirt." *Id.* ¶ 15. Cozy Comfort has also marketed the product as a "wearable blanket," noting that The Comfy® allows users who wear it to perform activities that an ordinary blanket would not allow. *Id.* ¶¶ 16–17.

Cozy Comfort designed a logo to help market the product. *See id.* ¶ 22. The logo featured "an image of a standing panda bear wearing a hooded sweatshirt to the left of the words 'THE COMFY' all of which is above the words 'THE BLANKET … THAT'S A SWEATSHIRT!'" *Id.* On February 19, 2019, USPTO registered Trademark No. 5,678,126 to Cozy Comfort for that logo, noting that it fell under "Class 24, 'Blanket throws, namely whole body blankets,'" and "Class 35, 'On-line retail store services featuring blanket throws, namely whole body blankets[.]'" *Id.* ¶ 24. The logo is depicted below.



*See* Ex. P-4.

**JURISDICTION AND STANDARD OF REVIEW**

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(a) because Cozy Comfort contests Customs' denial of its protest against the tariff classification of its merchandise. 28 U.S.C. § 1581(a) ("The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part …."). The Court reviews Customs' denial of Cozy Comfort's protest *de novo. See Rheem Metalurgica S/A v. United States*, 20 CIT 1450, 1456 (1996), *aff'd*, 160 F.3d 1357, 1358 (Fed. Cir. 1998). Although Customs' decision is presumed

correct and "[t]he burden of proving otherwise shall rest upon the party challenging

such decision," 28 U.S.C. § 2639(a)(1), the Court's "duty is to find the *correct* result."

*Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) (Wisdom, J.).  In

a bench trial, the Court acts as the fact finder and weighs the evidence to reach a

determination.  *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 833

(Fed. Cir. 2010) ("As the fact finder in the bench trial, the judge is responsible for

deciding what evidence to credit or reject and what result to reach.").

## FINDINGS OF FACT

The Court makes the following findings of fact based on non-stricken testimony

given during a five-day bench trial, a review of all the evidence entered pursuant to

the Federal Rules of Evidence during that trial, and the Court's own *in camera* review

of The Comfy®.

### I.    Overview of Witnesses and Their Testimony

Cozy Comfort presented the testimony of three people at trial.  First, the Court

heard testimony from Mr. Michael Speciale, the co-founder of Cozy Comfort and co-

creator of The Comfy®.  *See* Trial Tr. vol. I at 61:20–64:2, ECF No. 108.  Second, the

Court heard from Mr. James Crumley, an outdoorsman and garment designer who

served as Cozy Comfort's expert witness.  *See* Trial Tr. vol. II at 559:17–22, ECF No.

109; *id.* at 562:10–579:7.  Third, the Court heard testimony from Customs employee

Ms. Tatiana Matherne's Rule 30(b)(6) deposition on behalf of the United States, which

Cozy Comfort read into the record.  *See* Trial Tr. vol. III at 717:20–25, 724:11–725:25,

ECF No. 110.  A Rule 30(b)(6) witness offers testimony "on behalf" of a non-human

party to the case.  Fed. R. Civ. P. 30(b)(6) (Notes of Advisory Committee on Rules –

1970 Amendment).

The Government presented the testimony of four people at trial.  First, the

Court heard live testimony from Ms. Renee Orsat, a national import specialist at

Customs who helped classify The Comfy®.  *See* Trial Tr. vol. III at 747:18–749:9, ECF

No. 110.  Second, the Court heard live testimony from Ms. Patricia Concannon, an

expert witness and experienced clothing marketing professional.  *See id.* at 837:21–

843:3.  Third, the Court heard live testimony from Professor Mary Ann Ferro, an

expert witness and an experienced garment designer.  *See id.* at 914:7–925:2.  Fourth,

the Court heard testimony from Mr. Speciale's Rule 30(b)(6) deposition on behalf of

Cozy Comfort, which the Government read into the record.  *See* Trial Tr. vol. IV at

1164:20–1165:18, 1169:6–16, ECF No. 111.

Cozy Comfort's principal witness, Mr. Speciale, provided a detailed

explanation of how he and his brother invented The Comfy®.  *See* Trial Tr. vol. I at

61:20–65:6, ECF No. 108.  Mr. Speciale testified that he invented The Comfy® while

living with his brother Brian Speciale.  *See id.* at 61:20–63:15.  Mr. Speciale conceived

of The Comfy® one morning when he saw his young "[seven]-year-old" nephew

"wearing one of [Brian Speciale's] old hoodies" while lying next to a sherpa-lined,

microfleece throw blanket.  *Id.* at 62:8–11; *see id* at 61:20–63:15.  Brian Speciale was

"six [foot] one" and "about 200 pounds," so that his sweatshirt was oversized on

Michael Speciale's nephew.  *Id.* at 62:11–13.  Inspired by this scene, Mr. Speciale

decided to combine an oversized sweatshirt and a throw blanket to create a new

product for adults. *Id.* at 63:21–22. To make the first prototype, he bought blankets and took them to a prototype design company to put together the first sample, which "was fairly close to what [they] wanted." *Id.* at 64:7–22. Mr. Speciale also discussed various patent and trademark exhibits that the Court accepted into evidence. *See, e.g.*, *id.* at 85:10–88:1 (describing Ex. P-4); Exs. P-3, P-4, P-5, P-6, P-8, P-9. These aspects of Mr. Speciale's testimony were credible, persuasive, and undisputed by the Government.

    Other aspects of Mr. Speciale's testimony spoke to factual issues disputed by the parties. Mr. Speciale explained how he and his brother sought to market the product to consumers and how they sold The Comfy® in various stores and online retail sites. *See* Trial Tr. vol. I at 88:7–89:25, 151:18–166:17, ECF No. 108. This explanation sought to portray The Comfy® as being sold like a blanket. *See, e.g.*, *id.* at 88:12–16 (MR. SPECIALE: "[I]t is always a blanket first[.]"). Mr. Speciale also testified about how Cozy Comfort launched The Comfy® on the TV show *Shark Tank*, and the Court accepted a video of that appearance into evidence. *See id.* at 71:21–72:20, 73:14–24; Ex. D-27. That video showed Cozy Comfort's initial marketing strategy, which described The Comfy® as "the blanket that's a sweatshirt" and sought to distinguish it from a well-known existing product, The Snuggie®. *See* Ex. D-27 at 0:43–46, 1:30–33, 6:32–49. The Court finds that Mr. Speciale's characterization of The Comfy®'s marketing was undermined by other evidence in the record and was less persuasive than related testimony from Professor Ferro and Patricia Concannon.

Mr. Speciale also spoke about physical characteristics that he believed The Comfy® possessed. *See, e.g.*, Trial Tr. vol. I at 94:5–96:6, ECF No. 108; *id.* at 57:12–15. He repeatedly referred to The Comfy® as a "wearable blanket." *See, e.g., id.* at 132:18. Mr. Speciale claimed the product was "designed … so you can pull your knees in, pull your arms in and get into the full cocoon position[,]" which he demonstrated in Court. *Id.* at 57:13–15, 94:5–96:6. Mr. Speciale and other witnesses referred to this position as "The Comfy® cocoon." *Id.* at 57:15–16. Mr. Speciale also asserted that The Comfy® "will protect [a user] from extreme cold," especially when used in the cocooning position. *Id.* at 130:6–12; *see id.* at 132:12–133:4. Mr. Speciale testified that Cozy Comfort's customers used the product in the extreme cold, and the Court accepted various photographs of customers using The Comfy® into evidence. *See id.* at 134:8–145:17; Ex. P-13. The Court, however, found that these portions of Mr. Speciale's testimony were contradicted by other evidence in the record and were less persuasive than testimony from Professor Mary Ann Ferro and Patricia Concannon.

Cozy Comfort's expert witness, Mr. James Crumley, is an avid, lifelong outdoorsman who uses this expertise to help companies design hunting garments. *See* Trial Tr. vol. II at 559:20–22, 572:12–23, ECF No. 109. Mr. Crumley testified that he grew up "outdoors … fishing, hunting[,] and [playing] sports" from a young age and that he began working as a hunting guide after college. *Id.* at 563:10–11, 565:3–25; *see also id.* at 563:14–20, 566:1–11. During his work as a hunting guide, Mr. Crumley decided to invent new "camo[uflage] patterns that blend in with the surroundings in the United States[.]" *Id.* at 568:11–13. The pattern he invented,

Trebark®, became a commercial success; and Mr. Crumley started helping companies design garments that used this pattern. *See id.* at 572:12–23. Mr. Crumley's garment design work involved applying his "experience of being in the woods" to ensure products were suitable for hunters. *Id.* at 578:12.

Mr. Crumley's testimony primarily focused on The Comfy®'s ability to protect against the extreme cold. *See, e.g., id.* at 582:24–583:2. His expert opinion on this topic was informed both by his experience hunting in extreme cold conditions and by his work designing and testing hunting garments. *See, e.g., id.* at 575:19–578:3 (describing his experience hunting in conditions as cold as "5 degrees air temperature blowing 25 miles an hour and gusting to 50"); *id.* at 578:6–579:7 (describing his professional experience designing and evaluating products that protect against the extreme cold). Mr. Crumley believes The Comfy® can protect against the extreme cold because of "the construction and the fabrics used in the construction and the way the patents show that it should be worn to maximize warmth." *Id.* at 582:24–583:2. This testimony was disputed by later witnesses, and the Court found Mr. Crumley's expert opinion to be less persuasive than the opinion of the other two expert witnesses, Professor Mary Ann Ferro and Patricia Concannon.

Professor Ferro was the Government's principal expert witness. She is a garment design expert who has spent her career designing outerwear for various major clothing companies including London Fog. *See* Trial Tr. vol. III at 914:7–925:2, ECF No. 110 (direct testimony of Prof. Ferro). Currently, she is an assistant professor at the Fashion Institute of Technology. *See id.* at 925:8–19. Professor Ferro's

testimony primarily focused on the physical characteristics and design of The Comfy®. She testified that The Comfy® could not protect against the extreme cold because it cannot insulate the user and trap body heat. Her experience designing garments for cold weather informed her opinion. *See, e.g.*, *id.* at 977:25–979:7. Professor Ferro supported her opinion with a detailed explanation about how The Comfy®'s interior fabric was "very porous" and allowed air to flow into and out of the item. *See id.* at 928:11–929:18. She explained how The Comfy®'s open bottom and open hood also allowed airflow into and out of it. *See id.* at 930:12–931:20. Professor Ferro's testimony about The Comfy®'s inability to protect against the extreme cold aligned with aspects of Ms. Concannon's testimony but differed from Mr. Speciale's and Mr. Crumley's testimonies. The Court found Professor Ferro's detailed analysis of the product to be more persuasive than the testimonies of Mr. Speciale and Mr. Crumley.

Professor Ferro also testified about the differences between a pullover and a blanket, and she detailed how those differences impacted her assessment of The Comfy®. *See id.* at 915:13–14, 1034:4–1036:2 (direct testimony of Prof. Ferro). She explained that, in the fashion industry, pullovers are defined by certain common features: (1) they have an opening for the head, (2) they "pull[] over the head[,]" (3) they are "knitted[,]" (4) they "may ... have a hood[,]" (5) they usually have "some kind of rib at the wrist ... like ribbed cuffs," (6) they "have sleeves[,]" (7) they have "[f]ront and back panels ... sewn together[,]" and (8) they can have a kangaroo pocket. *See id.* at 1034:4–1036:2. Based on her experience as a garment designer, she believed

that The Comfy® is an "oversized garment," *id.* at 928:16–17, and more specifically is "an oversized pullover with a hood." *Id.* at 915:13–14.  Professor Ferro's definition of the term pullover provided helpful context to determine the "common and commercial meaning[]" of the term pullover, a customs term at issue in this case. *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).  Her opinion that The Comfy® was a pullover — while informative — spoke to the ultimate issue in this case, which involves mixed questions of fact and law that the Court must assess on its own.  *See Wilton Indus., Inc. v. United States*, 741 F.3d 1263, 1265–66 (Fed. Cir. 2013) (noting that properly classifying an item is a "two-step process" involving questions of law and fact).

The Government's other expert witness, Patricia Concannon, is a fashion marketing professional.  She has spent her career helping companies sell clothing to retailers and advising these companies on how to "bring [clothing] product[s] to market."  Trial Tr. vol. III at 840:8, ECF No. 110 (direct testimony of Ms. Concannon); *see also id.* at 837:21–843:3.  Ms. Concannon's testimony focused on how The Comfy® was marketed and sold to consumers.  She explained how products that protect against the extreme cold are typically marketed in ways that detail "the technical features that go into producing" the product and provide "a temperature range of what level [of cold] protection" the product affords.  *Id.* at 845:1–3, 851:2–5.  Ms. Concannon noted The Comfy® was not marketed in that manner.  *See id.* at 856:14–858:2.  It instead was marketed as a wearable indoor garment with some mention of outdoor activities like "walking the dog" and "going to a sporting event[.]"  *See id.* at

856:14–857:2, 870:8–15.  She based her opinion on her professional knowledge about how products "that protect[] against the extreme cold … [are] marketed and sold." *Id.* at 844:17–19.  The Court found Ms. Concannon's testimony on these topics to align with the testimony of Professor Ferro and to be more persuasive than the testimony of Mr. Speciale and Mr. Crumley.

The remaining witnesses and testimonies that the Court heard were less relevant for resolving factual issues in this case.  The Government called Renee Orsat as a fact witness.  *See id.* at 747:7–10.  Ms. Orsat is a national import specialist who works for Customs and who helped classify The Comfy®.  *See id.* at 747:18–749:9 (direct testimony of Ms. Orsat).  Ms. Orsat's testimony provided helpful context about the general Customs classification process and the agency's interpretation of the relevant tariff headings, but it did not speak to any of the disputed facts at issue in the trial.  *See, e.g., id.* at 777:2–6.  Similarly, each party read deposition testimony from a Rule 30(b)(6) witness into the record.  Mr. Speciale was deposed as the Rule 30(b)(6) witness representing Cozy Comfort, and the Government introduced portions of his testimony into evidence.  *See* Trial Tr. vol. IV at 1164:20–1165:18, 1169:6–16, ECF No. 111.  The Court found Mr. Speciale's deposition testimony on behalf of Cozy Comfort generally duplicative of the live testimony Mr. Speciale offered as a fact witness.  *See, e.g., id.* at 1173:15–1174:15.  Tatiana Matherne was deposed as the Rule 30(b)(6) witness for the Government.  *See* Trial Tr. vol. III at 717:20–25, 724:11–725:25, ECF No. 110.  Cozy Comfort read portions of her testimony into the record. *See id.*  This testimony — much like Ms. Orsat's testimony — provided helpful context

about the Customs classification process and Customs' interpretation of the relevant tariff provisions, but it did not speak to the facts in dispute in the trial.  *See, e.g.*, *id.* at 726:3–20.

## II.    The Comfy®'s Design, Intended Use, and Physical Characteristics

Cozy Comfort designed The Comfy® to combine the features of an oversized sweatshirt and a throw blanket, creating a new product for adults.  *See* Trial Tr. vol. I at 62:6–65:6, ECF No. 108 (direct testimony of Mr. Speciale).  To make the first prototype, Mr. Speciale bought blankets and took them to a prototype design company to put together the first sample, which "was fairly close to what [they] wanted."  *Id.* at 64:7–22 (direct testimony of Mr. Speciale).  The design process eventually produced the product depicted below.



*See* Ex. P-6, fig. 1.

The Comfy® solved what Cozy Comfort's lawyers call the "left behind blanket problem."  *See* Trial Tr. vol. I at 28:4–7, ECF No. 108 (opening statement of Cozy Comfort).  Pre-importation patents Cozy Comfort filed note that, although traditional "[t]hrow blankets are great at keeping a person warm and comfortable on the couch, … sadly, eventually, one must get up from the couch … [and] must leave the warm blanket behind …."  Ex. P-6, col. 1, lines 19–27.  The Comfy® aimed to be "[a]n improved, cozy, comfortable blanket" that was "practically portable" because it could be worn.  *Id.*

The Comfy® was "mainly meant for lounging … at home."  Trial Tr. vol. I at 67:18–19, ECF No. 108 (direct testimony of Mr. Speciale).  The "background of the invention" section of Cozy Comfort's patent describes indoor activities such as "get[ing] up from the couch … to grab a hot chocolate, adjust the fire, or go to bed" as the context for why Cozy Comfort created The Comfy®.  *See* Ex. P-6, col. 1, lines 23–25.  Professor Ferro agreed The Comfy® was "designed primarily for indoors" in her expert opinion.  *Compare* Trial Tr. vol. III at 915:4–8, ECF No. 110 (direct testimony of Prof. Ferro), *with* Trial Tr. vol. I at 67:16–25, ECF No. 108 (direct testimony of Mr. Speciale).

The Comfy® is designed so that users put it on by pulling it over their heads.  Mr. Speciale demonstrated this process in Court during his testimony.  He described the process of donning the product:

> I'm holding The Original Comfy.  I'm opening it up now from the very large bottom opening.  I'm going to slide my arms into each of the two sleeves and pull the rib cuff to my

> wrists.  I am now going to put my head through the hole for
> the — where the hood is.  I now have The Comfy on.

Trial Tr. vol. I at 108:23–109:6, ECF No. 108.

Once on, The Comfy® may be worn whether the wearer is standing or seated. The product's patent begins its "DETAILED DESCRIPTION" of The Comfy® by explaining how The Comfy® is used "as worn by a person … in a standing position." Ex. P-6, col. 2, lines 43–46.  Photographs of users wearing The Comfy® show customers wearing the product while standing.  *See* Ex. P-13.  When they are not standing in these photographs, users are typically wearing The Comfy® in a seated position.  *See id.*

The Comfy® was designed to be oversized.  Mr. Speciale's first conception of The Comfy® was for it to be a "big oversized" item for adults.  Trial Tr. vol. I at 63:21–22, ECF No. 108 (direct testimony of Mr. Speciale).  The Comfy® extends to between the mid-thigh and knees of a wearer, depending on that wearer's height.  *See* Ex. P-13. Product patents predating The Comfy®'s first importation into the United States corroborate Mr. Speciale's testimony regarding The Comfy®'s oversized design.  *See, e.g.*, Ex. P-6, col. 6, lines 6–8 (describing the product as "approximately three to four times wider and approximately one-and-a-half times longer" than "a conventional item of clothing").  The Court confirmed The Comfy® was oversized when it donned The Comfy® in open court and allowed the parties to point out aspects of the product they felt were relevant.  *See* Trial Tr. vol. V. at 1389:11–1391:16, ECF No. 112 (THE COURT:  "I was going to come down and put The Comfy on here in the courtroom … and allow you to point out anything that you might want to point out….").  The in-

court review demonstrated that the product fell to about the undersigned's knees. *See id.* at 1396:17–21 (MR. SITRICK: "Your Honor, where does The Comfy come down to on your body while you're standing?" THE COURT: "It looks like about my knees.").

The Comfy® was not "primarily intended to be used in a cocooning position," despite its size and Cozy Comfort's arguments before the Court. Pl.'s Br. at 11, ECF No. 114. Mr. Speciale testified at trial that the product was "designed … so you can pull your knees in, pull your arms in and get into the full cocoon position." Trial Tr. vol. I at 57:12–15, ECF No. 108. Mr. Speciale and other witnesses at the trial referred to this position as "The Comfy cocoon." *See, e.g.*, *id.* at 57:15–16 (direct testimony of Mr. Speciale). Cozy Comfort and its patents describe the cocooning position as "a seated position with the user's arms and legs pulled into the article with the knees and hands pulled into the chest area." Pl.'s Br. at 8, ECF No. 114; *see also* Ex. P-6, fig. 10. That position is depicted below.



*See* Ex. P-6, fig. 10.

Persuasive evidence demonstrates that the cocooning position was not the product's primary use.  First, the Court's *in camera* and in court review found that the cocooning position, as depicted above, was uncomfortable, constricting, and immobilizing.  The Court had difficulty rising from the floor when assuming the cocoon position.  The immobilizing nature of the cocooning position is in tension with how Cozy Comfort's patents describe the product's intended uses.  Those patents detail how The Comfy® is portable and suitable for indoor activities and primarily focus on how the product is used "as worn by a person … in a standing position."  Ex. P-6, col. 2, lines 43–46; *see also id.*, col. 1.  Although a user might partially cocoon in The Comfy® by pulling his legs into the item while lying on his side in a fetal position, Cozy Comfort describes the "The Comfy® cocoon" as something different.  *See* Pl.'s Br. at 8–9, ECF No. 114; Ex. P-6, fig. 10 (figure depicted above).

Court No. 1:22-cv-00173 (SAV)                                      Page 23

Second, customer photographs show only a handful of customers in a position resembling "The Comfy® cocoon." *See* Ex. P-13. Third, the box in which The Comfy® is sold does not mention or show the cocooning position. *See* Ex. P-1. All the pictures on the box instead show users wearing The Comfy® in a variety of standing positions. *See id.* For these reasons, the Court finds that the cocooning position is not the product's primary intended use. The cocooning position is a possible but uncomfortable and infrequent use of the product. It is not a position from which one can hunt or perform any other outdoor activity requiring movement. *See* Trial Tr. vol. II at 629:16–630:5, ECF No. 109 (cross-examination of Mr. Crumley) (describing the process for field testing hunting garments).

The Comfy® provides users with some warmth. That is primarily because The Comfy®'s interior is lined with a "sherpa-type … curly pile fabric" modeled after "real … shearling." Trial Tr. vol. III at 932:3–11, ECF No. 110 (direct testimony of Prof. Ferro). The Comfy®'s sherpa is an insulating fabric "made of … synthetic fabric[.]" *Id.* at 933:7–12 (direct testimony of Prof. Ferro). Its addition helps trap some body heat in the product, keeping the user's body temperature higher in indoor environments. *See* Trial Tr. vol. II at 597:21–598:5, ECF No. 109 (direct testimony of Mr. Crumley). The Comfy®'s interior sherpa lining was created by threading synthetic sherpa fiber through a mesh fabric. *See* Trial Tr. vol. III at 928:19–929:18, ECF No. 110 (direct testimony of Prof. Ferro); *see also id.* at 933:2–18 (direct testimony of Prof. Ferro). Because of the visible holes in this mesh fabric, The Comfy®'s sherpa lining is "porous" and allows for some airflow into and out of the

product.  *Id.* at 929:16–930:3 (direct testimony of Prof. Ferro).  Because of this open design, The Comfy® only keeps users warm in indoor or mild outdoor conditions, as detailed later in this opinion.  *See id.* at 979:8–14 (MR. KENNEDY:  "[W]ould you be able to estimate where you could wear The Comfy outdoors, at what temperature ranges?"  PROF. FERRO:  "I would say mild temperatures because of its open — especially because of its open design.").

Eighty-three percent of The Comfy®'s purchasers are females.  *See* Ex. P-12 at 6; Trial Tr. vol. I at 83:14–18, ECF No. 108 (direct testimony of Mr. Speciale).  Twenty-seven percent reside in the Midwest, twenty-eight percent in the Northeast, twenty-three percent in the South, and twenty-two percent in the West.  *See* Ex. P-12 at 6.  No testimony directly addressed whether The Comfy® is worn primarily during particular seasons, but testimony suggests the product is worn indoors year-round.  *See* Trial Tr. vol. I at 120:8–121:21, ECF No. 108 (direct testimony of Mr. Speciale) (explaining how he wore The Comfy® indoors at a hockey rink "in the summer").  It can be worn outdoors in cool and mild conditions.  *See* Trial Tr. vol. III at 979:8–14, ECF No. 110 (direct testimony of Prof. Ferro).

### III.    Marketing & Sales of The Comfy®

Cozy Comfort "knew from the beginning" that The Comfy® would "get compared with the Snuggie" by consumers.  Trial Tr. vol. I at 66:24–67:1, ECF No. 108 (direct testimony of Mr. Speciale).  The Snuggie® is a large, modified blanket "with two sleeves you put your arms through."  Trial Tr. vol. IV at 1193:16–18, ECF No. 111 (Rule 30(b)(6) deposition of Mr. Speciale); *see also Allstar Mktg. Grp., LLC v.*

*United States*, 41 CIT __, 211 F. Supp. 3d 1319, 1324–26 (2017) (describing The Snuggie®).  These sleeves allow a user to wear the Snuggie "on the front" of their body.  Trial Tr. vol. IV at 1193:19–20, ECF No. 111 (Rule 30(b)(6) deposition of Mr. Speciale on behalf of Cozy Comfort).  The Snuggie®'s box and a Snuggie® laid on a table are depicted below.



*See* Ex. D-50.

Mr. Speciale explained that comparisons between The Comfy® and The Snuggie® were "not necessarily a bad thing, especially in marketing …" because The Snuggie® is a well-known item.  Trial Tr. vol. I at 67:1–3, ECF No. 108.  Two major aspects of Cozy Comfort's marketing relied on public knowledge of The Snuggie. First, Cozy Comfort sold The Comfy® exactly how The Snuggie® is sold:  in a box. *Compare* Ex. P-1, *with Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1325 (noting The Snuggie® is sold in "boxes").  Second, Cozy Comfort sold The Comfy® in the same store sections as The Snuggie®.  *Compare* Trial Tr. vol. I at 152:12–154:13, ECF No.

108 (direct testimony of Mr. Speciale) (detailing how The Comfy® has been sold in the "bedding and blanket section," the "bedding or lifestyle section," and the "As Seen on TV section"), *with Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1326 ("The Snuggie® is sold in the bedding, housewares, general merchandise, impulse buy, or as-seen-on-TV departments of retail stores, never in the wearing apparel department.") (internal quotation marks and citations omitted).

Cozy Comfort still needed to distinguish The Comfy® from The Snuggie® to generate consumer interest, and it did so by emphasizing how The Comfy® was fully wearable and portable unlike The Snuggie®. *See* Trial Tr. vol. I at 67:8–25, ECF No. 108 (direct testimony of Mr. Speciale) (MR. SPECIALE: "But what's great about [The Comfy®] is that you can get up and take your warmth with you. If you're going to get something to drink, just day-to-day activities or going out to get the mail[.]"); Trial Tr. vol. IV at 1193:23–25, ECF No. 111 (Rule 30(b)(6) deposition of Mr. Speciale on behalf of Cozy Comfort) (MR. SPECIALE: "So [The Snuggie®] does have an opening, as opposed to The Comfy, where[as] The Comfy is closed around."). Expert testimony confirmed that clothing-like wearability was the key difference between The Comfy® and The Snuggie®. Professor Ferro testified that, unlike The Snuggie®, "The Comfy is not a blanket, because you wear it. You wear it … indoors. You wear it outdoors. It's not just … for the couch like the Snuggie …." Trial Tr. vol. III at 945:23–946:2, ECF No. 110. She summarized the difference between the products by stating that "The Snuggie is like a blanket. But [The Comfy®] is a garment." *Id.* at 946:4–5.

Focusing on The Comfy®'s distinct clothing-like wearability was an essential part of Cozy Comfort's marketing strategy. This focus began from the moment Cozy Comfort launched The Comfy® on the TV show *Shark Tank* in December 2017. *See* Trial Tr. vol. I at 71:21–72:20, 73:14–24, ECF No. 108 (direct testimony of Mr. Speciale). Cozy Comfort introduced its product on *Shark Tank* as "the blanket that's a sweatshirt" and explained that "it goes with you and keeps you warm wherever you are." Ex. D-21 at 0:43–46, 1:30–33. One of the *Shark Tank* hosts, Lori Greiner, noted The Comfy® is "just like" The Snuggie®. *Id.* at 6:03–05. Mr. Speciale responded that The Comfy® "is absolutely not The Snuggie®." *Id.* at 6:09–10. Another *Shark Tank* host, Barbara Corcoran, then asked Mr. Speciale to "explain to me what the difference between your product is and The Snuggie®." *Id.* at 6:32–37. Mr. Speciale explained, "If you're on the couch with The Snuggie® and you wanted to get up to go do something, you have to take it off every time." *Id.* at 6:37–43. His brother then emphasized that, unlike The Comfy®, The Snuggie® is "open in the back, it's like having a robe on backwards." *Id.* at 6:43–46. These differences made The Comfy® a "significant improvement" on The Snuggie® that customers would appreciate. *Id.* at 6:47–49 (according to Brian Speciale).

Early post-*Shark Tank* marketing played up this wearability while referencing known terms in the consumer goods market. *See* Trial Tr. vol. I at 88:5–16, ECF No. 108 (direct testimony of Mr. Speciale). Cozy Comfort identified the product as a hybrid of a blanket and a sweatshirt with slogans like "The Comfy, the Blanket… That's A Sweatshirt!" Ex. P-4. Cozy Comfort also adopted a trademark for The

Comfy®'s marketing logo, which depicts "a standing panda bear wearing a hooded sweatshirt …." Ex. P-4. This slogan and logo emphasize to observers how The Comfy® can be worn like an article of clothing, unlike The Snuggie®.



*See* Ex. P-4.

Cozy Comfort changed this trademark in June 2021, but that change occurred after the present dispute with the Government began. *See* Trial Tr. vol. I at 91:23–92:1, ECF No. 108 (direct testimony of Mr. Speciale) (noting Cozy Comfort cancelled its original trademark on "June 17 of 2021"). Mr. Speciale admitted that the tariff dispute "may have accelerated" this marketing change. *Id.* at 93:19; *see also id.* at 93:14–23. That makes Cozy Comfort's later trademarks and slogans less reliable evidence for the Court's assessment of The Comfy®'s intended use and how it was marketed.

Cozy Comfort also switched to calling the product a "wearable blanket" alongside this marketing change. *See id.* at 89:6–25 (direct testimony of Mr. Speciale); Ex. P-1. Though it dropped the word "sweatshirt" from its slogan, the key marketing emphasis for The Comfy® remained its clothing-like wearability. *See* Ex. P-1 (The Comfy® and its accompanying box). To that end, the pictures of The Comfy®

on the box in which it is sold still depict people wearing The Comfy® while standing, emphasizing its clothing-like wearability and portability. *See id.* Those pictures continued to contrast The Comfy® with the Snuggie®. *Compare Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1325 ("The retail packaging shows users wearing the Snuggie® on their front with their arms through the sleeves while reclining or seated on an airplane, couch, bed, and floor[.]"), *and* Ex. D-50 (pictures of The Snuggie®), *with* Ex. P-1 (The Comfy® and its accompanying box).

Cozy Comfort makes a plurality of its sales on Amazon.com. *See* Trial Tr. vol. I at 151:18–152:11, ECF No. 108 (direct testimony of Mr. Speciale); Ex. P-16. Mr. Speciale testified that, early on, Amazon sold the product as a blanket. *See* Trial Tr. vol. I at 145:18–147:3, ECF No. 108. Today, Amazon sells The Comfy® in the "wearable blankets" category, which Amazon created for the product sometime in 2019. *See id.* at 145:18–146:23 (direct testimony of Mr. Speciale).

Other retailers sell The Comfy® in similar sections and categories as The Snuggie®. *Cf. Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1326 ("The Snuggie® is sold in the bedding, housewares, general merchandise, impulse buy, or as-seen-on-TV departments of retail stores, never in the wearing apparel department.") (internal quotation marks omitted). QVC sells The Comfy® in the "bedding and blanket section." *See* Trial Tr. vol. I at 152:12–16, ECF No. 108 (direct testimony of Mr. Speciale). Costco sells it in the "bedding or lifestyle section." *Id.* at 152:17–19 (direct testimony of Mr. Speciale). Target sells the product in the "As Seen on TV section," because the product was featured on the TV show *Shark Tank. Id.* at 152:24–153:2

(direct testimony of Mr. Speciale). Bed Bath & Beyond sold the product in the "blanket and bedding section." *Id.* at 153:3–5 (direct testimony of Mr. Speciale). Other stores sell the product in similar areas. *See id.* at 153:6–154:13 (direct testimony of Mr. Speciale). Exhibit P-10, a series of photographs that shows The Comfy® displayed for sale in retail locations, confirms Mr. Speciale's testimony. *See* Ex. P-10; Trial Tr. vol. I at 154:21–155:2, ECF No. 108 (direct testimony of Mr. Speciale).

Licensing agreements with different major companies refer to The Comfy® in a variety of ways. *See* Trial Tr. vol. I at 165:12–166:17, ECF No. 108 (direct testimony of Mr. Speciale). Agreements with companies like Disney categorize the product as a "wearable throw[]... [or] blanket." *Id.* at 165:12–17 (direct testimony of Mr. Speciale); *see also id.* at 165:22–166:17; Ex. P-11. Other agreements with companies such as Marvel call the product a "home furnishing[.]" Trial Tr. vol. I at 166:4–5, ECF No. 108 (direct testimony of Mr. Speciale); *see also* Ex. P-11 at 1.

The Comfy® was primarily marketed as a comfortable, wearable product to be used indoors. Ms. Concannon testified, "A lot of the imagery and a lot of the marketing looked like it was worn mostly indoors[.]" Trial Tr. vol. III at 856:16–18, ECF No. 110. The outdoor activities displayed in marketing materials focused on activities "like walking the dog" and "going to a sporting event." *Id.* at 856:21–857:2 (direct testimony of Ms. Concannon); *see also* Jt. Uncontested Facts ¶ 18, ECF No. 107. All these activities are incompatible with the blanket-like Snuggie®. *See* Ex. D-

21 at 6:37–43 (MR. SPECIALE: "If you're on the couch with The Snuggie® and you

wanted to get up to go do something, you have to take it off every time.").

### IV. Whether The Comfy® Protects Against the Extreme Cold

The remainder of the trial centered on whether The Comfy® protects against

the extreme cold. Sweaters, pullovers, vests, and other similar articles do not provide

protection against the "extreme cold." *Rubies Costume II*, 922 F.3d at 1345–46.

Customs' classification of the product as a pullover would be incorrect if The Comfy®

did provide such protection. *See id.*

### A.

Various witnesses offered competing ideas about what "extreme cold" means.

Mr. Speciale testified that what constitutes extreme cold "depends on the person and

the individual." Trial Tr. vol. I at 133:5–14, ECF No. 108. He believes, "Somebody

that's on the equator may consider 68 degrees extremely cold." *Id.* at 133:15–16. Mr.

Crumley, an experienced outdoorsman, noted that he "usually" had experienced

extreme cold temperatures out West with "5 to 10 degrees air temperature and [wind]

blowing 25 to 30 miles an hour." *See* Trial Tr. vol. II at 576:20–577:5, ECF No. 109.

*But see id.* at 593:13–16 (direct testimony of Mr. Crumley) (describing the extreme

cold as a subjective term). Professor Ferro believed "extreme cold" constituted a range

of temperatures that reasonable people consider to be extremely cold. *See* Trial Tr.

vol. III at 955:12–24, ECF No. 110. The parties continued to dispute the meaning of

"extreme cold" in their post-trial briefs. Cozy Comfort argues that extreme cold has

"inherent subjectivity" and varies based on the user. Pl.'s Br. at 36, ECF No. 114.

The Government argues that extreme cold "is maximum, intense, frigid, bitter, or arctic cold, *i.e.*, well below zero degrees Fahrenheit." Def.'s Br. at 6, ECF No. 116.

"Extreme cold" is relevant to this case because of the Federal Circuit's opinion in *Rubies Costume II*. 922 F.3d at 1345–46. The meaning of the phrase is a question of law for this Court to assess on its own. *See YBM Magnex, Inc. v. Int'l Trade Comm'n*, 145 F.3d 1317, 1320 (Fed. Cir. 1998) ("The meaning or interpretation of precedent is a question of law[.]") (citing *S. Park Indep. Sch. Dist. v. United States*, 453 U.S. 1301, 1304–05 (1981)), *rev'd on other grounds*, 285 F.3d 1046 (Fed. Cir. 2002). "[T]he language of [a judicial] opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). Courts interpreting the language of precedential opinions must remain cognizant that the words of a judicial opinion "appeared in a particular context and did particular work." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023).

The Court declines to adopt the Government's interpretation of "extreme cold." The Government's interpretation rests on a literalistic analysis of the word "extreme" and citations to general explanations about "extreme cold." *See* Def.'s Br. at 6–7, ECF No. 116 (citing to dictionary definitions of "extreme"); *id.* at 7 (citing to National Weather Service definitions of "extreme cold"). That interpretation makes no sense in the context the Federal Circuit's *Rubies Costume II* opinion. The Federal Circuit compared the jacket of a Santa Suit to a common sweater or sweatshirt when it wrote about the "extreme cold." *See Rubies Costume II*, 922 F.3d at 1345–46. It said that "[l]ike a sweater or sweatshirt, the [Santa Suit] jacket covers the upper body and

provides some warmth to the wearer but does not protect against wind, rain, or extreme cold." *Id.* "Extreme cold" follows the terms "wind" and "rain," two standard weather conditions. *Id.* This context implies that the "extreme cold" the Federal Circuit had in mind was a more common, serious but not severe, cold. *Cf. Fischer v. United States*, 603 U.S. 480, 487 (2024) ("[T]he canon of *noscitur a sociis* teaches that a word is given more precise content by the neighboring words with which it is associated.") (internal citations and quotation marks omitted); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) ("We rely upon [*noscitur a sociis*] to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words[.]").

The Court also declines to accept Cozy Comfort's subjective definition of the extreme cold. Nothing in the Federal Circuit's opinion implies it was adopting a purely subjective, user-based standard for "some warmth," "rain," "wind," or "extreme cold." One cannot read the Federal Circuit as saying that the jacket in *Rubies Costume II* provides some warmth to the wearer but does not protect against wind, rain, or 68-degree weather. *Compare* Trial Tr. vol. I at 133:15–16, ECF No. 108 (direct testimony of Mr. Speciale) (suggesting someone at the equator "may consider 68 degrees extremely cold"), *with Rubies Costume II*, 922 F.3d at 1345–36.

The term "extreme cold" in *Rubies Costume II* instead refers to a range of temperatures at, near, or below freezing. No bright line separates the ordinary cold from the extreme cold, because, as the National Weather Service recognizes, "[w]hat constitutes extreme cold varies in different parts of the country." Ex. D-30. Still, there are limits to what temperatures are extremely cold. The National Weather

Service's definition of "extreme cold" goes no higher than "near freezing temperatures" when experienced in the "southern U.S." *Id.* Elsewhere, such as in the northern states, "extreme cold [only] means temperatures well below zero." *Id.* The National Weather Service's range — from "near freezing" down to "well below zero" — aligns with both common sense and the context of *Rubies Costume II.* 922 F.3d at 1345–46 ("Like a sweater or sweatshirt, the jacket … provides some warmth to the wearer but does not protect against wind, rain, or extreme cold."). Temperatures in this range present a similar degree of inclement weather as "wind" and "rain." *Id.* They also involve the kind of weather against which an ordinary sweater, sweatshirt, or pullover cannot protect — the precise inquiry that motivated the Federal Circuit to write the phrase in question. *See id.* at 1345 ("Although the precise term for the type of jacket included with the Santa Suit does not appear in the list of items in heading 6110, the jacket shares the characteristics of the named articles in the heading.").

Persuasive expert testimony at trial demonstrated that no single product protects against the extreme cold. The key to protecting against the extreme cold is proper layering, which, as Professor Ferro explained, "keep[s] in the [body's] heat." Trial Tr. vol. III at 934:13–14, ECF No. 110; *see also id.* at 944:11–17 (direct testimony of Prof. Ferro); Trial Tr. vol. II at 603:17–604:23, ECF No. 109 (direct testimony of Mr. Crumley). For an outer layer like The Comfy® to protect against the extreme cold, it must insulate, or trap, air within the garment and "prevent[] the outside … cold from getting into the garment." Trial Tr. vol. III at 935:24–936:1, ECF No. 110

(direct testimony of Prof. Ferro); *see also* Trial Tr. vol. II at 657:21–25, ECF No. 109 (direct testimony of Mr. Crumley) (noting a garment protecting against "colder weather" needs material "to trap air, [and] body heat").  As Professor Ferro elaborated, "What the [outer] garment does is keep in the heat…. Most outerwear that's made for extreme cold weather has to be more or less snugly fit."  Trial Tr. vol. III at 934:13–18, ECF No. 110.  This insulating function keeps cold air out and body heat in, allowing the body to maintain its temperature.  *See id.* at 983:1–984:18 (direct testimony of Prof. Ferro) (detailing the importance of trapping heat "at least around the body"); *see also id.* at 1018:4–12 (direct testimony of Prof. Ferro).  Outer garments that protect against the extreme cold have certain common characteristics, according to the National Weather Service.  *See* Ex. D-30.  They are typically tightly woven to keep body heat in the garment.  *See id.*  They also often are water repellent and have a hood with a drawstring to pull the hood snug against the face.  *See id.*; *see also* Trial Tr. vol. III at 997:5–1000:3, ECF No. 110 (direct testimony of Prof. Ferro).

### B.

The Comfy® does not protect against the extreme cold.[3]  Aspects of The Comfy®'s physical design make it unsuited for extreme cold conditions, as Professor Ferro persuasively explained and the evidence confirmed.  Three facts lead to this

---

[3] The Government's post-trial brief suggests that the relevant inquiry should be whether The Comfy® protects against the rain, wind, and extreme cold, not simply whether The Comfy® protects against the extreme cold.  *See* Def.'s Br. at 32, ECF No. 116.  The parties stipulated that The Comfy® does not protect against the rain or wind.  *See* Jt. Uncontested Facts ¶ 13, ECF No. 107.  Because The Comfy® does not protect against the extreme cold, the Court finds it unnecessary to address the Government's suggestion that all three conditions should be evaluated together.

finding.  First, The Comfy® lacks several important features products designed for the extreme cold typically possess.  Second, The Comfy® is not marketed like products that protect against the extreme cold.  Third, The Comfy® was designed primarily for indoor use.

The Comfy®'s porous interior fabric design renders it unable to protect users against the extreme cold.  Professor Ferro credibly and persuasively testified that The Comfy®'s interior synthetic sherpa lining "wasn't thick" because "it was knitted on" to a background material that was "very porous."  Trial Tr. vol. III at 928:19–929:18, ECF No. 110; *see also id.* at 933:2–18.  That background material is mesh-like.  *See id.* at 929:21–23 (direct testimony of Prof. Ferro).  The Court confirmed these facts *in camera*.  Cozy Comfort manufactures The Comfy®'s interior lining by looping sherpa fabric in and out of the mesh holes in the background material.  *See id.* at 929:24–930:3 (direct testimony of Prof. Ferro).  This leaves gaps in the lining where there is no sherpa material to block air from entering.  *See id.* at 929:16–930:3 (direct testimony of Prof. Ferro); *see also* Trial Tr. vol. II at 436:23–467:2, ECF No. 109 (cross examination of Mr. Speciale) (MR. KENNEDY: "[The Comfy®] has hundreds of holes throughout the inside of the sherpa lining, correct?"  MR. SPECIALE: "That's how it's manufactured, correct.").

Similarly, The Comfy®'s open bottom and open hood make it unsuitable for the extreme cold.  The Comfy® has an oversized bottom opening that allows cold air to enter the product, as Professor Ferro testified and the Court's review confirmed.  *See* Trial Tr. vol. III at 930:12–21, ECF No. 110.  The product's oversize hood also allows

cold air to enter. *See id.* at 931:11–20 (direct testimony of Prof. Ferro). Indeed, The Comfy® lacks a drawstring that would permit the wearer to ensure a tight fit around the head to retain heat. *See id.* at 930:12–21, 931:11–20 (direct testimony of Prof. Ferro). The Comfy®'s porous material, open bottom, and open hood permit easy airflow into and out of the product. Summarizing her views, Professor Ferro persuasively testified, "You're not going to be able to wear [The Comfy®] in the freezing cold because … [i]t's too open[.]" *Id.* at 943:22–24; *see also id.* at 1018:5–7 (PROF: FERRO: "The Comfy was too open to really — for the fabric to really do [its] job to keep the heat in.").

Garments keep users warm in the extreme cold by insulating them with air trapped between layers. *See* Ex. D-30; Trial Tr. vol. III at 934:15–18, ECF No. 110 (PROF. FERRO: "What the garment does is keep in the heat…. Most outerwear that's made for extreme cold weather has to be more or less snugly fit."). The Comfy®'s oversized design and porous lining prevent it from effectively trapping air so that it cannot adequately insulate users. *Compare* Trial Tr. vol. III at 928:19–929:18, 930:12–931:21, ECF No. 110 (direct testimony of Prof. Ferro) (detailing how The Comfy® is porous and open), *with id.* at 930:15–21 (PROF. FERRO: "[I]f I'm thinking about … staying warm, cold air can get into the garment very easily…. [i]t really needs to be cinched in, in order to keep the cold air from getting into the garment."), *and* Trial Tr. vol. II at 657:21–25, ECF No. 109 (direct testimony of Mr. Crumley) (noting a garment protecting against "colder weather" needs material "to trap air, [and] body heat"). The Comfy® therefore is unsuitable for the extreme cold, and the

Court finds that it does not protect from the extreme cold. *See* Trial Tr. vol. III at 935:24–936:1, ECF No. 110 (direct testimony of Prof. Ferro) (explaining for an outer layer to protect against the extreme cold it must "prevent[] the outside … cold from getting into the garment").

Cozy Comfort's post-trial brief attempts to discredit Professor Ferro's expert testimony.[4] It argues Professor Ferro's opinion that The Comfy® did not protect against the extreme cold hinges on her belief that "extreme cold" only encompasses arctic-like temperatures. Pl.'s Br. at 45, ECF No. 114. Cozy Comfort claims that "Ms. Ferro applied an even more demanding standard for extreme cold … [and] testified that extreme cold means 'minus 15 or below.'" *Id.* The Court disagrees.

Cozy Comfort's characterization of Professor Ferro's testimony hinges on a line from her cross examination. In that portion of her testimony, counsel for Cozy Comfort asked her about a time when she wore a down coat to protect against temperatures that she considered extremely cold. *See* Trial Tr. vol. IV at 1118:3–5, ECF No. 111 (cross examination of Prof. Ferro). Only once amid this line of questioning did Professor Ferro say, "According to the [National Weather Service], [extreme cold is] minus 15 and below." *Id.* at 1119:20–23. This was a brief statement

---

[4] Cozy Comfort also argues that "Ms. Ferro … was considering only the outermost layer and not the overall effect that a garment has in a series of layers." *See* Pl.'s Br. at 45, ECF No. 114. This too mischaracterizes Professor Ferro's testimony. Professor Ferro explained that no single garment protects against the extreme cold, and layering is essential. *See, e.g.*, Trial Tr. vol. IV at 1101:19–1102:1, ECF No. 111 (cross examination of Prof. Ferro) (explaining Prof. Ferro's belief that the Canada Goose protects against the extreme cold only when properly layered). The Court understands Professor Ferro's opinion on The Comfy® to be rooted in her analysis of The Comfy® as the outermost of multiple layers, not only as an analysis of The Comfy®'s ability to protect against the cold in isolation.

where Professor Ferro, under cross-examination, quickly summarized how she believed the National Weather Service defined extreme cold. In contrast, Professor Ferro gave an extensive, detailed explanation of her view that the term "extreme cold" embodied a range of temperatures that a reasonable person may find "extremely cold." She explained that she believed the meaning of extreme cold:

> [D]epends on — for a person, it depends on where they come from, what their constitution is, what their build is, what their health is like, what [their] age is. If you live in Arizona and it comes near freezing, you're very cold. But the person that lives in Wisconsin is fine.

Trial Tr. vol. III at 955:12–24, ECF No. 110 (direct testimony of Prof. Ferro). She based her opinion on outside sources like a National Weather Service webpage on the extreme cold. *See, e.g.*, *id.* at 955:12–956:24, 957:12–958:4 (direct testimony of Prof. Ferro). When allowed to fully explain the National Weather Service's definition of extreme cold, Professor Ferro provided testimony demonstrating the National Weather Service adopted a similar standard. *See, e.g.*, *id.* at 957:18–958:1 (direct testimony of Prof. Ferro) (reading the National Weather Service webpage) (PROF. FERRO: "In the Southern United States, near freezing temperatures are considered extreme — extremely cold."); *see also* Ex. D-30. Thus, when Professor Ferro said she believed The Comfy® could not protect against the extreme cold, the totality of her testimony clarifies that she meant The Comfy® could not protect against any temperature in the range considered to be extremely cold. This range included "near freezing" temperatures, *see* Trial Tr. vol. III at 955:20–21, ECF No. 110 (direct

testimony of Prof. Ferro), of the type the Federal Circuit meant when it wrote "extreme cold" in *Rubies Costume II*. 922 F.3d at 1345–46.

That The Comfy® lacks the common characteristics of clothing that does protect against the extreme cold further supports the Court's determination. Unlike most overgarments designed for the extreme cold, The Comfy® does not possess an elastic band or drawstring to keep its open bottom tight to the body and its hood close to the face. *See* Trial Tr. vol. III at 930:12–21, 931:11–20, ECF No. 110 (direct testimony of Prof. Ferro). It also does not use common insulating fabrics like Gore-Tex, Thinsulate, Primaloft, down, or fiber fill. *See* Trial Tr. vol. II at 435:21–436:10, ECF No. 109 (cross-examination of Mr. Speciale).

The Comfy® also lacks water resistance. The parties stipulated that The Comfy® does not protect against the rain. *See* Jt. Uncontested Facts at ¶ 13, ECF No. 107. But this understates The Comfy®'s deficiencies. As Professor Ferro testified, The Comfy® absorbs water on contact and stays wet for hours.[5] *See* Trial

---

[5] In its post-trial brief, Cozy Comfort makes a conclusory argument that Professor Ferro's water test was "irrelevant, undefined, and unscientific ...." Pl.'s Br. at 45–46, ECF No. 114. The Court disagrees. Expert witnesses must provide testimony that "is the product of reliable principles and methods[,]" and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702 (c)–(d). Courts reviewing the reliability of an expert's methodology focus on whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed." *Walker v. Soo Line R. R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000). Here, Professor Ferro first assessed whether The Comfy® is water resistant. To do that, she poured "a couple of tablespoons of water on the fabric that comes in the box with The Comfy®." *See* Trial Tr. vol. III at 936:5–8, ECF No. 110 (direct testimony of Prof. Ferro). Pouring a small quantity of water on an item is an appropriate method for determining if it is water resistant. After pouring this water on the material, Professor Ferro observed what happened to the material and waited to see how quickly the sample fabric dried. *See id.* at 936:18–937:22 (direct testimony of Prof. Ferro). That is an appropriate way to determine if a garment is capable of wicking water. The Court struggles to imagine another method to make that determination, and Cozy

Tr. vol. III at 935:10–938:9, ECF No. 110. Water resistance is not technically essential for a product to protect against the extreme cold, but products that do usually have this feature. *See id.* at 980:4–981:11 (direct testimony of Prof. Ferro). That is because water resistance prevents the wearer's perspiration from soaking the garment and causing heat to leave the body. *See id.* at 934:4–8 (direct testimony of Prof. Ferro). Moisture is the enemy of heat preservation, and The Comfy® lacks any ability to wick moisture away from the body. *See id.* at 982:15–19 (MR. KENNEDY: "So then is [water] wicking important for the inside of the garment?" PROF. FERRO: "Yeah. That's … essential … for [the] extreme cold[.]").

The Comfy® is not marketed or sold like products that protect against the extreme cold. Ms. Concannon credibly explained that products which protect against the extreme cold are typically marketed with certain features.[6] These products' tags

---

Comfort's briefing provides no alternative test it considers more appropriate. *See* Pl.'s Br. at 46, ECF No. 114.

[6] Cozy Comfort attempts to discredit Ms. Concannon's testimony by arguing that she too relied on an incorrect definition of the term "extreme cold." It claims that Ms. Concannon interpreted "extreme cold" to mean "temperatures like 'negative 22 degrees Fahrenheit.'" Pl.'s Br. at 43, ECF No. 114 (citing Trial Tr. vol. III 847:11–19, 851:1–5, ECF No. 110 (direct testimony of Prof. Concannon)). Cozy Comfort's characterization of Ms. Concannon's testimony is inaccurate. When Ms. Concannon was discussing negative 22-degree weather, she was not explaining her definition of extreme cold. Instead, she was providing an example of the temperatures against which some products claim to protect. That is clear from the full context of her statement. She said, "A lot of times, some of the goods will give you a temperature range of what level you'll be protected up to, say for example, negative 22 degrees Fahrenheit. You know, they'll put these specs on there. Canada Goose is one example of that." Trial Tr. vol. III at 851:2–8, ECF No. 110 (direct testimony of Ms. Concannon). The Court understands Ms. Concannon's definition of extreme cold to embody a range of temperatures up to and including freezing cold. When discussing the concept of "extreme cold" in depth, Ms. Concannon cited to outdoor sports that typically take place in temperatures at, near, or slightly below freezing such as skiing and hiking. *See* Trial Tr. vol. II at 847:15–19 (direct testimony of Ms. Concannon); *see also id.* at 851:20–852:2 (direct testimony of Ms. Concannon). She did not discuss extreme arctic sports that typically take place at temperatures well below zero degrees Fahrenheit.

or websites tend to detail "the technical features that go into producing that garment" to demonstrate to consumers how and why the product can protect against the extreme cold. *Id.* at 845:1–3 (direct testimony of Ms. Concannon); *see also id.* at 844:20–846:24 (direct testimony of Ms. Concannon). This information often provides buyers with "a temperature range of what level [of cold] you'll be protected up to[.]" *See id.* at 851:2–5 (direct testimony of Ms. Concannon). Garments that protect against the extreme cold are also typically advertised in ways that show the garment being worn in extremely cold conditions. *See id.* at 850:11–851:13 (direct testimony of Ms. Concannon).

By contrast, Cozy Comfort marketed The Comfy® primarily as an indoor product, with some mention of outdoor activities like "walking the dog" and "going to a sporting event." *Id.* at 856:21–23 (direct testimony of Ms. Concannon); *see also id.* at 856:14–857:2 (direct testimony of Ms. Concannon). The box in which The Comfy® comes does not contain any indication the product offers protection from the extreme cold. *See* Ex. P-1; Trial Tr. vol. III at 857:5–858:2, ECF No. 110 (direct testimony of Ms. Concannon). The Comfy® was marketed "as more of a loungewear product" rather than a product that protects against the elements. Trial Tr. vol. III at 870:13–14, ECF No. 110 (direct testimony of Ms. Concannon); *see also id.* at 870:8–15 (direct testimony of Ms. Concannon). Mr. Speciale confirmed this portion of Ms. Concannon's testimony. He admitted Cozy Comfort had never marketed The Comfy® as protecting against the extreme cold. *See* Trial Tr. vol. II at 434:15–17, ECF No. 109 (cross

examination of Mr. Speciale) (MR. KENNEDY: "The Comfy has never been marketed for protection from extreme cold, correct?" MR. SPECIALE: "Correct.").

Finally, Cozy Comfort's admission that it designed The Comfy® primarily for indoor use reinforces the Court's finding. *See* Pl.'s Br. at 10, ECF No. 114. As The Comfy®'s co-creator Mr. Speciale testified on direct examination, The Comfy® is "mainly meant for lounging on the couch at home." Trial Tr. vol. I at 67:16–19, ECF No. 108. Given the stark temperature differences between the typical indoor environment and any fair definition of extreme cold, it would be unlikely that the same product could be comfortably worn in both environments. *See* Ex. P-6, col. 1 (describing the indoor environment as the background for invention of The Comfy®). A product that protects against the extreme cold would keep in too much body heat, causing the user to become too hot for room temperature conditions. The opposite is true for a product designed for indoor use, like The Comfy®, which would be too loose and non-insulating to protect users from the extreme cold.

## C.

Cozy Comfort makes four main arguments for why The Comfy® protects against the extreme cold. First, it offers expert opinion testimony from Mr. Crumley, an avid hunter and outdoorsman who believes the product protects against the extreme cold. Second, it argues that the product was designed to protect against the extreme cold. Third, it contends that customers use the product in the extreme cold. Fourth, it insists that customer reviews confirm the product is used in the extreme

cold. The Court finds each of these arguments unsupported by the evidence admitted at trial.

Mr. Crumley's opinion that The Comfy® protects against the extreme cold was unpersuasive. Mr. Crumley believes that The Comfy® protects against the extreme cold because of "the construction and the fabrics used in the construction and the way the patents show that it should be worn to maximize warmth." *See* Trial Tr. vol. II at 582:24–583:2, ECF No. 109. His opinion focused on the cocooning position as an aspect of The Comfy®'s protection against the extreme cold. *See id.* at 588:3–589:1. The cocooning position, in his view, allows users to protect their extremities from the cold. *See id.* at 588:3–19. Mr. Crumley stated he believes the The Comfy®'s sherpa lining traps body air to maximize warmth in the cocooning position. *See id.* at 588:20–589:1. Mr. Speciale advanced the same theory in his testimony. *See, e.g.*, Trial Tr. vol. I at 71:7–14, ECF No. 108; *id.* at 132:24–133:4.

Both Mr. Crumley and Professor Ferro agree that a garment cannot protect against the extreme cold unless it traps air inside the garment to help the body retain heat. *Compare* Trial Tr. vol. III at 935:20–23, ECF No. 110 (direct testimony of Prof. Ferro), *with* Trial Tr. vol. II at 588:20–589:8, ECF No. 109 (direct testimony of Mr. Crumley), *and id.* at 597:21–25 (direct testimony of Mr. Crumley). Mr. Crumley rested his analysis on conclusory assertions that "the construction and the fabrics" of The Comfy® enable it to protect against the extreme cold. Trial Tr. vol. II at 582:24–583:2, ECF No. 109. He also suggested that, if users properly layer items beneath

The Comfy®, then it would protect against the extreme cold.  *See id.* at 603:17–605:7; Pl.'s Br. at 39, ECF No. 114.

But Professor Ferro undermined Mr. Crumley's opinion.  Unlike Mr. Crumley's conclusory assertions, Professor Ferro's testimony provided a detailed analysis of The Comfy®'s porous, open design and physical characteristics.  *See* Trial Tr. vol. III at 928:19–931:20, ECF No. 110 (direct testimony of Prof. Ferro).  An outer layer like The Comfy® must trap air to protect against the extreme cold.  *See* Ex. D-30; Trial Tr. vol. III at 935:20–23, ECF No. 110 (direct testimony of Prof. Ferro); Trial Tr. vol. II at 588:20–589:8, ECF No. 109 (direct testimony of Mr. Crumley).  Professor Ferro persuasively demonstrated how The Comfy®'s design made it unable to effectively trap air and keep the user warm in the extreme cold.  *See, e.g.*, Trial Tr. vol. III at 928:19–929:18, ECF No. 110 (PROF. FERRO:  "[The background the sherpa was knitted on is] very porous….  The background is all … it's like a mesh type …."); *id.* at 987:13–17 (MR. KENNEDY:  "And what is the effect of the sherpa being porous?" PROF. FERRO:  "Again, you know, it's not doing its … full job.  The air is escaping. The air can get in even.").  As she testified, "[The Comfy® is] a very open, loose garment….  [I]f I'm thinking about it staying warm, cold air can get into the garment very easily."  *Id.* at 930:14–18.  The Court finds Professor Ferro's detailed analysis more persuasive and credible than that of Mr. Crumley.

The Court is also unpersuaded by Mr. Crumley's testimony about the protection provided by The Comfy® in the cocooning position.  To be sure, Professor Ferro credibly testified that the cocooning position keeps the user warmer than when

standing, because the bottom is no longer open.  *See id.* at 986:19–22.  However, she

explained that, even as a cocoon, The Comfy® does not have the characteristics "that

it needs to protect against the extreme cold."  *Id.* at 986:25–987:3.  That is because

"the fabrics … are still not touching the body[;] … [t]he hood is still open[;] … the

sherpa is porous[;] … it's not water repellent[;] … [and] [i]t doesn't have a finish."  *Id.*

at 987:5–12 (direct testimony of Prof. Ferro).  These features make it difficult for The

Comfy® to trap air even when users cocoon.  Cocooning also involves crouching down

to the ground, which — in extreme cold conditions — may involve putting the non-

water resistant Comfy® in contact with the wet ground or snow.  In that case, The

Comfy® would absorb rather than repel the moisture, ending its ability to provide

warmth to the user.  *See id.* at 937:23–938:9 (MR. KENNEDY: "Okay.  And can you

just explain why … is it a good thing or bad thing that [The Comfy®] stays wet?"

PROF. FERRO: "No.  It's a bad thing."  MR. KENNEDY: "And why is that?"  PROF.

FERRO: "Heat moves very quickly through water.  So you lose the heat from your

body a lot faster.  The whole idea of putting all these things on is to keep the heat

in.").  Thus, even in the position most likely to provide protection, The Comfy®'s flaws

prevent it from being able to protect in extreme cold conditions.

   Cozy Comfort argues that The Comfy®'s ribbed knit and thick sherpa lining

provide protection from the extreme cold, but the evidence does not support this

contention.  The Comfy® protects against mild to cool temperatures, like a sweater,

pullover, or other similar article.  *See id.* at 979:8–14 (MR. KENNEDY: "[W]ould you

be able to estimate where you could wear The Comfy outdoors, at what temperature

ranges?"  PROF. FERRO:  "I would say mild temperatures because of its open —
especially because of its open design.").  As Professor Ferro testified, the ribbed knit
at the bottom of the sleeves "keep[s] out the wind" and outside cold air.  *Id.* at 929:7.
The sherpa lining also traps some body heat in the product to "keep … warmth in."
*Id.* at 1023:3–9 (direct testimony of Prof. Ferro).  These are important features for
providing warmth to users.  But other deficiencies with the product make it unable
to protect against the extreme cold, including the porous nature of the sherpa, the
open hood, and the open bottom.  *See id.* at 928:19–931:20 (direct testimony of Prof.
Ferro).  Thus, The Comfy® only provides warmth indoors at room temperature or
outdoors in mild weather.  *See id.* at 979:8–14 (MR. KENNEDY: "[W]ould you be able
to estimate where you could wear The Comfy outdoors, at what temperature ranges?"
PROF. FERRO:  "I would say mild temperatures because of its open — especially
because of its open design.")

Cozy Comfort also contends that the product was designed to protect from the
extreme cold.  *See* Trial Tr. vol. I at 94:5–8, ECF No. 108 (direct testimony of Mr.
Speciale).  The evidence did not support these assertions.  Mr. Speciale testified that
he drew inspiration from his nephew cocooned in a sweatshirt lying next to a blanket.
*See id.* at 61:20–63:15.  This occurred indoors.  *See id.*  When making the prototype,
Mr. Speciale took basic throw blankets — like those he saw next to his nephew — and
paid a company to turn them into "wearable blanket" that was almost identical to
final version of The Comfy®.  *See id.* at 64:7–22.  No extra steps were taken to ensure
The Comfy® could protect against the extreme cold.  *See* Trial Tr. vol. II at 434:7–10,

ECF No. 109 (cross-examination of Mr. Speciale) (MR. KENNEDY: "No testing has been performed by Cozy Comfort that shows The Comfy protects from extreme cold, correct?" MR. SPECIALE: "I believe that is correct, yes.").

On direct examination, when asked to point to patent documents showing that The Comfy® could protect from the extreme cold, Mr. Speciale could only identify language that details how The Comfy® protects one indoors. *See* Trial Tr. vol. I at 95:4–96:6, 100:1–101:17, ECF No. 108 (citing Ex. P-6, col. 1). The cited patent describes how The Comfy® allows someone to "stay warm inside a cool building." Ex. P-6, col. 1, line 29. The patent contains no mention of how The Comfy® is, can be, or should be used outdoors. *See id.* The cool room temperatures described in the patent do not approach near freezing. A product designed for these conditions is ill suited for any credible definition of extreme cold.

Cozy Comfort also entered photographs into evidence that purport to show customers using the product in the extreme cold. *See* Ex. P-13; Trial Tr. vol. I at 134:8–18, ECF No. 108 (direct testimony of Mr. Speciale). Cozy Comfort identified five photographs in Exhibit P-13. *See* Trial Tr. vol. I at 142:12–14, ECF No. 108. Through its witnesses, it argued these photographs showed customers wearing The Comfy® "in extremely cold conditions" based on the fact there was "snow on the ground." *Id.* at 145:15–17 (direct testimony of Mr. Speciale). The Court has reviewed all the photographs admitted in Exhibit P-13. The Court finds that these photographs have little evidentiary value on whether The Comfy® can protect one in extreme cold conditions. The photographs provide little evidence of the weather

conditions at the time they were taken.  None of the photographs depict the temperature or wind speed.  Snow can remain for a time once the temperature rises above levels that could be described as extremely cold.  The Court is cognizant of the Government's objection that the photographs could easily be cherrypicked by the Plaintiff.  *See* Trial Tr. vol. I at 141:4–14, ECF No. 108 (raising objections to the admission of Ex. P-13); *cf.* Fed. R. Evid. 403 ("The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice[.]"); Fed. R. Evid. 1006(a) ("The court may admit as evidence a summary … offered to prove the content of voluminous admissible … photographs that cannot be conveniently examined in court[.]").  Mr. Speciale could not provide a precise estimate of the total number of customer photographs Cozy Comfort possesses, but he guessed that the number "would be in the thousands."  Trial Tr. vol. II at 504:6, ECF No. 109 (cross-examination of Mr. Speciale).  Exhibit P-13, however, only contains around one hundred of these photographs; and Mr. Speciale "[didn't] know exactly how they were selected."  *Id.* at 503:4–5 (cross-examination of Mr. Speciale); s*ee id.* at 502:13–16 (cross-examination of Mr. Speciale).  It is impossible to gauge how frequently customers may wear the product outside as opposed to inside from Exhibit P-13.  The customer reviews referenced by some witnesses in their testimony suffer from the same defects.  *See, e.g.*, Trial Tr. vol. III at 885:3–25, ECF No. 110 (cross-examination of Ms. Concannon).  When the photographs and reviews are compared with objective evidence such as the design of the product as well as Cozy Comfort's representations in its patent applications that the product is designed for use "inside a cool building,"

the objective evidence bears greater weight.  *See* Ex. P-6.  For these reasons, the Court

finds that The Comfy® does not protect against the extreme cold.

## CONCLUSIONS OF LAW

The question of law in this case is under which HTSUS heading The Comfy®

belongs.   The parties propose Heading 6110 (sweaters, pullovers, sweatshirts,

waistcoats (vests), and similar articles); Heading 6301 (blankets and traveling rugs);

Heading 6114 (other garments, knitted or crocheted); or Heading 6307 (other made-

up articles, including dress patterns).  For the following reasons, the Court finds that

The Comfy® is properly classified as a pullover under Heading 6110, and — within

that Heading — under Subheading 6110.30.30, HTSUS.

## I.    The Legal Framework for Tariff Classification

The  Harmonized  Tariff  Schedule  of  the  United  States  is  organized  into

headings,  each  of  which  contains  one  or  more  subheadings.   Headings  describe

"general categories of merchandise."  *Wilton Indus.*, 741 F.3d at 1266.  Subheadings

"provide a more particularized segregation of the goods within each category."  *Id.*

The General Rules of Interpretation (GRIs) of the HTSUS set out a strict order

of operations for courts to follow.  First, "[a] classification analysis begins, as it must,

with the language of the headings."  *Orlando Food Corp. v. United States*, 140 F.3d

1437, 1440 (Fed. Cir. 1998) (citing GRI 1, HTSUS).  Then, "[h]aving classified the

product under the appropriate heading," the Court "turn[s] to the subheadings"

within the heading.  *Id.* at 1442 (citing GRI 6, HTSUS).

Heading classification follows a two-step process whenever — as is the case here — litigants dispute material facts related to "the nature of the merchandise[.]"[7] *Wilton Indus.*, 741 F.3d at 1266. First, courts interpret the language of the tariff headings at issue. *See Orlando Food*, 140 F.3d at 1439; *see also Wilton Indus.*, 741 F.3d at 1266. "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." *Carl Zeiss*, 195 F.3d at 1379. The Court decides the common meaning of a tariff term as a question of law. *E.M. Chems. v. United States*, 920 F.2d 910, 912 (Fed. Cir. 1990) (citing *Stewart-Warner Corp. v. United States*, 748 F.2d 663, 664–65 (Fed. Cir. 1984)). The Court "may consult lexicographic and scientific authorities, dictionaries, and other reliable information" or may rely on its "own understanding of the terms used" when the tariff term lacks a clear definition. *Baxter Healthcare Corp. v. United States*, 182 F.3d 1333, 1337–38 (Fed. Cir. 1999). It may also consult the Explanatory Notes for the Harmonized Commodity Description and Coding System, which the World Customs Organization maintains. Although not legally binding, the Explanatory Notes "are generally indicative of the proper interpretation of a tariff provision." *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing *Motorola Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006)).

Some HTSUS headings are *eo nomine* provisions, which "describe[] an article by a specific name." *CamelBak Prods.*, 649 F.3d at 1364–65 (citing *Carl Zeiss*, 195

---

[7] This two-step process "collapses entirely into a question of law" whenever there is "no dispute as to the nature of the merchandise[.]" *Wilton Indus.*, 741 F.3d at 1266 (citing *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006)).

F.3d at 1379).  *Eo nomine* provisions differ from use provisions, which describe merchandise by its use.  *See Carl Zeiss*, 195 F.3d at 1379.  An *eo nomine* provision "include[s] all forms of the named article[,]" *id.*, even improved forms, "as long as the improved article performs the same essential function as the named exemplar." *Deckers Corp. v. United States*, 752 F.3d 949, 957 (Fed. Cir. 2014).  An improved article stops performing the same essential function of a named exemplar when its improvements cause it to "possess[] features *substantially in excess* of those within the common meaning of the [named] term."  *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1354 (Fed. Cir. 2014) (internal quotation marks omitted) (emphasis in original).

　　　Second, after interpreting the tariff headings, courts apply the General Rules of Interpretation, starting with GRI 1, to determine the product's proper heading.  *See Orlando Food*, 140 F.3d at 1439.  GRI 1 provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes."  GRI 1, HTSUS.  The Federal Circuit has explained that GRI 1 determines a product's classification if it "is described *in whole* by a single classification heading" of the HTSUS.  *La Crosse Tech., Ltd. v. United States*, 723 F.3d 1353, 1358 (Fed. Cir. 2013) (emphasis added).  If no heading describes the product in whole, the Court then uses GRIs 2 through 5, in order — only using the next GRI if the previous GRI cannot classify the product.  *See Mita Copystar Am. v. United States*, 160 F.3d 710, 712 (Fed. Cir. 1998); *Wilton Indus.*, 741 F.3d at 1266.  But, "if the proper heading can be

determined under GRI 1, the court is not to look to the subsequent GRIs." *R.T. Foods*, 757 F.3d at 1353.

Once the Court determines the correct heading for the merchandise, it then analyzes the relevant subheadings. *See Orlando Food*, 140 F.3d at 1440. The Court uses the same process to determine the proper HTSUS subheading as it did the heading: first construing the subheadings' meanings and then applying the General Rules of Interpretation in order. *See* GRI 6, HTSUS; *Orlando Food*, 140 F.3d at 1442.

## II.    Construction of the Relevant HTSUS Headings

The parties suggest four possible headings for The Comfy®. The Government maintains that the The Comfy® belongs in Heading 6110, as Customs originally determined. *See* Def.'s Br. at 31, ECF No. 116. Cozy Comfort suggests three alternative Headings — 6114, 6301, and 6307. *See* Pl.'s Br. at 2, 4, ECF No. 114. "All of the asserted classifications fall within Section XI of the HTSUS, which covers 'textiles and textile articles' and includes Chapters 50 to 63 of the HTSUS." *Allstar Mktg.*, 41 CIT ___, 211 F. Supp. 3d at 1328. Chapter 61 and Chapter 63 apply only to "made up articles." Note 1 to Ch. 61, HTSUS; Note 1 to Ch. 63, HTSUS. Note 7(e) to Section XI defines "made up" as an item "assembled by sewing, gumming or otherwise." Note 7(e) to Section XI, HTSUS. Neither party disputes that The Comfy® is "made up" within the meaning of the section. *See* Pl.'s Br., ECF No. 114; Def.'s Br., ECF No. 116. It is therefore appropriate to turn to these chapters to classify The Comfy®.

## A.

Heading 6110 falls under Chapter 61 of the HTSUS. That chapter encompasses "articles of apparel and clothing accessories, knitted or crocheted." Ch. 61, HTSUS. Headings 6101 to 6114 of Chapter 61 encompass various articles of apparel. For an item to be classifiable under these headings, it first must be "wearing apparel." *Rubies Costume Co. v. United States* (*Rubies Costume I*), 337 F.3d 1350, 1357 (Fed. Cir. 2003); *see* Statistical Note 2, Ch. 61, HTSUS (all items in Heading 6110 are "garments"); *Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1329–30 (deciding if an item is a "garment" by first considering if it is "wearing apparel"). The Federal Circuit clarified the meaning of "wearing apparel" in *Rubies Costume I*, where it determined that various Halloween costumes were not wearing apparel because they were "of a flimsy nature and construction" and were not "normal articles of apparel." *Rubies Costume I*, 337 F.3d at 1358, 1360. As the Court explained, "Wearing apparel" is defined as "all articles which are ordinarily worn—dress in general." *Id.* at 1357 (emphasis removed) (quoting *Arnold v. United States*, 147 U.S. 494, 496 (1893)).

Heading 6110 covers "[s]weaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted[.]" 6110, HTSUS. The Federal Circuit elaborated on the meaning of this heading in *Rubies Costume II*, where it determined a "well-made" and "durable" Santa Suit jacket was a "similar article" classifiable under Heading 6110. *Rubies Costume II*, 922 F.3d at 1345–46. The Federal Circuit explained that items under this heading share a few common traits: (1) they cover the upper body; (2) they provide "some warmth"; (3) they do not "protect against wind,

rain, or extreme cold"; and (4) they can be worn over "undergarments or other clothing." *Rubies Costume II*, 922 F.3d at 1345–46.  Goods of Heading 6110 also have openings for the waist, head, and arms.  *See BASF Corp. v. United States*, 35 CIT 1478, 1481 (2011) ("To assist it in ascertaining the common meaning of a tariff term, the court may rely on its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources.") (citing *Baxter Healthcare*, 182 F.3d at 1337–38).

Heading 6110 is an *eo nomine* provision because the terms in Heading 6110 "describe[] … article[s] by [their] specific name." *R.T. Foods*, 757 F.3d at 1354; *see Rubies Costume II*, 922 F.3d at 1345–46 (treating Heading 6110 as an *eo nomine* provision).  "[A] sweater describes 'a knitted or sometimes crocheted elastic jacket or pullover made in various styles and of various materials and usu[ally] having ribbing around the neck, cuffs, and lower edge[.]'" *LeMans Corp. v. United States*, 34 CIT 156, 162–63 (2010) (alteration in original) (quoting Webster's Third New International Dictionary 1840, 2308 (2002)); *see also Carl Zeiss, Inc.*, 195 F.3d at 1379.  "[A] pullover comprises 'a garment (as a sweater, shirt, or blouse) that is put on by being pulled over the head and is usu[ally] made without a placket or similar opening.'" *LeMans Corp.*, 34 CIT at 162–63 (alteration in original) (quoting Webster's Third New International Dictionary 1840, 2309 (2002)).  A placket is "a finished slit" that provides an opening in the front of a garment. *Id.* at 163 n.11 (quoting Webster's Third New International Dictionary 1728 (2002)).  A sweatshirt is "a collarless long-sleeved pullover made of cotton jersey with a smooth-

Court No. 1:22-cv-00173 (SAV)                                              Page 56

finished face and a heavily napped back." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2308 (1968). A waistcoat or vest is "an item of wearing apparel extending to the waist or below that is similar to a sleeveless jacket … [u]sually worn over a blouse or shirt …." *Victoria's Secret Direct, LLC v. United States*, 37 CIT 573, 588–89 (2013) (citing THE FAIRCHILD DICTIONARY OF FASHION 477 (3rd ed. 2003)).

Though Heading 6110 is an *eo nomine* provision, the Court must still consider use when classifying goods under this heading. In general, courts "should not read a use limitation into an *eo nomine* provision." *Kahrs Int'l v. United States*, 713 F.3d 640, 646 (Fed. Cir. 2013) (citing *Carl Zeiss*, 195 F.3d at 1379). But in certain "very limited circumstances," the terms of an *eo nomine* provision "inherently suggest[] looking to intended use" and require a court to "consider use." *Ford Motor Co. v. United States*, 926 F.3d 741, 753 (Fed. Cir. 2019); *see also Carl Zeiss*, 195 F.3d at 1375, 1379. To determine if these circumstances exist, courts look to "the language of the particular headings" to see whether it "impl[ies] that use or design is a defining characteristic." *Irwin Indus. Tool Co. v. United States*, 920 F.3d 1356, 1361 (Fed. Cir. 2019).

Use is a relevant consideration when classifying an item under Heading 6110. In *Rubies Costume II*, the Federal Circuit's classification of a Santa Suit jacket under Heading 6110 rested on its assessment that users can "wear the jacket over either undergarments or other clothing" and that the jacket "provides some warmth to the wearer but does not protect against the wind, rain, or extreme cold." *Rubies Costume II*, 922 F.3d at 1346. These considerations relate to how the Santa Suit jacket is used.

*See id.* The term pullover in Heading 6110 also "suggests a type of use," *Carl Zeiss*, 195 F.3d at 1379, because a pullover must be "put on by being pulled over the head[.]" *LeMans Corp.*, 34 CIT at 162–63 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1840, 2309 (2002)). The Court accordingly must consider use when classifying goods under Heading 6110. Doing so requires the Court to consider not only an article's physical characteristics but also its design, intended use, and marketing. *See GRK Canada, Ltd. v. United States*, 761 F.3d 1354, 1358 (Fed. Cir. 2014).

## B.

Heading 6301 covers "blankets and travelling rugs."[8] 6301, HTSUS. Note 2(a) to Chapter 63 states that Headings 6301 to 6307 do not cover the "[g]oods of chapters 56-62." If an article is properly classified under Heading 6110, it cannot be classified in Heading 6301. *Cf. Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1328 (first examining if an article is classifiable under Heading 6114 before examining if it can be classified in Heading 6301 based on note 2(a) to Chapter 63).

The Court of International Trade analyzed the meaning of the term blanket in Heading 6301 in *Allstar Marketing*. *See* 41 CIT __, 211 F. Supp. 3d at 1335–36. The Court explained, "Blanket is not defined in the statute or legislative history; thus, the court considers its common commercial meaning." *Id.* at 1335 (internal quotation marks omitted). The Court's review of dictionary entries revealed that "first … a

---

[8] Neither party suggests that The Comfy® is a travelling rug. A travelling rug is an article commonly used to cover the lower half of a person's body while travelling by carriage, car, rail, ship, or other means of motorized transportation. *See Riley & Co. v. United States*, 8 Ct. Cust. 116, 117–18 (1917).

blanket is a large (possibly oblong) piece of fabric, and second, that a blanket is used as a covering for warmth, often, but not always, as common knowledge dictates, on a bed." *Id.* at 1336. The Court summarized its understanding of the term blanket by saying, "[T]he essential characteristics of a blanket ... [are] a large piece of fabric providing a warm covering." *Id.* at 1337 (internal quotation marks omitted).

Heading 6301 is an *eo nomine* provision because it "describes an article by a specific name." *R.T. Foods*, 757 F.3d at 1354. The term "traveling rug" in Heading 6301 "impl[ies] that use or design is a defining characteristic" for at least some items classifiable under the heading, *Irwin Indus. Tool Co.*, 920 F.3d at 1361, because "traveling rug[s]" are rugs used as a covering for passengers traveling in "automobiles ... [and] carriages" or other means of motorized transportation. *Riley & Co. v. United States*, 8 Ct. Cust. 116, 117–18 (1917).

## C.

Cozy Comfort offers two alternative headings, both basket provisions. Heading 6114 covers "Other garments, knitted or crocheted." Heading 6307 covers "Other made up articles, including dress patterns[.]" "A basket provision is not a specific provision." *R.T. Foods*, 757 F.3d at 1354 (quoting *Int'l Bus. Machs. Corp. v. United States*, 152 F.3d 1332, 1338 (Fed. Cir. 1998)). Imported merchandise only belongs in a basket provision "if there is no tariff category that covers the merchandise more specifically." *Id.* (quoting *Rollerblade, Inc. v. United States*, 24 CIT 812, 815 (2000), *aff'd*, 282 F.3d 1349 (Fed. Cir. 2002)). The two basket headings do not apply if the Court finds that either of the more specific provisions covers The Comfy®. *Id.*

### III.    The Comfy® Is Classifiable Under Heading 6110

The Government correctly classified The Comfy® under Heading 6110 because The Comfy® is a pullover.  Heading 6110 covers "[s]weaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted."  6110, HTSUS.  The parties agree that The Comfy® is "knitted," so that it is classifiable under Heading 6110 if it (1) is wearing apparel; (2) shares the common characteristics of goods in Heading 6110; and (3) is a sweater, a pullover, a sweatshirt, a waistcoat, or a similar article.  *See Rubies Costume II*, 922 F.3d at 1344–46 (determining if a Santa Suit jacket falls under Heading 6110); Jt. Uncontested Facts ¶ 4, ECF No. 107 ("The Comfy® is knitted.").   As the foregoing analysis shows, The Comfy® is wearing apparel.  It shares the key characteristics common to "[s]weaters, pullovers, sweatshirts, waistcoats (vests) and similar articles" and is a "pullover[.]"  6110, HTSUS.

### A.

The Comfy® must be a "garment," or "wearing apparel," to be classified in Heading 6110.  *See Rubies Costume I*, 337 F.3d at 1357; *Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1330.  Cozy Comfort argues that The Comfy® is not wearing apparel because it "is not ordinarily worn in a common place way like pants, a shirt, a jacket, or another article of clothing."  Pl.'s Br. at 21–22, ECF No. 114.  Instead, "it is a brand new, novel patented product designed, marketed, and sold as an alternative to a household blanket … not as clothing for general use in public."  *Id.* at 22. The Comfy® — in Cozy Comfort's telling — possesses "non-clothing features that sharply and

materially distinguish it from standard wearing apparel." *Id.* at 23.  The Court disagrees.

Federal courts have analyzed the meaning of the term "wearing apparel" for over a century. *See, e.g.*, *Arnold v. United States*, 147 U.S. 494 (1893).  Summarizing that case law, the Federal Circuit has explained:

> An understanding of what is an article of [wearing] apparel begins with the Supreme Court's decision in *Arnold v. United States* … where the Court stated:  "The term 'wearing apparel' is not an uncommon one in statutes, and is used in an inclusive sense as embracing all articles which are *ordinarily* worn" ….  The Customs Court in *Antonio Pompeo v. United States*, 40 Cust. Ct. 362 (1958), further developed this definition [saying that]:  "Wearing apparel refers to clothes or coverings for the human body worn for decency or comfort and common knowledge indicates that adornment is also an element of many articles of wearing apparel."

*Rubies Costume I*, 337 F.3d at 1357 (emphasis in original) (indentations omitted).  Certain features may indicate an item is wearing apparel "such as the extent of styling features, including 'zippers, inset panels, darts or hoops, and whether the edges of the materials [are] left raw or finished.'"  *Rubies Costume II*, 922 F.3d at 1343 (citing *Rubies Costume I*, 337 F.3d at 1357).

Whether merchandise is wearing apparel hinges on if it is "ordinarily worn." *Rubies Costume I*, 337 F.3d at 1358 (citing *Arnold*, 147 U.S. at 496).  The parties have stipulated that The Comfy® is "intended to be worn …."  Jt. Uncontested Facts ¶ 11, ECF No. 107.  The remaining question is whether the merchandise is *ordinarily* worn. An item is "ordinarily" worn if it is worn like wearing apparel "in the ordinary course of events: usually" or "in a commonplace … way[.]"  WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY 1589 (1968); *see also Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1332.

No brightline rule governs when merchandise moves from being merely worn to being ordinarily worn. Courts examining the question conduct a fact intensive inquiry. In *Rubies Costume I*, the Federal Circuit held that a variety of Halloween costumes were not "ordinarily worn" because they were (1) worn once a year "for Halloween fun," (2) "lacked cognitive association as wearing apparel," and (3) were "of a flimsy nature" and not generally recognized as "normal articles of apparel." 337 F.3d at 1358. In *Allstar Marketing*, the Court of International Trade applied *Rubies Costume I* and found that The Snuggie® was not ordinarily worn because (1) The Snuggie® lacked cognitive association as wearing apparel because of its long "dimensions and lack of [a] rear closure" and (2) The Snuggie® was used like a blanket and thus was not "ordinarily worn in any commonplace way." 41 CIT __, 211 F. Supp. 3d at 1333–34. By contrast, in *Rubies Costume II*, the Federal Circuit found that a Santa Suit jacket was classifiable as "wearing apparel under HTSUS chapter 61" because the jacket's "styling, construction, and finishing touch[es]" showed it was "well-made" and "of durable and nonflimsy construction...." 922 F.3d at 1345.

Extensive evidence shows that The Comfy® is ordinarily worn because users wear it in a variety of everyday, commonplace situations. These situations primarily include indoor activities like lounging on the couch, grabbing a drink, and adjusting the fire. *See* Jt. Uncontested Facts ¶ 18, ECF No. 107; Ex. P-6, col. 1. They also include outdoor activities like "walking the dog," "getting the mail," and "outside

chores[.]"  Jt. Uncontested Facts ¶ 18, ECF No. 107.  When users don and wear The Comfy® in these situations, they do so by pulling it over their head in a manner identical to how users don and wear an ordinary pullover.  *Cf.* Trial Tr. vol. I at 108:23–109:6, ECF No. 108 (direct testimony of Mr. Speciale) (describing how to put on The Comfy®).  The Comfy®'s patents further explain that The Comfy® "is worn on the body of the person like an article of clothing[.]"  Ex. P-6, col. 5, lines 65–66.  The Comfy® is "made from a fleece outer-fabric and … a thick, luxurious sherpa lining."  Trial Tr. vol. II at 595:4–6, ECF No. 109 (direct testimony of Mr. Crumley); *see also* Trial Tr. vol. I at 125:15–16, ECF No. 108 (direct testimony of Mr. Speciale) (noting The Comfy® has a "thick sherpa layer").  These materials impart The Comfy® with a "durable and nonflimsy construction."  *Rubies Costume II*, 922 F.3d at 1345.

The Comfy® is not worn once or twice during a specific week of the year, like the Halloween costumes in *Rubies Costume I*.  Nor is its use limited by season.  Testimony and evidence established that The Comfy® can keep users warm indoors and in cool or mild outdoor conditions.  It is worn indoors year-round, even during the summer.  *See* Trial Tr. vol. I at 120:8–121:16, ECF No. 108 (direct testimony of Mr. Speciale) (describing how he wore The Comfy® indoors at a hockey rink "in the summer" when "it was 110 [degrees] outside").  The Comfy® also is used for outdoor activities during cool and mild temperatures, which may occur during all four seasons depending on where a user lives.  *See* Trial Tr. vol. III at 979:8–14, ECF No. 110 (MR. KENNEDY:  "[W]ould you be able to estimate where you could wear The Comfy outdoors, at what temperature ranges?"  PROF. FERRO:  "I would say mild

temperatures because of its open — especially because of its open design."); Ex. P-12 at 6 (detailing the distribution of Comfy® customers in different regions of the United States).

The Comfy® also retains a cognitive association with wearing apparel, unlike a Halloween costume and The Snuggie®. The Federal Circuit in *Rubie's Costume I* explained that Halloween costumes "lacked cognitive association as wearing apparel" because they "promote[] festive value rather than cognitive association as wearing apparel." 337 F.3d at 1358. In other words, the costumes did not resemble items that people wear in ordinary circumstances. *See id.* That is not a concern here, as users wear The Comfy® in ordinary situations. *See* Jt. Uncontested Facts ¶ 18, ECF No. 107 (noting users wear The Comfy® while performing activities like "walking the dog," "getting the mail," and performing "outside chores"). In *Allstar Marketing*, The Snuggie®'s lack of cognitive association as wearing apparel hinged on the product's long "dimensions and lack of [a] rear closure." 211 F. Supp. 3d at 1333–34. Unlike The Snuggie® depicted below, The Comfy® has a closed back like typical wearing apparel. And it is not as long as The Snuggie®. *Compare id.* at 1333 ("[T]he Snuggie® consists of a 71-by-54 inch rectangular piece of ... fabric[.]"), *with* Jt. Uncontested Facts ¶ 7, ECF No. 107 (stipulating that The Comfy® is, at its longest, 36-by-41 inches). The Comfy® also has a "hood[,]" a "marsupial ... pocket[,]" and "ribbed wrist cuffs," unlike The Snuggie®. *See* Jt. Uncontested Facts ¶ 6, ECF No. 107. These differences give The Comfy® a cognitive association as wearing apparel and make the item appear to be an oversized pullover.

 

*See* Ex. D-50.

The Comfy® is also used like commonplace apparel unlike The Snuggie®. Courts considering an item's use give great weight to its "primary design and use," *CamelBak Prods.*, 649 F.3d at 1362, 1368–69, and assess if that "specific primary" or "obvious" purpose aligns with the purposes of items in the HTSUS headings at issue. *Otter Prods., LLC v. United States*, 834 F.3d 1369, 1376, 1381 (Fed. Cir. 2016). In *Allstar Marketing*, the Court focused on how "the Snuggie® was designed (and, thus, intended) to be loosely worn as an outer layer roughly covering the front of the user to provide warmth." *Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1334. Additionally, evidence "showed people wearing [T]he Snuggie® in the types of situations one might use a blanket; for example, while seated or reclining on a couch or bed, or outside cheering a sports team." *Id.* at 1337.

Cozy Comfort relies on *Allstar Marketing* and argues that The Comfy®'s "primary design and use" is as a "as a cozy, cocooning blanket[,]" not as wearing

apparel.  Pl.'s Br. at 24–25, ECF No. 114.  But The Comfy® and The Snuggie® are different products with different physical characteristics.  Unlike The Snuggie®, The Comfy® covers both sides of a user's body, not just the wearer's front; and users put on The Comfy® exactly like an ordinary pullover.  *See* Trial Tr. vol. I at 108:23–109:6, ECF No. 108 (direct testimony of Mr. Speciale).  Cozy Comfort called these differences a "significant improvement" on The Snuggie® when its founders tried persuading *Shark Tank*'s investors of The Comfy®'s viability, and Cozy Comfort's marketing of The Comfy® emphasized these unique aspects of the product.  *See* Ex. D-21 at 6:43–49 (according to Brian Speciale); Ex. P-1.  Users do not primarily cocoon in The Comfy®, as Cozy Comfort argues.  *See* Pl.'s Br. at 24–25, ECF No. 114; *supra* at 21–23.  Instead, they primarily wear The Comfy® during indoor lounging activities like sitting or lying on the couch while watching television.  True, these are "the types of situations one might use a blanket," but they also are situations where one might use wearing apparel like a sweatshirt or pullover.  *Cf. Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1337.  And unlike blankets and The Snuggie®, users also wear The Comfy® during a variety of active tasks.  Cozy Comfort stipulated that users wear the product during activities such as "ice skating; holiday activities at the park; tailgating; dinner party hosting; outside chores, like raking leaves; outside play, like jumping in the freshly raked leaves; pumpkin picking; pumpkin carving; hayrides; corn mazes; dancing; walking the dog; getting the mail; [and] cheering on the sidelines[.]"  Jt. Uncontested Facts ¶ 18, ECF No. 107.  The Comfy®'s co-creator, Mr. Speciale, testified that he wore The Comfy® in public at a hockey rink and while

"explor[ing]" the area near Niagara Falls.  *See* Trial Tr. vol. I at 118:25–121:21, ECF No. 108.  These activities are not possible while using a blanket.

The Court does not find Cozy Comfort's remaining argument — that The Comfy® has "non-clothing features" that make it different from wearing apparel — persuasive.  Pl.'s Br. at 23, ECF No. 114.  Several features Cozy Comfort points to are simply features of oversized clothing.  These include The Comfy®'s large hood opening, that its hood is "huge" and "can cover the user's entire face," the merchandise's ability to "drape over a person," its ability to "cover the [wearer] when in the fetal position," and its ability to permit a user to "bring [his or her] arms in and out of the sleeves …."  *Id.*  Cozy Comfort claims that The Comfy®'s "thick, blanket materials," microfleece and sherpa, distinguish the item from clothing.  *Id.*; *see also* Jt. Uncontested Facts ¶ 5, ECF No. 107.  But these are fabrics that are in clothing as well.  *See* Trial Tr. vol. III at 952:2–6, ECF No. 110 (MR. KENNEDY:  "What types of fabrics can be used to make garments?"  PROF. FERRO:  "You can use … anything to make a garment."); *id.* at 952:17–21 ("MR. KENNEDY:  "[H]ave you ever designed garments using sherpa?"  PROF. FERRO:  "Yes, I did."); *see also* Pl.'s Br. at 23, ECF No. 114.  For these reasons, the Court finds that The Comfy® is wearing apparel.

## B.

The next question is whether The Comfy® shares the common characteristics of goods in Heading 6110.  "Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles" all (1) cover the upper body, (2) provide "some warmth," (3) do not "protect against wind, rain, or extreme cold," and (4) can be worn over

"undergarments or other clothing." *Rubies Costume II*, 922 F.3d at 1345–46. The Comfy® possesses all four characteristics. The parties agree that The Comfy® does not provide protection against rain or wind. *See* Jt. Uncontested Facts ¶ 13, ECF No. 107. And they agree, "The Comfy® is intended to be worn over clothes or undergarments." *Id* ¶ 11. The Court resolved the parties' remaining factual arguments over this issue in its findings of fact. The Comfy® covers the upper body of the user, *see supra* at 20–21, provides some warmth, *see supra* at 23–24, but does not protect against the extreme cold. *See supra* at 31–50.

Cozy Comfort's remaining argument is that "The Comfy® … cannot be classified in Heading 6110, HTSUS, because it extends to the knees or below of a typical user whereas Heading 6110 only applies to upper body garments." Pl.'s Br. at 46, ECF No. 114. The Court found that The Comfy® falls between the thigh and the knees of a user, depending on the user's height. Because the typical user is an adult female and the typical adult female is 5 feet 4 inches tall, The Comfy® falls around a typical user's knees. *See* Trial Tr. vol. I at 77:23–78:11, ECF No. 108 (direct testimony of Mr. Speciale). Cozy Comfort designed the product to be oversized. *See id.* at 63:21–22 (direct testimony of Mr. Speciale); Ex. P-6, col. 6, lines 4–15. This gives rise to a colorable argument that The Comfy®'s oversized design takes it out of Heading 6110. Pl.'s Br. at 46, ECF No. 114.

Cozy Comfort, however, incorrectly assumes that "[H]eading 6110 *only* applies to upper body garments." *Id.* (emphasis added). *But see Victoria's Secret Direct*, 37 CIT at 589 (noting that a waistcoat or vest is "an item of wearing apparel *extending*

*to the waist or below*") (emphasis added). To be sure, in *Rubies Costume II*, the Federal Circuit noted that the typical sweater, sweatshirt, or pullover "covers the upper body." 922 F.3d at 1345–46. To Cozy Comfort, this implies that these goods may cover no more than the upper body. Modifications from a typical item, however, do not remove a product from an *eo nomine* heading unless the "difference" is "significant." *R.T. Foods*, 757 F.3d at 1354 (citing *CamelBak Prods.*, 649 F.3d at 1365); s*ee also Deckers Corp.*, 752 F.3d at 957.

When determining if a "significant enough" difference exists, "[t]he criterion is whether the item possesses features *substantially in excess* of those within the common meaning of the [heading] term." *Casio, Inc. v. United States*, 73 F.3d 1095, 1098 (Fed. Cir. 1996) (internal quotation marks omitted) (emphasis in original). An article that "has been improved or amplified but whose essential characteristic is preserved or only incidentally altered is not excluded from an unlimited *eo nomine* statutory designation." *Id.* But an item does not belong in an *eo nomine* provision if it "is in character or function something other than as described … and the difference is significant." *Id.* at 1097 (citation omitted).

Courts apply this "substantial excess" test in a fact-specific inquiry. *See, e.g.*, *id.* at 1098 (an electronic synthesizer does not possess characteristics in substantial excess of ordinary musical instruments because its "additional features are designed primarily to make it easier for a musician to create music or embellish the sound he or she would normally be able to produce"); *CamelBak Prods.*, 649 F.3d at 1368–69 (a bag with hydration and cargo components possessed features substantially in excess

of a backpack because it was principally designed to afford "hands-free" hydration, not storage); *Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1336–37 (the addition of wearable sleeves to an ordinary blanket did not introduce features in substantial excess of a blanket because the sleeves amplified the product's ability serve as a covering). "Relevant factors include the subject import's design, use, or function, how the article is regarded in commerce and described in sales and marketing literature, and whether the addition 'is a substantial or incidental part of the whole product.'" *Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1336–37 (quoting *CamelBak Prods.*, 649 F.3d at 1368).

Oversized sweaters, sweatshirts, and pullovers may be somewhat atypical, but they are still familiar items in the apparel market. Indeed, Mr. Speciale modeled The Comfy® off of a scene he witnessed where he saw his "[seven]-year-old" nephew cocooned in Mr. Speciale's "six [foot] one … 200 pound" brother's "hood[y]" sweatshirt. Trial Tr. vol. I at 62:6–13, ECF No. 108 (direct testimony of Mr. Speciale). That sweatshirt was oversized on his nephew, but it was still a sweatshirt. *See id.* (describing what his nephew was wearing as "one of my brother's old hoodies"). Its oversized nature did not transform it into something new.

Like the size of the sweatshirt his nephew wore, The Comfy®'s oversized nature is an "incidental part of the whole product." *CamelBak Prods.*, 649 F.3d at 1368. Despite its size, the product is principally donned and worn like an ordinary pullover. *See* Trial Tr. vol. I at 108:23–109:6, ECF No. 108 (direct testimony of Mr. Speciale). The Comfy® possesses all the essential characteristics of a sweater,

sweatshirt, or pullover:  It covers the user's upper body; it provides for some warmth without protecting from inclement weather; and users can wear it over other garments.  *See supra* at 67.  The Comfy®'s oversized features do not negate these essential characteristics.  If anything, they amplify The Comfy®'s ability to be worn over other garments and provide for some warmth.

The Comfy's marketing also leans in favor of concluding The Comfy®'s oversized nature does not remove it from Heading 6110.  Marketing is relevant when deciding if a product's improved features — here, being oversized — are in substantial excess of a heading term.  *See GRK Canada*, 761 F.3d at 1358.  It is true that The Comfy® was sold in a box and often was sold in stores' bedding or blanket sections, but that reflects Cozy Comfort's desire to take advantage of the public's familiarity with The Snuggie® rather than The Comfy®'s true nature.  *Compare* Ex. P-1 (showing The Comfy®'s box), *and* Trial Tr. vol. I at 152:12–154:13, ECF No. 108 (direct testimony of Mr. Speciale) (detailing where The Comfy® has been sold), *with Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1325 (stating The Snuggie® is sold in a "box"), *and id.* at 1326 (detailing where The Snuggie® is sold).  The Comfy®'s marketing strategy focused on how The Comfy® differs from The Snuggie® by emphasizing its sweatshirt-like wearability.  *See, e.g.*, Trial Tr. vol. IV at 1193:23–25, ECF No. 111 (Rule 30(b)(6) deposition of Mr. Speciale on behalf of Cozy Comfort) (MR. SPECIALE:  "So [The Snuggie®] does have an opening, as opposed to The Comfy, where[as] The Comfy is closed around."); Trial Tr. vol. III at 945:23–946:5, ECF No. 110 (PROF. FERRO:  "The Snuggie is like a blanket.  But [The Comfy®] is a

garment."); Ex. D-21 at 6:03–47 (Mr. Speciale describing the differences between The Snuggie® and The Comfy® on *Shark Tank*). This difference was the centerpiece of Cozy Comfort's marketing strategy. *See* Trial Tr. vol. I at 67:1–7, ECF No. 108 (direct testimony of Mr. Speciale); Ex. P-4; Ex. D-21. That strategy involved calling the product "The Blanket … *That's A Sweatshirt*" and advertising the product using a trademark of a panda "wearing a hooded sweatshirt." Ex. P-4 (emphasis added). The Comfy® is oversized, but that did not stop Cozy Comfort from emphasizing its sweatshirt-like characteristics when selling consumers on the product. In the words of the patent, The Comfy® solved the left-behind blanket problem by giving users something that was "practically portable when worn on the body," Ex. P-6, col. 1., lines 40–41, and The Comfy® is "worn on the body of the person like an article of clothing[.]" *Id.* at col. 5, lines 65–66. The Comfy® thus meets the essential characteristics associated with items of Heading 6110.

## C.

Finally, the Court assesses if The Comfy® falls under a particular term in Heading 6110. 6110, HTSUS. No party argues that The Comfy® is a waistcoat or vest, and the Court finds The Comfy® is not classifiable as such a garment. *Compare Victoria's Secret Direct*, 37 CIT at 588 (defining vest as "[a]n item of wearing apparel … that is similar to a sleeveless jacket") (citing THE FAIRCHILD DICTIONARY OF FASHION 477 (3rd ed. 2003)), *with* Jt. Uncontested Facts ¶ 6, ECF No. 107 (noting The Comfy® has "long sleeves"). No party argues that The Comfy® is a sweater or a sweatshirt. Instead, they debate whether The Comfy® falls under the term

"pullovers" or under the catch-all term "similar articles." *See* Pl.'s Br. at 19–49, ECF No. 114; Def.'s Br. at 31–37, ECF No 116.

"[A] pullover comprises 'a garment (as a sweater, shirt, or blouse) that is put on by being pulled over the head and is usu[ally] made without a placket or similar opening.'" *LeMans Corp.*, 34 CIT at 162–63 (alteration in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1840, 2308 (2002)).  Professor Ferro testified that, in the garment industry, pullovers share key features:  (1) they have an opening for the head; (2) they pull over the head; (3) they are knitted; (4) they have a hood; (5) they usually have some kind of rib at the wrist like ribbed cuffs; (6) they have sleeves; (7) they have front and back panels sewn together; and (8) they can have a kangaroo pocket.  *See* Trial Tr. vol. III at 1034:4–1036:2, ECF No. 110.

Users put on The Comfy® by pulling it "over the head," in the same manner as users don an ordinary pullover.  *Id.*; *see also* Jt. Uncontested Facts ¶ 10, ECF No. 107. The Comfy® also has all the other key features of a pullover:  It has an opening for the head; it is knitted; it has a hood; it has ribbed cuffs; it has sleeves; its front and back panels are sewn together; and it has a kangaroo pocket.  *See* Trial Tr. vol. III at 1034:4–1036:2, ECF No. 110 (direct testimony of Prof. Ferro); Jt. Uncontested Facts ¶¶ 4–6, ECF No. 107.  It lacks a "placket or similar opening" in the front panel of the garment.  *LeMans Corp.*, 34 CIT at 162–63.  Its design was inspired in part by a pullover.  *See* Trial Tr. vol. I at 61:20–63:15, ECF No. 108 (direct testimony of Mr. Speciale).  And users wear it in the same situations they might wear a pullover.  *See* Jt. Uncontested Facts ¶ 18, ECF No. 107 (list of activities during which The Comfy®

can be worn).  Cozy Comfort's marketing of The Comfy® as an improvement on The Snuggie® that offers clothing-like wearability also leans in favor of this conclusion. *See* Ex. P-4 (depicting a "standing panda bear wearing a hooded sweatshirt" as a logo for The Comfy®); Ex. D-21 at 6:03–49; Trial Tr. vol. IV at 1193:23–25, ECF No. 111 (Rule 30(b)(6) deposition of Mr. Speciale on behalf of Cozy Comfort) (MR. SPECIALE: "So [The Snuggie®] does have an opening, as opposed to The Comfy, where[as] The Comfy is closed around.").  Indeed, the first association a consumer is likely to have on viewing the product for the first time is that it is an oversized pullover.  It is an inescapable association.

## IV.    The Comfy® Cannot Be Classified Under Any Other Heading

Cozy Comfort makes three arguments for why The Comfy® should be classified as a blanket under Heading 6301.  First, it argues that The Comfy® "is a large piece of fabric" like a blanket.  *See* Pl.'s Br. at 50–51, ECF No. 114.  Second, it asserts The Comfy® is "oblong, meaning that it is elongated and departs from an exact square with its rectangular shape."  *See id.*  Third, it contends "the Comfy® is designed and primarily used as a covering for warmth and protection from the cold like a blanket." *See id.* at 51 (emphasis removed).  The Court is unpersuaded.

That The Comfy® is made of fabric does not render the product a blanket. Many items are made of fabric, including sweaters, sweatshirts, pullovers, blankets, tee shirts, pants, suit jackets, dresses, skirts, scarves, gloves, and ties.  The HTSUS does not contain a general "fabric" classification.  Instead, it creates a system where fabric-made items are classified based on the physical characteristics that the

manufacturing process imparts on them, *e.g.*, by sewing.  *See, e.g.*, 6110, HTSUS ("Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted[.]"); 6301, HTSUS ("Blankets and traveling rugs[.]").

The Comfy® is oblong, but — as with being made of fabric — that characteristic is not unique to blankets.  Many items also have an elongated, non-square shape.  These items include ties, dresses, and shirts.  Oblongness, while perhaps a feature of blankets, is not sufficient to make an item a blanket.

The Comfy® is designed to provide for some warmth and protection from the cold, but it is not a "covering … like a blanket."  Pl.'s Br. at 51, ECF No. 114.  As *Allstar Marketing* noted, the "essential characteristic" of a blanket is that a blanket is "a large piece of fabric providing a warm covering."  41 CIT __, 211 F. Supp. 3d at 1337.  *Allstar Marketing*'s reference to the term "covering" is linked to the fact that people drape a blanket over their front.  *See id.* at 1333–34 (discussing how The Snuggie® is designed "to be loosely worn as an outer layer roughly covering the front of the user").  The Comfy® does not cover a person like a blanket.  Rather than being draped over their front, users wear The Comfy® by pulling it over their head, sliding their arms into the item, and then pulling it down.  The Comfy® not only covers a user's front but also covers his back, arms, and — if he uses the hood — his head.  This is not the kind of "covering" that the *Allstar Marketing* Court viewed as quintessentially blanket-like.  41 CIT __, 211 F. Supp. 3d at 1337.  That The Comfy® is sewn shut with a back panel undermines Cozy Comfort's argument that the product is a blanket.  Both the typical blanket and The Snuggie® are not sewn shut and do

not have a back panel.  *See Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1333 (discussing how The Snuggie® is "open in the back").  This difference is not esoteric; being sewn shut with a back panel is not an "incident[al] alter[ation]" to the ordinary blanket.  *Cf. Casi*o, 73 F.3d at 1098.

Sewing the panels together makes The Comfy® into something "in character [and] function" significantly different from a blanket in three important ways.  *Id.* at 1097; *see als*o Trial Tr. vol. III at 946:4–7, ECF No. 110 (PROF. FERRO:  "The Snuggie is like a blanket.  But [The Comfy®] is a garment.  It has seams that pull it all together just like any garment.  It's sewn together.").  First, The Comfy® — by being sewn shut with a back panel — provides a 360-degree covering that, while oversized, tracks the shape of the human upper body.  A blanket does not have this kind of human-body-based design and instead is a flat piece of fabric.  *See Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1336 ("Plaintiff offers as a common meaning that a blanket is a flat, rectangular textile covering ….  Defendant contends the dictionary definitions suggest that a blanket is a single, continuous uninterrupted piece of fabric ….") (internal quotation marks and modifications omitted).  Second, customers don The Comfy® differently from how they use a blanket because The Comfy® is sewn shut with a back panel.  Users do not wrap a blanket around their body by "opening it up … from the very large bottom opening … slid[ing] [their] arms into each of the two sleeves … pull[ing] the rib cuff to [their wrists] … [and] put[ing] [their] head through the hole for … where the hood is."  Trial Tr. vol. I at 108:23–109:6, ECF No. 108 (direct testimony of Mr. Speciale).  Third, because of its back panel, The Comfy®

is designed to be worn like an article of clothing — including when the user is active.
Those activities can include "ice skating; holiday activities at the park; tailgating;
dinner party hosting; outside chores, like raking leaves; outside play, like jumping in
the freshly raked leaves; pumpkin picking; pumpkin carving; hayrides; corn mazes;
dancing; walking the dog; getting the mail; [and] cheering on the sidelines[.]"  Jt.
Uncontested Facts ¶ 18, ECF No. 107.

These three differences all touch on the core characteristics that define The
Comfy®.  They also make The Comfy® "in character [and] function something other
than as described" by the term blanket.  *Casio*, 73 F.3d at 1097.  Fundamental
differences like these mean that The Comfy® cannot be classified under Heading
6301.  *See id.* (holding that an item cannot be classified in an *eo nomine* provision if
it "is in character or function something other than as described … and the difference
is significant").  The Comfy® also cannot fit under the two other basket headings
proffered by Cozy Comfort.  Merchandise can only fit into a basket provision "if there
is no tariff category that covers the merchandise more specifically."  *R.T. Foods*, 757
F.3d at 1354 (quoting *Rollerblade*, 24 CIT at 815).  As Heading 6110 covers The
Comfy®, the product cannot fit into a basket provision.  *Id.*

## V.    The Comfy®'s Proper Subheading

Customs believes that, if The Comfy® is classifiable in Heading 6110, it
belongs in Subheading 6110.30.30.  Def.'s Br. at 58, ECF No. 116.  Cozy Comfort
argues over The Comfy®'s proper heading classification but does not address which

subheading The Comfy® should fall under if the Court finds the good classifiable under Heading 6110. Pl.'s Br. at 56–57, ECF No. 114.

The subheadings under Heading 6110 classify products based on the kind of fabric used in the production process. *See, e.g.*, 6110.30.15, HTSUS (items "[c]ontaining 23 percent or more by weight of wool or fine animal hair"); 6110.10.10, HTSUS (items "[o]f wool or fine animal hair" that are "[w]holly of cashmere"); 6110.20.10, HTSUS (items "[o]f cotton" that contain "36 percent or more by weight of flax fibers."). Subheading 6110.30.30 applies to items that are "[o]f man-made fibers" other than "23 percent or more ... of wool or fine animal hair," "30 percent or more ... of silk or silk waste," and "25 percent or more ... of leather." *Compare* 6110.30.30, HTSUS, *with* 6110.30.10, 6110.30.15, *and* 6110.30.20, HTSUS. The parties agree that The Comfy® is "knitted and made from 100% man-made fibers, specifically polyester." *See* Jt. Uncontested Facts ¶ 4, ECF No. 107. Therefore, The Comfy® is a pullover classifiable under Subheading 6110.30.30.

## CONCLUSION

A wearable, oversized item covering the front and back with a hood, sleeves, ribbed cuffs, and a marsupial pocket is not a blanket. It is a pullover. Judgment must enter accordingly.

**SO ORDERED.**

Stephen Alexander Vaden, Judge

Dated:  Jun 16 2025
New York, New York

Appx77

UNITED STATES COURT OF INTERNATIONAL TRADE

COZY COMFORT COMPANY, LLC,

*Plaintiff,*

v.

UNITED STATES,

*Defendant.*

Before: Stephen Alexander Vaden, Judge

Court No. 1:22-cv-00173 (SAV)

## JUDGMENT

This case concerns the proper classification of The Comfy®, a wearable consumer good created, produced, and sold by Cozy Comfort Company, LLC (Cozy Comfort). Cozy Comfort designed The Comfy® to combine the features of an ordinary throw blanket with those of an oversized pullover. The company imported The Comfy® into the United States as a blanket under Subheading 6301.40.0020, HTSUS. *See* Pre-Trial Order, Schedule C ¶ 32 (Jt. Uncontested Facts), ECF No. 106. In March 2020, Customs reclassified The Comfy® as a pullover under Subheading 6110.30.30, HTSUS. *See id.* Cozy Comfort protested. *See id.* ¶ 38.

After Customs denied Cozy Comfort's protests, the company filed the present lawsuit. *See* Compl. ¶¶ 26–27, ECF No. 6. The Government moved for summary judgment after discovery concluded. *See* Mot. for Summ. J., ECF No. 28. The Court

Appx78

denied the Motion, finding issues of material fact remained, and ordered a trial. *See* Order, ECF No. 47.

The Court held a bench trial from October 21 to October 25, 2024, to decide whether Customs properly classified The Comfy®. *See* Trial Tr. vols. I–V, ECF Nos. 108–112. The Court heard testimony from witnesses, admitted evidence, and considered objections from the parties. In some instances, the Court struck legally impermissible testimony and evidence from the record.[1] The parties submitted proposed findings of fact and conclusions of law after the trial concluded. *See* Pl.'s Proposed Findings of Fact and Conclusions of Law, ECF No. 114; Def.'s Proposed Findings of Fact and Conclusions of Law, ECF No. 116.

In accordance with the Opinion issued this day, and after due deliberation, it is hereby:

**ORDERED** that the Plaintiff's imported merchandise, The Comfy®, is a pullover made of man-made fibers, classifiable under Heading 6110 and Subheading 6110.30.30, HTSUS.

**ORDERED** that judgment is entered for the Defendant.

**SO ORDERED.**

Stephen Alexander Vaden, Judge

Dated: June 16, 2025
        New York, New York

---

[1] *See Cozy Comfort Co. v. United States*, Ct. No. 1:22-cv-00173, slip op. at 6 n.2 (CIT Jun. 16, 2025).

# GENERAL RULES OF INTERPRETATION

Classification of goods in the tariff schedule shall be governed by the following principles:

1. The table of contents, alphabetical index, and titles of sections, chapters and sub-chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following provisions:

2. (a) Any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article. It shall also include a reference to that article complete or finished (or falling to be classified as complete or finished by virtue of this rule), entered unassembled or disassembled.

   (b) Any reference in a heading to a material or substance shall be taken to include a reference to mixtures or combinations of that material or substance with other materials or substances. Any reference to goods of a given material or substance shall be taken to include a reference to goods consisting wholly or partly of such material or substance. The classification of goods consisting of more than one material or substance shall be according to the principles of rule 3.

3. When, by application of rule 2(b) or for any other reason, goods are, prima facie, classifiable under two or more headings, classification shall be effected as follows:

   (a) The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.

   (b) Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable.

   (c) When goods cannot be classified by reference to 3(a) or 3(b), they shall be classified under the heading which occurs last in numerical order among those which equally merit consideration.

4. Goods which cannot be classified in accordance with the above rules shall be classified under the heading appropriate to the goods to which they are most akin.

5. In addition to the foregoing provisions, the following rules shall apply in respect of the goods referred to therein:

   (a) Camera cases, musical instrument cases, gun cases, drawing instrument cases, necklace cases and similar containers, specially shaped or fitted to contain a specific article or set of articles, suitable for long-term use and entered with the articles for which they are intended, shall be classified with such articles when of a kind normally sold therewith. This rule does not, however, apply to containers which give the whole its essential character;

   (b) Subject to the provisions of rule 5(a) above, packing materials and packing containers entered with the goods therein shall be classified with the goods if they are of a kind normally used for packing such goods. However, this provision is not binding when such packing materials or packing containers are clearly suitable for repetitive use.

6. For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, mutatis mutandis, to the above rules, on the understanding that only subheadings at the same level are comparable. For the purposes of this rule, the relative section, chapter and subchapter notes also apply, unless the context otherwise requires.

# ADDITIONAL U.S. RULES OF INTERPRETATION

1.   In the absence of special language or context which otherwise requires--

   (a)   a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use;

   (b)   a tariff classification controlled by the actual use to which the imported goods are put in the United States is satisfied only if such use is intended at the time of importation, the goods are so used and proof thereof is furnished within 3 years after the date the goods are entered;

   (c)   a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for "parts" or "parts and accessories" shall not prevail over a specific provision for such part or accessory; and

   (d)   the principles of section XI regarding mixtures of two or more textile materials shall apply to the classification of goods in any provision in which a textile material is named.

**[COMPILER'S NOTE: Multiple sets of changes to the Harmonized System have caused heading and subheading numbers and product coverage in some rules of origin for free trade agreements to be inconsistent with those in current tariff schedule chapters. First, the rules of origin provisions for certain United States free trade agreements have NOT been updated since major changes to the HTS were proclaimed effective on February 3, 2007, and will therefore contain tariff numbers that do not exist in the chapters of the HTS; these outdated rules are included in terms of HS 2002. Other agreements, including the new United States-Mexico-Canada Free Trade Agreement, are set forth in terms of HS 2012 and may not contain current tariff numbers. However, the rules for the North American Free Trade Agreement [expired; retained for reference through June 30, 2021], the United States-Australia Free Trade Agreement, the United States-Chile Free Trade Agreement, the United States-Bahrain Free Trade Agreement, and the United States-Korea Free Trade Agreement have been updated, and the pertinent general notes do reflect proclaimed rectifications through 2007 or 2012, depending on the agreement. See Presidential Proclamation 8097, which modified the HTS to reflect World Customs Organization changes to the Harmonized Commodity Description and Coding System and was effective as of Feb. 3, 2007; proclaimed modifications appear on the Web site of the United States International Trade Commission, www.usitc.gov.**

**Second, the rules of origin for the United States-Chile Free Trade Agreement have been updated to reflect the modifications to the HTS made by Presidential Proclamation 8771 of December 29, 2011 and effective as of February 3, 2012, to reflect the WCO changes to the Harmonized System recommended to be effective in 2012. In addition, the rules of origin for the United States-Korea Free Trade Agreement were updated effective on and after January 1, 2014, pursuant to Presidential Proclamation 9072. Presidential Proclamation 9555 set forth modifications to the rules of origin for the United States-Oman Free Trade Agreement (effective February 1, 2017), the United States-Panama Trade Promotion Agreement (to become effective pursuant to a future Federal Register notice from USTR), and the Dominican Republic-Central America-United States Free Trade Agreement (effective as of November 1, 2020) The United States-Singapore Free Trade Agreement's rules were updated in annex IV to Presidential Proclamation 10053 of June 2020, effective as of September 1, 2020; and the United States-Colombia Trade Promotion Agreement updates are scheduled to be effective January 1, 2021. Where not updated for HS 2017, be aware that the rule you try to apply may contain HTS numbers as in effect in 2002, 2007 or 2012. Changes to FTA rules must be negotiated whenever Harmonized System changes arise and must go through appropriate national processes prior to implementation. You can find U.S. proclamations updating rules in the *Federal Register.* Last, the new trade agreement between the United States and Japan (see general note 36 and chapter 99 subchapter XXI) does contain rules of origin that do not appear in the tariff schedule. Consult Customs for guidance if materials have not been posted on their site.**

**Contact officials of U.S. Customs and Border Protection in order to ascertain how to apply out-of-date rules and whether affected goods qualify for FTA treatment. A ruling on an individual shipment may be necessary.]**

## General Notes

| Heading/ Subheading | Stat. Suffix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6104 (con.) | | Women's or girls' suits, ensembles, suit-type jackets, blazers, dresses, skirts, divided skirts, trousers, bib and brace overalls, breeches and shorts (other than swimwear), knitted or crocheted: (con.) | | | | |
| | | Trousers, bib and brace overalls, breeches and shorts: (con.) | | | | |
| 6104.62 | | Of cotton: | | | | |
| 6104.62.10 | | Bib and brace overalls.................................. | .................. | 10.3%[1/] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 90% |
| | 10 | Insulated, for cold weather protection (359).... | doz. kg | | | |
| | | Other: | | | | |
| | 20 | Women's (359)............................ | doz. kg | | | |
| | 30 | Girls' (237)............................ | doz. kg | | | |
| 6104.62.20 | | Other.................................... | .................. | 14.9%[1/] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 90% |
| | | Trousers and breeches: | | | | |
| | | Women's: | | | | |
| | 06 | Containing 5 percent or more by weight of elastomeric yarn or rubber thread (348)................ | doz. kg | | | |
| | 11 | Other (348)............................ | doz. kg | | | |
| | | Girls': | | | | |
| | | Imported as parts of playsuits: | | | | |
| | 16 | Containing 5 percent or more by weight of elastomeric yarn or rubber thread (237)................ | doz. kg | | | |
| | 21 | Other (237)............................ | doz. kg | | | |
| | | Other: | | | | |
| | 26 | Containing 5 percent or more by weight of elastomeric yarn or rubber thread (348)................ | doz. kg | | | |
| | 28 | Other (348)............................ | doz. kg | | | |
| | | Shorts: | | | | |
| | 30 | Women's (348)............................ | doz. kg | | | |
| | | Girls': | | | | |
| | 50 | Imported as parts of playsuits (237)... | doz. kg | | | |
| | 60 | Other (348)............................ | doz. kg | | | |

ADD3

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6109 (con.) | | T-shirts, singlets, tank tops and similar garments, knitted or crocheted: (con.) | | | | |
| 6109.90 (con.) | | Of other textile materials: (con.) | | | | |
| 6109.90.40 | | Containing 70 percent or more by weight of silk or silk waste.................... | .................. | 2.6%[2/] | Free (AU, BH, CA, CL, CO, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 90% |
| | 10 | Men's or boys' (738)................................ | doz. kg | | | |
| | 20 | Women's or girls' (739)............................ | doz. kg | | | |
| 6109.90.80 | | Other.................................................. | .................. | 16%[1/] | Free (AU, BH, CA, CL, CO, E*, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 90% |
| | 10 | Men's or boys' (838)................................ | doz. kg | | | |
| | | Women's or girls': | | | | |
| | 20 | Of wool (438)................................ | doz. kg | | | |
| | 30 | Other (838)................................ | doz. kg | | | |
| 6110 | | Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: | | | | |
| | | Of wool or fine animal hair: | | | | |
| 6110.11.00 | | Of wool................................................ | .................. | 16%[6/] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 54.5% |
| | | Sweaters: | | | | |
| | 15 | Men's (445)................................ | doz. kg | | | |
| | 25 | Boys' (445)................................ | doz. kg | | | |
| | 30 | Women's (446)................................ | doz. kg | | | |
| | 40 | Girls' (446)................................ | doz. kg | | | |
| | | Vests, other than sweater vests: | | | | |
| | 50 | Men's or boys' (459)................................ | doz. kg | | | |
| | 60 | Women's or girls' (459)........................ | doz. kg | | | |
| | | Other: | | | | |
| | 70 | Men's or boys' (438)................................ | doz. kg | | | |
| | 80 | Women's or girls' (438)............................ | doz. kg | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6110 (con.) | | Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: (con.) | | | | |
| | | Of wool or fine animal hair: (con.) | | | | |
| 6110.12 | | Of Kashmir (cashmere) goats: | | | | |
| 6110.12.10 | | Wholly of cashmere........................... | .................. | 4%[7] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 52% |
| | | Sweaters: | | | | |
| | 10 | Men's or boys' (445)................... | doz. kg | | | |
| | 20 | Women's or girls' (446)................ | doz. kg | | | |
| | | Vests, other than sweater vests: | | | | |
| | 30 | Men's or boys' (445)................... | doz. kg | | | |
| | 40 | Women's or girls' (446)................ | doz. kg | | | |
| | | Other: | | | | |
| | 50 | Men's or boys' (445)................... | doz. kg | | | |
| | 60 | Women's or girls' (446)................ | doz. kg | | | |
| 6110.12.20 | | Other............................................... | .................. | 16%[1] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 54.5% |
| | | Sweaters: | | | | |
| | 10 | Men's (445)................................ | doz. kg | | | |
| | 20 | Boys' (445)................................ | doz. kg | | | |
| | 30 | Women's (446)........................... | doz. kg | | | |
| | 40 | Girls' (446)................................ | doz. kg | | | |
| | | Vests, other than sweater vests: | | | | |
| | 50 | Men's or boys' (459)................... | doz. kg | | | |
| | 60 | Women's or girls' (459)................ | doz. kg | | | |
| | | Other: | | | | |
| | 70 | Men's or boys' (438)................... | doz. kg | | | |
| | 80 | Women's or girls' (438)................ | doz. kg | | | |

ADD5

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | General | Special | 2 |
| | | | | | 1 | |
| 6110 (con.) | | Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: (con.) | | | | |
| | | Of wool or fine animal hair: (con.) | | | | |
| 6110.19.00 | | Other............................................. | ................... | 16%[1/] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 54.5% |
| | | Sweaters: | | | | |
| | 15 | Men's  (445)............................ | doz. kg | | | |
| | 25 | Boys'  (445)............................ | doz. kg | | | |
| | 30 | Women's (446)........................ | doz. kg | | | |
| | 40 | Girls' (446)............................. | doz. kg | | | |
| | | Vests, other than sweater vests: | | | | |
| | 50 | Men's or boys' (459)................ | doz. kg | | | |
| | 60 | Women's or girls' (459)........... | doz. kg | | | |
| | | Other: | | | | |
| | 70 | Men's or boys' (438)................ | doz. kg | | | |
| | 80 | Women's or girls' (438)........... | doz. kg | | | |
| 6110.20 | | Of cotton: | | | | |
| 6110.20.10 | | Containing 36 percent or more by weight of flax fibers......................................... | ................... | 5%[1/] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| | | Sweaters: | | | | |
| | 10 | Men's or boys' (345)................ | doz. kg | | | |
| | 20 | Women's or girls' (345)........... | doz. kg | | | |
| | | Vests other than sweater vests: | | | | |
| | 22 | Men's or boys' (359)................ | doz. kg | | | |
| | 24 | Women's or girls' (359)........... | doz. kg | | | |
| | | Other: | | | | |
| | | Men's or boys' | | | | |
| | 26 | Knit to shape articles described in statistical note 6 to this chapter (338)....... | doz. kg | | | |
| | 29 | Other  (338)............... | doz. kg | | | |
| | | Women's or girls': | | | | |
| | 31 | Knit to shape articles described in statistical note 6 to this chapter (339)....... | doz. kg | | | |
| | 33 | Other  (339)............... | doz. kg | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6110 (con.) | | Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: (con.) | | | | |
| 6110.20 (con.) | | Of cotton: (con.) | | | | |
| 6110.20.20 | | Other | .................. | 16.5% [6/] | Free (AU, BH, CA, CL, CO, IL, JO, MA, MX, OM, P, PA, PE, SG) 1.6% (KR) | 50% |
| | 05 | Boys' or girls' garments imported as parts of playsuits (237) | doz. kg | | | |
| | | Other: | | | | |
| | | Sweaters: | | | | |
| | 10 | Men's (345) | doz. kg | | | |
| | 15 | Boys' (345) | doz. kg | | | |
| | 20 | Women's (345) | doz. kg | | | |
| | 25 | Girls' (345) | doz. kg | | | |
| | | Vests, other than sweater vests: | | | | |
| | 30 | Men's or boys' (359) | doz. kg | | | |
| | 35 | Women's or girls' (359) | doz. kg | | | |
| | | Sweatshirts: | | | | |
| | 41 | Men's (338) | doz. kg | | | |
| | 44 | Boys' (338) | doz. kg | | | |
| | 46 | Women's (339) | doz. kg | | | |
| | 49 | Girls' (339) | doz. kg | | | |
| | | Other: | | | | |
| | | Men's or boys': | | | | |
| | 67 | Knit to shape articles described in statistical note 6 to this chapter (338) | doz. kg | | | |
| | 69 | Other (338) | doz. kg | | | |
| | | Women's or girls': | | | | |
| | 77 | Knit to shape articles described in statistical note 6 to this chapter (339) | doz. kg | | | |
| | 79 | Other (339) | doz. kg | | | |

| Heading/ Subheading | Stat. Suffix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6110 (con.) | | Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: (con.) | | | | |
| 6110.30 | | Of man-made fibers: | | | | |
| 6110.30.10 | | Containing 25 percent or more by weight of leather..... | .................. | 6%[1] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 35% |
| | | Sweaters: | | | | |
| | 10 | Men's or boys' (645)............................ | doz. kg | | | |
| | 20 | Women's or girls' (646)....................... | doz. kg | | | |
| | | Vests, other than sweater vests: | | | | |
| | 30 | Men's or boys' (659)............................ | doz. kg | | | |
| | 40 | Women's or girls' (659)....................... | doz. kg | | | |
| | | Other: | | | | |
| | 50 | Men's or boys' (638)............................ | doz. kg | | | |
| | 60 | Women's or girls' (639)....................... | doz. kg | | | |
| | | Other: | | | | |
| 6110.30.15 | | Containing 23 percent or more by weight of wool or fine animal hair........................ | .................. | 17%[8] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 54.5% |
| | | Sweaters: | | | | |
| | 10 | Men's or boys' (445)............................ | doz. kg | | | |
| | 20 | Women's or girls' (446)....................... | doz. kg | | | |
| | | Vests, other than sweater vests: | | | | |
| | 30 | Men's or boys' (459)............................ | doz. kg | | | |
| | 40 | Women's or girls' (459)....................... | doz. kg | | | |
| | | Other: | | | | |
| | 50 | Men's or boys' (438)............................ | doz. kg | | | |
| | 60 | Women's or girls' (438)....................... | doz. kg | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6110 (con.) | | Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: (con.) | | | | |
| 6110.30 (con.) | | Of man-made fibers: (con.) | | | | |
| | | Other: (con.) | | | | |
| | | Other: | | | | |
| 6110.30.20 | | Containing 30 percent or more by weight of silk or silk waste.................................. | .................. | 6.3%[1] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 90% |
| | | Sweaters: | | | | |
| | 10 | Men's or boys' (645)........................... | doz. kg | | | |
| | 20 | Women's or girls' (646)...................... | doz. kg | | | |
| | | Vests, other than sweater vests: | | | | |
| | 30 | Men's or boys' (659)........................... | doz. kg | | | |
| | 40 | Women's or girls' (659)...................... | doz. kg | | | |
| | | Other: | | | | |
| | | Men's or boys': | | | | |
| | 51 | Knit to shape articles described in statistical note 6 to this chapter (638).............................................. | doz. kg | | | |
| | 53 | Other (638).................................... | doz. kg | | | |
| | | Women's or girls': | | | | |
| | 61 | Knit to shape articles described in statistical note 6 to this chapter (639).............................................. | doz. kg | | | |
| | 63 | Other (639).................................... | doz. kg | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 6110 (con.) | | Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: (con.) | | | | |
| 6110.30 (con.) | | Of man-made fibers: (con.) | | | | |
| | | Other: (con.) | | | | |
| | | Other: (con.) | | | | |
| 6110.30.30 | | Other........................................ | .................. | 32%[9] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 90% |
| | 05 | Boys' and girls' garments imported as parts of playsuits (237)............................. | doz. kg | | | |
| | | Other: | | | | |
| | | Sweaters: | | | | |
| | 10 | Men's (645)................................. | doz. kg | | | |
| | 15 | Boys' (645)................................. | doz. kg | | | |
| | 20 | Women's (646)............................. | doz. kg | | | |
| | 25 | Girls' (646)................................. | doz. kg | | | |
| | | Vests, other than sweater vests: | | | | |
| | 30 | Men's or boys' (659).................... | doz. kg | | | |
| | 35 | Women's or girls' (659)................ | doz. kg | | | |
| | | Sweatshirts: | | | | |
| | 41 | Men's (638)................................. | doz. kg | | | |
| | 44 | Boys' (638)................................. | doz. kg | | | |
| | 45 | Women's or girls' (639)................ | doz. kg | | | |
| | | Other: | | | | |
| | | Men's or boys': | | | | |
| | 51 | Knit to shape articles described in statistical note 6 to this chapter (638)............... | doz. kg | | | |
| | 53 | Other (638)............................ | doz. kg | | | |
| | | Women's or girls': | | | | |
| | 57 | Knit to shape articles described in statistical note 6 to this chapter (639)............... | doz. kg | | | |
| | 59 | Other (639)............................ | doz. kg | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6110 (con.) | | Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: (con.) | | | | |
| 6110.90 | | Of other textile materials: | | | | |
| 6110.90.10 | | Containing 70 percent or more by weight of silk or silk waste.................. | | 0.9%[10/] | Free (AU, BH, CA, CL, CO, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 60% |
| | | Sweaters: | | | | |
| | 10 | Men's or boys' (745)............... | doz. kg | | | |
| | 20 | Women's or girls' (746)............... | doz. kg | | | |
| | | Vests, other than sweater vests: | | | | |
| | 30 | Men's or boys' (759)............... | doz. kg | | | |
| | 40 | Women's or girls' (759)............... | doz. kg | | | |
| | | Other: | | | | |
| | 50 | Men's or boys' (738)............... | doz. kg | | | |
| | 60 | Women's or girls' (739)............... | doz. kg | | | |
| 6110.90.90 | | Other.............................. | | 6%[11/] | Free (AU, BH, CA, CL, CO, E*, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 60% |
| | | Sweaters for men or boys: | | | | |
| | 10 | Subject to cotton restraints (345).................... | doz. kg | | | |
| | 12 | Subject to wool restraints (445).................... | doz. kg | | | |
| | 14 | Subject to man-made fiber restraints (645)..... | doz. kg | | | |
| | | Other: | | | | |
| | 15 | Of silk (846)............... | doz. kg | | | |
| | 23 | Other (845)............... | doz. kg | | | |
| | | Sweaters for women or girls: | | | | |
| | 26 | Subject to cotton restraints (345).................... | doz. kg | | | |
| | 28 | Subject to wool restraints (446).................... | doz. kg | | | |
| | 30 | Subject to man-made fiber restraints (646)..... | doz. kg | | | |
| | | Other: | | | | |
| | 34 | Of silk (846)............... | doz. kg | | | |
| | 41 | Other (845)............... | doz. kg | | | |

ADD11

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6110 (con.) | | Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: (con.) | | | | |
| 6110.90 (con.) | | Of other textile materials: (con.) | | | | |
| 6110.90.90 (con.) | | Other (con.) | | | | |
| | | Vests, other than sweater vests: | | | | |
| | | Subject to cotton restraints: | | | | |
| | 44 | Men's or boys' (359)................ | doz. kg | | | |
| | 46 | Women's or girls' (359).............. | doz. kg | | | |
| | | Subject to wool restraints: | | | | |
| | 48 | Men's or boys' (459)................ | doz. kg | | | |
| | 50 | Women's or girls' (459).............. | doz. kg | | | |
| | | Subject to man-made fiber restraints: | | | | |
| | 52 | Men's or boys' (659)................ | doz. kg | | | |
| | 54 | Women's or girls' (659).............. | doz. kg | | | |
| | | Other: | | | | |
| | 64 | Men's or boys' (859)................ | doz. kg | | | |
| | 66 | Women's or girls' (859).............. | doz. kg | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6110 (con.) | | Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: (con.) | | | | |
| 6110.90 (con.) | | Of other textile materials: (con.) | | | | |
| 6110.90.90 (con.) | | Other (con.) | | | | |
| | | Other: | | | | |
| | | Subject to cotton restraints: | | | | |
| | | Men's or boys': | | | | |
| | 67 | Knit to shape articles described in statistical note 6 to this chapter (338) | doz. kg | | | |
| | 69 | Other (338) | doz. kg | | | |
| | | Women's or girls': | | | | |
| | 71 | Knit to shape articles described in statistical note 6 to this chapter (339) | doz. kg | | | |
| | 73 | Other (339) | doz. kg | | | |
| | | Subject to wool restraints: | | | | |
| | 75 | Men's or boys' (438) | doz. kg | | | |
| | 77 | Women's or girls' (438) | doz. kg | | | |
| | | Subject to man-made fiber restraints: | | | | |
| | | Men's or boys': | | | | |
| | 79 | Knit to shape articles described in statistical note 6 to this chapter (638) | doz. kg | | | |
| | 80 | Other (638) | doz. kg | | | |
| | | Women's or girls': | | | | |
| | 81 | Knit to shape articles described in statistical note 6 to this chapter (639) | doz. kg | | | |
| | 82 | Other (639) | doz. kg | | | |
| | | Other: | | | | |
| | 88 | Men's or boys' (838) | doz. kg | | | |
| | 90 | Women's or girls' (838) | doz. kg | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6114 6114.20.00 | | Other garments, knitted or crocheted: Of cotton.................................................. | ............... | 10.8%[12] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 90% |
| | | Tops: | | | | |
| | 05 | Men's or boys' (338)................................. | doz. kg | | | |
| | 10 | Women's or girls' (339)............................. | doz. kg | | | |
| | 15 | Jumpers  (359)......................................... | doz. kg | | | |
| | 20 | Bodysuits and bodyshirts (359)................ | doz. kg | | | |
| | | Sunsuits, washsuits, one-piece playsuits and similar apparel: | | | | |
| | 35 | Boys' (237)......................................... | doz. kg | | | |
| | 40 | Women's or girls' (237)....................... | doz. kg | | | |
| | | Coveralls, jumpsuits and similar apparel: | | | | |
| | 42 | Insulated, for cold weather protection (359).......... | doz. kg | | | |
| | | Other: | | | | |
| | 44 | Boys', sizes 2-7 (237)................... | doz. kg | | | |
| | 46 | Girls' (237).................................... | doz. kg | | | |
| | 48 | Men's and other boys' (359)........... | doz. kg | | | |
| | 52 | Women's (359)............................... | doz. kg | | | |
| | | Other: | | | | |
| | 55 | Men's or boys' (359)............................ | doz. kg | | | |
| | 60 | Women's or girls' (359)........................ | doz. kg | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6114 (con.) | | Other garments, knitted or crocheted: (con.) | | | | |
| 6114.30 | | Of man-made fibers: | | | | |
| 6114.30.10 | | Tops................... | ................... | 28.2%[1/] | Free (AU, BH, CA, CL, CO, IL, JO, MA, MX, OM, P, PA, PE, SG) 2.8% (KR) | 90% |
| | 10 | Men's or boys' (638)............................... | doz. kg | | | |
| | 20 | Women's or girls' (639)............................... | doz. kg | | | |
| 6114.30.20 | | Bodysuits and bodyshirts............................... | ................... | 32%[1/] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 90% |
| | 10 | Of fabric containing by weight 5 percent or more elastomeric yarn or rubber thread (659)............... | doz. kg | | | |
| | | Other: | | | | |
| | 30 | Containing 23 percent or more by weight of wool or fine animal hair (459)...................... | doz. kg | | | |
| | 60 | Other (659)............................... | doz. kg | | | |
| 6114.30.30 | | Other............................... | ................... | 14.9%[1/] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 90% |
| | | Jumpers: | | | | |
| | 12 | Containing 23 percent or more by weight of wool orfine animal hair (459)........................... | doz. kg | | | |
| | 14 | Other (659)............................... | doz. kg | | | |
| | | Sunsuits, washsuits, one-piece playsuits and similar apparel: | | | | |
| | 20 | Boys' (237)............................... | doz. kg | | | |
| | 30 | Women's or girls' (237)............................... | doz. kg | | | |
| | | Coveralls, jumpsuits and similar apparel: | | | | |
| | | Men's or boys': | | | | |
| | 42 | Containing 23 percent or more by weight of wool or fine animal hair (459)............... | doz. kg | | | |
| | 44 | Other (659)............................... | doz. kg | | | |
| | | Women's or girls': | | | | |
| | 52 | Containing 23 percent or more by weight of wool or fine animal hair (459)............... | doz. kg | | | |
| | 54 | Other (659)............................... | doz. kg | | | |
| | | Other: | | | | |
| | 60 | Men's or boys' (659)............................... | doz. kg | | | |
| | 70 | Women's or girls' (659)............................... | doz. kg | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6114 (con.) | | Other garments, knitted or crocheted: (con.) | | | | |
| 6114.90 | | Of other textile materials: | | | | |
| 6114.90.05 | | Of wool or fine animal hair.............................. | .................. | 12%[1] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 90% |
| | | Tops: | | | | |
| | 20 | Men's or boys' (438)............................. | doz. kg | | | |
| | 40 | Women's or girls' (438)......................... | doz. kg | | | |
| | 50 | Jumpers (459)........................................ | doz. kg | | | |
| | | Other: | | | | |
| | 60 | Men's or boys' (459)............................. | doz. kg | | | |
| | 70 | Women's or girls' (459)......................... | doz. kg | | | |
| 6114.90.10 | | Containing 70 percent or more by weight of silk or silk waste............................................................. | .................. | 0.9%[1] | Free (AU, BH, CA, CL, CO, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 60% |
| | | Tops: | | | | |
| | 10 | Men's or boys' (738)............................. | doz. kg | | | |
| | 20 | Women's or girls' (739)......................... | doz. kg | | | |
| | 30 | Jumpers (759)........................................ | doz. kg | | | |
| | 40 | Sunsuits, washsuits and similar apparel (759)...... | doz. kg | | | |
| | 50 | Coveralls, jumpsuits and similar apparel (759)...... | doz. kg | | | |
| | 60 | Other (759)............................................ | doz. kg | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 6114 (con.) | | Other garments, knitted or crocheted: (con.) | | | | |
| 6114.90 (con.) | | Of other textile materials: (con.) | | | | |
| 6114.90.90 | | Other........................................ | ................ | 5.6%[2] | Free (AU, BH, CA, CL, CO, E*, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 60% |
| | 10 | Tops (838)................................... | doz. kg | | | |
| | 20 | Jumpers (859)............................... | doz. kg | | | |
| | 30 | Sunsuits, washsuits and similar apparel (859)...... | doz. kg | | | |
| | 40 | Coveralls, jumpsuits and similar apparel (859)...... | doz. kg | | | |
| | | Other: | | | | |
| | 45 | Subject to cotton restraints (359)................... | doz. kg | | | |
| | 50 | Subject to wool restraints (459)................... | doz. kg | | | |
| | 55 | Subject to man-made fiber restraints (659)...... | doz. kg | | | |
| | 70 | Other (859)................................. | doz. kg | | | |
| 6115 | | Panty hose, tights, stockings, socks and other hosiery, including graduated compression hosiery (for example, stockings for varicose veins) and footwear without applied soles, knitted or crocheted: | | | | |
| 6115.10 | | Graduated compression hosiery (for example, stockings for varicose veins): | | | | |
| 6115.10.05 | 00 | Surgical panty hose and surgical stockings with graduated compression for orthopedic treatment........ | doz. prs. kg | Free | | 40% |
| | | Other graduated compression panty hose and tights: | | | | |
| 6115.10.10 | 00 | Of synthetic fibers (659)............................ | doz. prs. kg | 14.9%[1] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 72% |
| 6115.10.15 | | Of other textile materials................................ | ................ | 16%[1] | Free (AU, BH, CA, CL, CO, E*, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 90% |
| | 10 | Of cotton (359)................................ | doz. prs. kg | | | |
| | 20 | Of wool or fine animal hair (459).................... | doz. prs. kg | | | |
| | 40 | Other (859)................................. | doz. prs. kg | | | |

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| | | I. OTHER MADE UP TEXTILE ARTICLES | | | | |
| 6301 | | Blankets and traveling rugs: | | | | |
| 6301.10.00 | 00 | Electric blankets (666)........................................ | No. kg | 11.4%[1] | Free (AU, BH, CA, CL, CO, E*, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 77.5% |
| 6301.20.00 | | Blankets (other than electric blankets) and traveling rugs, of wool or fine animal hair................................. | .................. | Free[2] | | $1.10/kg + 60% |
| | 10 | Not over 3 meters in length (464)................... | No. kg | | | |
| | 20 | Over 3 meters in length (410)........................ | m² kg | | | |
| 6301.30.00 | | Blankets (other than electric blankets) and traveling rugs, of cotton....................................................... | .................. | 8.4%[3] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 30% |
| | 10 | Woven (369)................................................. | No. kg | | | |
| | 20 | Other (369).................................................. | No. kg | | | |
| 6301.40.00 | | Blankets (other than electric blankets) and traveling rugs, of synthetic fibers............................................. | .................. | 8.5%[1] | Free (AU, BH, CA, CL, CO, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 77.5% |
| | 10 | Woven (666)................................................. | No. kg | | | |
| | 20 | Other (666).................................................. | No. kg | | | |
| 6301.90.00 | | Other blankets and traveling rugs............................ | .................. | 7.2%[4] | Free (AU, BH, CA, CL, CO, E*, IL, JO, KR, MA, MX, NP, OM, P, PA, PE, SG) | 90% |
| | 10 | Of artificial fibers (666)................................. | No. kg | | | |
| | | Other: | | | | |
| | 20 | Containing 85 percent or more by weight of silk or silk waste............................................... | No. kg | | | |
| | 30 | Other (899)................................................. | No. kg | | | |

CHAPTER 62

ARTICLES OF APPAREL AND CLOTHING ACCESSORIES, NOT KNITTED OR CROCHETED  1/

Notes

1.    This chapter applies only to made up articles of any textile fabric other than wadding, excluding knitted or crocheted articles (other than those of heading 6212).

2.    This chapter does not cover:

   (a)   Worn clothing or other worn articles of heading 6309;

   (b)   Orthopedic appliances, surgical belts, trusses or the like (heading 9021).

3.    For the purposes of headings 6203 and 6204:

   (a)   The term "suit" means a set of garments composed of two or three pieces made up, in respect of their outer surface, pieces made up in identical fabric, and comprising:

      -    one suit coat or jacket the outer shell of which, exclusive of sleeves, consists of four or more panels, designed to cover the upper part of the body, possibly with a tailored waistcoat in addition whose front is made from the same fabric as the outer surface of the other components of the set and whose back is made from the same fabric as the lining of the suit coat or jacket; and

      -    one garment designed to cover the lower part of the body and consisting of trousers, breeches or shorts (other than swimwear), a skirt or a divided skirt, having neither braces nor bibs.

   All of the components of a "suit" must be of the same fabric construction, color and composition; they must also be of the same style and of corresponding or compatible size. However, these components may have piping (a strip of fabric sewn into the seam) in a different fabric.

   If several separate components to cover the lower part of the body area presented together (for example, two pairs of trousers or trousers and shorts, or a skirt or divided skirt and trousers), the constituent lower part shall be one pair of trousers, or, in the case of women's or girls' suits, the skirt or divided skirt, the other garments being considered separately.

   The term "suit" includes the following sets of garments whether or not they fulfill all the above conditions:

      -    morning dress, comprising a plain jacket (cutaway) with rounded tails hanging well down at the back and striped trousers;

      -    evening dress (tailcoat), generally made of black fabric, the jacket of which is relatively short at the front, does not close and has narrow skirts cut in at the hips and hanging down behind;

      -    dinner jacket suits, in which the jacket is similar in style to an ordinary jacket (though perhaps revealing more of the shirt front), but has shiny silk or imitation silk lapels.

   (b)   The term "ensemble" means a set of garments (other than suits and articles of heading 6207 or 6208) composed of several pieces made up in identical fabric, put up for retail sale, and comprising:

      -    one garment designed to cover the upper part of the body, with the exception of waistcoats which may also form a second upper garment, and

      -    one or two different garments, designed to cover the lower part of the body and consisting of trousers, bib and brace overalls, breeches, shorts (other than swimwear), a skirt or a divided skirt.

   All of the components of an ensemble must be of the same fabric construction, style, color and composition; they also must be of corresponding or compatible size. The term "ensemble" does not apply to track suits or ski-suits of heading 6211.

4.    For the purposes of heading 6209:

   (a)   The expression "babies' garments and clothing accessories" means articles for young children of a body height not exceeding 86 centimeters;

1/ See section XI, statistical note 5.

Notes (con.)

(b)  Articles which are, prima facie, classifiable both in heading 6209 and in other headings of this chapter are to be classified in heading 6209.

5.  Garments which are, prima facie, classifiable both in heading 6210 and in other headings of this chapter, excluding heading 6209, are to be classified in heading 6210.

6.  For the purposes of heading 6211,"ski-suits" means garments or sets of garments which, by their general appearance and texture, are identifiable as intended to be worn principally for skiing (cross-country or alpine). They consist either of:

(a)  A "ski overall," that is, a one-piece garment designed to cover the upper and the lower parts of the body; in addition to sleeves and a collar the ski overall may have pockets or footstraps; or

(b)  A "ski ensemble," that is, a set of garments composed of two or three pieces, put up for retail sale and comprising:

-  one garment such as an anorak, windbreaker or similar article, closed by a slide fastener (zipper), possibly with a waistcoat in addition, and

-  one pair of trousers whether or not extending above waist level, one pair of breeches or one bib and brace overall.

The "ski ensemble" may also consist of an overall similar to the one mentioned in paragraph (a) above and a type of padded, sleeveless jacket worn over the overall.

All the components of a "ski ensemble" must be made up in a fabric of the same texture, style and composition whether or not of the same color; they also must be of corresponding or compatible size.

7.  Scarves and articles of the scarf type, square or approximately square, of which no side exceeds 60 centimeters, are to be classified as handkerchiefs (heading 6213). Handkerchiefs of which any side exceeds 60 centimeters are to be classified in heading 6214.

8.  Garments of this chapter designed for left over right closure at the front shall be regarded as men's or boys' garments, and those designed for right over left closure at the front as women's or girls' garments. These provisions do not apply where the cut of the garment clearly indicates that it is designed for one or other of the sexes.

Garments which cannot be identified as either men's or boys' garments or as women's or girls' garments are to be classified in the headings covering women's or girls' garments.

9.  Articles of this chapter may be made of metal thread.

Additional U.S. Notes

1.  For the purpose of heading 6209, the term "sets" means two or more different garments of headings 6111, 6209 or 6505 imported together, of corresponding sizes and intended to be worn together by the same person.

2.  For the purposes of subheadings 6201.92.17, 6201.92.35, 6201.93.47, 6201.93.60, 6202.92.05, 6202.92.30, 6202.93.07, 6202.93.48, 6203.41.01, 6203.41.25, 6203.43.03, 6203.43.11, 6203.43.55, 6203.43.75, 6204.61.05, 6204.61.60, 6204.63.02, 6204.63.09, 6204.63.55, 6204.63.75 and 6211.20.15, the term "water resistant" means that garments classifiable in those subheadings must have a water resistance (see current version of ASTM D7017) such that, under a head pressure of 600 millimeters, not more than 1.0 gram of water penetrates after two minutes when tested in accordance with the current version of AATCC Test Method 35. This water resistance must be the result of a rubber or plastics application to the outer shell, lining or inner lining.

3.  (a) When used in a subheading of this chapter or immediate superior text thereto, the term 'recreational performance outerwear' means trousers (including, but not limited to, ski or snowboard pants, and ski or snowboard pants intended for sale as parts of ski-suits), coveralls, bib and brace overalls, jackets (including, but not limited to, full zip jackets, ski jackets and ski jackets intended for sale as parts of ski-suits), windbreakers and similar articles (including padded, sleeveless jackets), the foregoing of fabrics of cotton, wool, hemp, bamboo, silk or manmade fibers, or a combination of such fibers; that are either water resistant within the meaning of additional U.S. note 2 to this chapter or treated with plastics, or both; with critically sealed seams, and with 5 or more of the following features (as further provided herein):

(i)  insulated for cold weather protection;

(ii)  pockets, at least one of which has a zippered, hook and loop, or other type of closure;

(iii)  elastic, draw cord or other means of tightening around the waist or leg hems, including hidden leg sleeves with a means of tightening at the ankle for trousers and tightening around the waist or bottom hem for jackets;

CHAPTER 63

OTHER MADE UP TEXTILE ARTICLES; NEEDLECRAFT SETS; WORN CLOTHING AND WORN TEXTILE ARTICLES; RAGS  1/

<u>Notes</u>

1.    Subchapter 1 applies only to made up articles, of any textile fabric.

2.    Subchapter 1 does not cover:

    (a)   Goods of chapters 56 to 62; or

    (b)   Worn clothing or other worn articles of heading 6309.

3.    Heading 6309 applies only to the following goods:

    (a)   Articles of textile materials:

        (i)    Clothing and clothing accessories, and parts thereof;

        (ii)   Blankets and traveling rugs;

        (iii)  Bed linen, table linen, toilet linen and kitchen linen;

        (iv)  Furnishings, other than carpets of headings 5701 to 5705 and tapestries of heading 5805.

    (b)   Footwear and headgear of any material other than asbestos.

    In order to be classified in this heading, the articles mentioned above must comply with both of the following requirements:

    (i)    They must show signs of appreciable wear; and

    (ii)   They must be entered in bulk or in bales, sacks or similar packings.

<u>Subheading Note</u>

1. Subheading 6304.20 covers articles made from warp knit fabrics, impregnated or coated with alpha-cypermethrin (ISO), chlorfenapyr (ISO), deltamethrin (INN, ISO), lambda-cyhalothrin (ISO), permethrin (ISO), or pirimiphosmethyl (ISO).



DES**C**ARTES CustomsInfo™

Preferences | Contact Us | Logout

Home | CI Search | Research Tools | Classification⁺ | GTIM | GistNet | Trade Tools | Export Control | U.S. Census Analytics | Compliance Workbench | Alternative Supplier Search | Denied Party Screening

Help    User Guide

Back   Terms

Note   Projects   Print

Document   Result Excerpts   EN 6110

**Title:**    61.10 - Jerseys, pullovers, cardigans, waistcoats and similar articles, knitted or crocheted (+).

**61.10 RUL** - **Jerseys, pullovers, cardigans, waistcoats and similar articles, knitted or crocheted.**

- Of wool or fine animal hair

6110.11 US EU CH RUL - - Of wool

6110.12 US EU CH RUL - - Of Kashmir (cashmere) goats

6110.19 US EU CH RUL - - Other

6110.20 US EU CH RUL - Of cotton

6110.30 US EU CH RUL - Of man-made fibres

6110.90 US EU CH RUL - Of other textile materials

This heading covers a category of knitted or crocheted articles, without distinction between male or female wear, designed to cover the upper parts of the body (jerseys, pullovers, cardigans, waistcoats and similar articles). Articles incorporating incidentally protective components such as elbow pads sewn on sleeves and used for certain sports (e.g., soccer goalkeeper jerseys) remain classified in this heading.

It also covers tailored waistcoats **except** when these are presented with and constitute one of the components of a man's or boy's or woman's or girl's suit of **heading 61.01 or 61.02 RUL**, as the case may be.

The heading also **excludes** padded waistcoats generally worn over all other clothing for protection against the weather, of **heading 61.01 or 61.02 RUL**.

°

° °

**Subheading Explanatory Note.**

**Subheading 6110.12 US EU CH RUL**

The provisions of the Explanatory Note to subheading 5102.11 US EU CH RUL apply, *mutatis mutandis*, to the products of this subheading.

© 2025 World Customs Organization – All rights reserved

ADD22

HQ H243928

June 22, 2017

CLA-2 OT:RR:CTF:TCM H243928 PJG

CATEGORY: Classification

TARIFF NO.: 6307.90.98

Mr. Hans Wurian
Design Salt
P.O. Box 751
Redway, California 95560

RE:    Revocation of NY N012720, NY H81550, NY F84497, NY C89291, NY 817811, HQ 950620, HQ 089134, HQ 089137, and HQ 088149; tariff classification of sleep sacks

Dear Mr. Wurian:

This letter is to inform you that U.S. Customs and Border Protection ("CBP") has reconsidered three Headquarters Ruling Letters ("HQ"), specifically, HQ 088149, dated December 27, 1990, HQ 089134, dated August 8, 1991, and HQ 950620, dated February 20, 1992, issued to you on behalf of Design Salt. We have also reconsidered HQ 089137, dated August 6, 1991, issued to Bellsey and Baker. All four rulings pertain to the tariff classification under the Harmonized Tariff Schedule of the United States ("HTSUS") of the COCOON TravelSheet 100 percent woven cotton sleep sacks. We have since reviewed these rulings and determined them to be in error. Accordingly, HQ 088149, HQ 089137, HQ 089134, and HQ 950620 are revoked.

CBP has also reviewed New York Ruling Letters ("NY") NY 817811, dated January 25, 1996, NY C89291, dated July 16, 1998, NY F84497, dated March 31, 2000, NY H81550, dated June 26, 2001, and N012720, dated June 22, 2007, which concern the tariff classification of substantially similar sleep sacks, and has determined them to be in error as well. Accordingly, NY 817811, NY C89291, NY F84497, NY H81550, and N012720 are also revoked.

Pursuant to section 625(c)(1), Tariff Act of 1930 (19 U.S.C. § 1625(c)(1)), as amended by section 623 of Title VI (Customs Modernization) of the North American Free Trade Agreement Implementation Act, Pub. L. No. 103-182, 107 Stat. 2057, 2186 (1993), notice of the proposed action was published on April 12, 2017, in Volume 51, Number 15, of the Customs Bulletin. No comments were received in response to this notice.

FACTS:

    In both HQ 088149 and HQ 089137 (which affirmed HQ 088149), the sleep sack was described as follows:

The merchandise at issue is a 100 percent woven cotton sleeping sack, to be imported from China. It measures 33 x 86 inches and is sewn together on three sides. One end of the sack has an 11 1/2 inch pocket which is formed by a

ADD23

folded length of material sewn on its sides, which can be used to accommodate the insertion of a pillow. The portion of the top sheet near the pillow insert is not sewn down, forming a flap which allows a person to easily slip into and out of the sleep sack. The literature accompanying your request states that this item is called a COCOON TRAVELSHEET. It is advertised as a "washable sleeping environment" to be used in hotels, hostels, hammocks, and homes. In your letter you indicate that the sleeping sack is intended to serve as a sleeping bag for travellers in warm countries. "COCOON" is available in three printed fabric styles.

In the Sales Facts sheet that you submitted to us along with a letter dated July 31, 1995, you describe the TravelSheet as a "[s]leeping bag liner" and a "stand alone product in warmer climates." On your website, you explain that the "TravelSheet is an extremely lightweight and roomy sleep sack or sleeping bag liner for hotels, youth hostels, alpine huts, boats, planes and trains. TravelSheets are also used as warm weather sleeping bags and guestsheets."

In both HQ 088149 and HQ 089137, CBP classified the sleep sack in heading 6302, HTSUS, which provides for "Bed linen, table linen, toilet linen and kitchen linen."


ISSUE:

Whether the subject sleep sacks are classifiable in heading 6302, as bed linen, or in heading 6307, HTSUS, as other made up articles.

LAW AND ANALYSIS:

Classification under the Harmonized Tariff Schedule of the United States ("HTSUS") is made in accordance with the General Rules of Interpretation ("GRI"). GRI 1 provides that the classification of goods shall be determined according to the terms of the headings of the tariff schedule and any relative Section or Chapter Notes. In the event that the goods cannot be classified solely on the basis of GRI 1, and if the headings and legal notes do not otherwise require, the remaining GRIs may then be applied.

The 2017 HTSUS provisions under consideration are as follows:

6302    Bed linen, table linen, toilet linen and kitchen linen:

    *    *    *

6307    Other made up articles, including dress patterns:

The Harmonized Commodity Description and Coding System Explanatory Notes ("ENs") constitute the official interpretation of the Harmonized System at the international level. While neither legally binding nor dispositive, the ENs provide a commentary on the scope of each heading of the HTSUS and are generally indicative of the proper interpretation of these headings. See T.D. 89-80, 54 Fed. Reg. 35127, 35128 (August 23, 1989).

The EN to 63.02 states, in pertinent part:
These articles are usually made of cotton or flax, but sometimes also of hemp, ramie or man-made fibres, etc.; they are normally of a kind suitable for laundering. They include :

Bed linen, e.g., sheets, pillowcases, bolster cases, eiderdown cases and mattress covers.

ADD24

The EN to 63.07 states, in pertinent part :

This heading covers made up articles of any textile material which are not included more specifically in other headings of Section XI or elsewhere in the Nomenclature.

As to the issue of whether the subject merchandise is a "bed linen," we note that neither the relevant legal text of the HTSUS nor EN 63.02 define the term "bed linen," therefore, we are permitted to consult dictionaries and other reliable sources to determine its common meaning. See C.J. Tower & Sons of Buffalo, Inc. v. United States, 673 F.2d 1268, 1271 (C.C.P.A. 1982) (citing Optical Glass, Inc. v. United States, 612 F.2d 1283 (C.C.P.A. 1979)). The Oxford English Dictionary defines "bed linen" as "[b]ed-clothes, esp. sheets and pillow-cases, originally of linen." Id. (Oxford University Press 2012) available at www.oed.com. The dictionary defines "bed-clothes" as "[t]he sheets and blankets with which a bed is covered." Id. (Oxford University Press 2016) available at www.oed.com.

The tariff term "bed linens" in heading 6302, HTSUS, includes "specialized items … which are only found on 'some' beds." See Medline Indus. v. United States, 62 F.3d 1407, 1409 (Fed. Cir. 1995) (the court held that drawsheets, which are "used primarily by hospitals and other health care providers to lift, roll, or slide incapacitated patients and to protect undersheets and mattresses from soiling" are classified in heading 6302, HTSUS). The court referred to the definition of "bed linen" in the Webster's Third New International Dictionary 196 (1981), which defined the term as "'linen or cotton articles for a bed; esp.: sheets and pillow cases'" and also referenced the broad language of the Explanatory Notes for heading 6302, HTSUS, which also included bolster cases and mattress covers as examples of bed linen. Id. The court concluded that "[n]either the statute nor the sources cited above limit the definition of 'bed linens' to only 'those items found on all beds.' The definition of bed linens includes at least linen, cotton or other fabric articles for a bed." Id.

The term "bed" is defined by the Oxford English Dictionary as "[t]he sleeping-place of a person or animal." The Oxford English Dictionary further provides that a bed is "[a] permanent structure or arrangement for sleeping on, or for the sake of rest." Id. (Oxford University Press 2016) available at www.oed.com.

Your description of the subject merchandise and your website suggest that it is designed and marketed primarily for use during travel, such as in a hammock, sleeping bag or independently, rather than on a "permanent structure or arrangement" as a bed linen. Therefore, we find that the COCOON TravelSheet described in HQ 088149, HQ 089137, HQ 089134, and HQ 950620 is not classifiable as bed linens in heading 6302, HTSUS.

Similarly, the sleep sacks described in NY N012720, NY H81550, NY F84497, NY C89291, and NY 817811, are not classifiable as bed linens in heading 6302, HTSUS, because they are certainly not "found on all beds," nor can they be described as "specialized items … which are only found on 'some' beds." See Medline, 62 F.3d at 1409. Instead, they are designed to travel with the consumer and be used either on a bed, alone, or as a sleeping bag liner. Indeed, some of the sleep sacks are imported with a carrying pouch for easier travel. Moreover, unlike the drawsheets in Medline, the sleep sacks are used to protect the consumer from the undersheets and mattresses, rather than to protect the undersheets and mattresses from the consumer. In other words, they are not "bed-clothes" designed to cover the bed, rather they are designed to protect the consumer. Id. (Oxford University Press 2016) available at www.oed.com.

Since the sleep sacks are not classifiable more specifically in any other heading, we find that they are classifiable in heading 6307, HTSUS, as "Other made up articles, including dress patterns" and specifically under subheading 6307.90.98, HTSUS, which provides for "Other made up articles, including dress patterns: Other: Other: Other."

HOLDING:

Under the authority of GRIs 1 and 6 the sleep sacks are classified in heading 6307, HTSUS, specifically in

subheading 6307.90.98, HTSUS, which provides for "Other made up articles, including dress patterns: Other: Other: Other." The 2017 column one, general rate of duty is 7 percent ad valorem.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on the internet at www.usitc.gov/tata/hts/.

EFFECT ON OTHER RULINGS:

NY N012720, dated June 22, 2007, NY H81550, dated June 26, 2001, NY F84497, dated March 31, 2000, NY C89291, dated July 16, 1998, NY 817811, dated January 25, 1996, HQ 950620, dated February 20, 1992, HQ 089134, dated August 8, 1991, HQ 089137, dated August 6, 1991, and HQ 088149, dated December 27, 1990, are hereby revoked.

In accordance with 19 U.S.C. § 1625(c), this ruling will become effective 60 days after its publication in the Customs Bulletin.


Sincerely,


        Myles B. Harmon, Director
Commercial and Trade Facilitation Division

ADD26

N012720

June 22, 2007

CLA-2-63:RR:NC:N3:349

CATEGORY:    Classification

TARIFF NO.:    6302.32.2060

R.I. Hasson
Independent Brokerage, LLC
10 Fifth Street, Suite 403
Valley Stream, NY 11581

RE:    The tariff classification of a sleep sack from China

Dear Mr. Hasson:

In your letter dated June 11, 2007 you requested a classification ruling on behalf of Levinsohn Textile.

The instant sample, identified as "Travel fresh personal sleep sack", is a sleeping sack with a small carry pouch. The sack is made from 100 percent polyester woven fabric. The fabric is not printed or napped. The sleep sack measures approximately 42 x 93 inches and is sewn together on four sides. The face panel features a slit opening. The slit opening is designed to allow the insertion of a pillow at the top end and the bottom portion allows a person to easily slip into and out of the sleep sack. The small carry pouch is made from the same woven fabric as the sack and has a drawstring closure. The sleep sack does not contain any embroidery, lace, trimming, etc.

The applicable subheading for the mattress cover will be 6302.32.2060, Harmonized Tariff Schedule of the United States (HTSUS), which provides for bed linen, table linen, toilet linen and kitchen linen: other bed linen: of man-made fibers: other…. other: other. The duty rate will be 11.4 percent ad valorem.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on World Wide Web at http://www.usitc.gov/tata/hts/.

The sleep sack falls within textile category designation 666. With the exception of certain products of China, quota/visa requirements are no longer applicable for merchandise which is the product of World Trade Organization (WTO) member countries. The textile category number above applies to merchandise produced in non-WTO member-countries. Quota and visa requirements are the result of international agreements that are subject to frequent renegotiations and changes. To obtain the most current information on quota and visa requirements applicable to this merchandise, we suggest you check, close to the time of shipment, the "Textile Status Report for Absolute Quotas" which is available on our web site at www.cbp.gov. For current information regarding possible textile safeguard actions on goods from China and related issues, we refer you to the web site of the Office of Textiles and Apparel of the Department of Commerce at otexa.ita.doc.gov.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the

ADD27

time this merchandise is imported. If you have any questions regarding the ruling, contact National Import Specialist John Hansen at 646-733-3043.

Sincerely,

Robert B. Swierupski
Director,
National Commodity
Specialist Division

ADD28

N116516

August 20, 2010

CLA-2-63:RR:E:NC:N3:351

CATEGORY: Classification

TARIFF NO.: 6306.99.0000

Ms. Lisa Whiles
James J. Boyle & Co.
7505 N.E. Ambassador Place, Suite B
Portland, OR 97220

RE: The tariff classification of a combination jacket/tent/sleep sack from China

Dear Ms. Whiles:

In your letter dated July 6, 2010, you requested a tariff classification ruling on behalf of your client, JakPak Inc, of Seattle.

You submitted a sample of a product called a JakPak. It is described as "a unisex all-in-one waterproof breathable jacket with integrated tent (shelter), mosquito netting and sleeping bag."

The jacket portion is made of a woven ripstop nylon fabric with taped seams and a waterproof coating. It has a full front opening with a zipper closure covered by a flap with hook-and-loop closures, long sleeves with adjustable tabs with hook-and-loop closures, an integral hood with an elasticized drawstring and cord locks, and two external and one inside zippered pocket in the waist area.

Attached to the inside back of the jacket is a fully detachable one-person tent carried in a dedicated interior pocket on the back of the jacket, circular in shape to fit the frame of the tent. It is fully detachable, but you state that it "must be worn with the jacket in order to provide protection against the elements. The tent portion is not functional as a tent on its own." The tent is designed to cover only the head and shoulders (which is why the jacket must be worn) and an attached mosquito netting extends down over the legs to approximately mid-calf.

To cover the legs while the user is sleeping, a sleep sack is also included. It is made of two panels of woven man-made fiber fabric, with the bottom panel said to be waterproof for lying on the ground. In your letter you state that it is detachable from the jacket, but on the sample we received the two are sewn together. It has a full-length zipper on one side for entrance and egress. It is unlined and unfilled so even though you call it a sleeping bag, it is not considered such for tariff purposes, as a sleeping bag of heading 9404, Harmonized Tariff Schedule of the United States (HTSUS) must be stuffed or filled. The sleep sack would be considered camping goods, classifiable in heading 6306.

The JakPak is considered a composite good for tariff purposes. The components are a jacket of Chapter 62, a tent of subheading 6306.22, and the sleep sack of subheading 6306.99. No one component imparts the essential character to this composite good. You state your belief that since neither the tent nor the sleep sack can function without the jacket, essential character is imparted by the jacket. We disagree. We find that the item will only be purchased by

ADD29

someone specifically intent on using all three components.

You further state that at the retail level, the JakPak will be sold on a hanger with other jackets. We find this to be not only non-dispositive, but unlikely. The JakPak is no ordinary jacket and is unlikely to be sold and certainly never to be purchased as an ordinary jacket. It will be marketed and sold with camping gear and similar sporting goods. Although it will probably be displayed on a hanger, the tent and sleep sack features will be prominently displayed.

In such a case, where no single component can be said to impart the essential character, General Rule of Interpretation 3(c), HTSUS, states that classification is determined by the heading that appears last in the tariff among the competing headings. Subheading 6306.99 comes last among the competing provisions mentioned above.

The applicable subheading for the JakPak will be will be 6306.99.0000, HTSUS, which provides for camping goods: Other: Of other textile materials. The rate of duty will be 4.5% ad valorem.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on World Wide Web at http://www.usitc.gov/tata/hts/.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. If you have any questions regarding the ruling, contact National Import Specialist Mitchel Bayer at (646) 733-3102.

Sincerely,


Robert B. Swierupski
Director
National Commodity Specialist Division


ADD30

N160104

May 11, 2011

CLA-2-61:OT:RR:NC:N3:356

CATEGORY: Classification

TARIFF NO.: 6101.30.2010; 6110.30.3053

Ms. Barbara Nichols
Spyder Active Sports, Inc.
4725 Walnut Street
Boulder, CO 80301

RE:   The tariff classification of men's knit garments from Indonesia.

Dear Ms. Nichols:

In your letter dated April 5, 2011, you requested a tariff classification ruling. As requested, your samples will be returned.

Style 11-3570 is a men's jacket constructed from a bonded fabric consisting of an outer layer of 100% polyester, rib knit fabric and an inner layer of 100% polyester, finely knit, sherpa pile fabric. The front panels are lined with 100% polyester, jacquard knit fabric. Style 11-3570 has a self-fabric stand-up collar lined with an underside of jacquard knit fabric; a full front opening with a zipper closure; embroidered logos on the left chest and on the back panel below the collar; long, tapered, raglan sleeves; two side entry, zippered pockets below the waist; and a straight bottom with a drawcord and cord locks.

Style 11-3572 is a men's jacket constructed from a bonded fabric consisting of an outer layer of 100% polyester, rib knit fabric and an inner layer of 100% polyester, finely knit, fleece pile fabric. The front panels are lined with 100% polyester, jacquard knit fabric. Style 11-3572 has a self-fabric hood; a full front opening with a zipper closure; a storm flap behind the zipper; embroidered logos on the left chest and on the lower right back panel; long, tapered, raglan sleeves; two side entry, zippered pockets below the waist; and a straight bottom with a drawcord and cord locks.

Style 11-3577 is a men's pullover garment constructed from a bonded fabric consisting of an outer layer of 100% polyester, rib knit fabric and an inner layer of 100% polyester, finely knit, fleece pile fabric. Style 11-3577 has a self-fabric stand-up collar; a partial front opening with a zipper closure; embroidered logos on the left chest and on the back panel below the collar; 100% polyester stretch fleece side panels; long, tapered, raglan sleeves; and a straight bottom with a drawcord and cord locks.

Following Chapter 60, Note 1 (c), the classification of Styles 11-3570, 11-3572 and 11-3577 is determined by the knit pile component of the bonded fabric whether the knit pile component is used as the inside or the outside surface of the fabric.

Consequently, the applicable subheading for Styles 11-3570 and 11-3572 will be 6101.30.2010, Harmonized Tariff Schedule of the United States, (HTSUS), which provides for: overcoats, carcoats, capes, cloaks, anoraks (including ski-jackets) windbreakers and similar articles, knitted or crocheted, other than those of heading 6103: of man-made

ADD31

fibers: other: other: men's. The rate of duty will be 28.2% ad valorem.

The applicable subheading for Style 11-3577 will be 6110.30.3053, Harmonized Tariff Schedule of the United States, (HTSUS), which provides for: sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: of man-made fibers: other: other: other: other: men's or boy's: other. The rate of duty is 32% ad valorem.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on World Wide Web at http://www.usitc.gov/tata/hts/.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177). A copy of this ruling letter or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. f you have any questions regarding this ruling, contact National Import Specialist Mary Ryan at 646-733-3271.

Sincerely,

Robert B. Swierupski
Director,
National Commodity
Specialist Division

ADD32

N258001

October 27, 2014

CLA-2-61:OT:RR:NC:N3:357

CATEGORY:    Classification

TARIFF NO.: 6102.30.2010; 6110.30.3059

Ms. Josephine Guanio
Exist Inc.
1650 N.W. 23rd Avenue
Unit A
Fort Lauderdale, FL 33311

RE:    The tariff classification of women's garments from China

Dear Ms. Guanio:

In your letter dated October 1, 2014, you requested a tariff classification ruling. Your samples will be returned.

Style ZHS247 is a fully lined knit jacket with a shell composed of 80% polyester and 20% cotton knit fabric napped on the inside surface.  The lining is 100% polyester Sherpa knit fabric. The jacket features a full front opening secured with a zipper closure which extends to the top of the collar, a hood, long, tapered sleeves, and a tight fitting ribbed knit bottom band. You state the jacket will be offered in sizes M-XXL.

In your letter, you describe this jacket as unisex. Examination of the sample supports the claim that the jacket is designed for unisex use. Therefore, in accordance with the Harmonized Tariff Schedule of the United States (HTSUS) Chapter 61 Legal Note 9, style ZHS247 is to be classified in the headings covering women's or girls' garments.

Style LJ7225, is a woman's cut-and-sewn cardigan constructed from 100% polyester finely knit mesh fabric. The outer surface of the garment's fabric measures more than nine stitches per two centimeters in the direction that the stitches were formed. The cardigan features a piece constructed hood with no means of closure, long hemmed sleeves, a full front opening with a zipper closure, two front pockets and a hemmed bottom. The garment extends to below the waist. You state the cardigan will be offered in ladies sizes S-XL.

In your letter, style LJ7225 is referred to as a jacket; however, based on construction and styling features, the cardigan is more specifically provided for as a garment of HTSUS heading 6110.

The applicable subheading for the style ZHS247 will be 6102.30.2010, HTSUS, which provides for Women's or girls' overcoats, carcoats, capes, cloaks, anoraks (including ski-jackets), windbreakers and similar articles, knitted or crocheted, other than those of heading 6104: Of man-made fibers: Other: Other: Women's. The rate of duty will be 28.2 percent ad valorem.

The applicable subheading for style LJ7225 will be 6110.30.3059, HTSUS, which provides for Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted: Of man-made fibers: Other: Other: Other: Women's or

girls': Other. The rate of duty will be 32 percent ad valorem.

At this time, we are unable to issue a ruling for style LCU506. We need additional information in order to issue a ruling. Please provide the following information.

How is the garment designed? Is it an original design or a "knock off" of an item already being sold? If it is an original design, what is the concept of the designer? If it is a "knock off," how was the item originally sold at retail? What changes or modifications were made to the garment? Were there changes made to the type or weight of the fabric used? Were there changes made to the size specifications?

What is the weight of the fabric? Is the fabric's type and weight typical of "Beach Cover Ups" sold by your company? Please explain.

How will the garment be marketed?

(a)    Are there any sketches or booklets used during the process of showing a potential buyer the line? If so, please provide copies.
(b)    Is the garment designed specifically for the buyer? If so, please provide the information in numbers 1 and 2 above on behalf of the buyer.
(c)    Provide the name of the buyer.

How will the garment be displayed to the consumer at retail?

What in-store advertising or signs will be placed near the garment?
    (b)    What other types of garments are sold in the same department?
    (c)    Provide copies of any labels that will be sewn into or tacked onto the garment, especially any that indicate how the garment is intended to be used.
(d)    Provide any advertising or advertising mock-ups that will be used for the garment. If nothing is available for this specific garment, please provide advertising for similar garments sold in prior seasons.
(e)    Will the garment be sold in a catalog? If so, please provide a copy of the entire catalog. If nothing is available for this specific garment, please provide a catalog showing similar garments sold in prior seasons.
(f)    Will the garment be sold on an internet site? If so, please provide a copy of the page, showing the garment's description, and the location on the website.

Often in swimwear departments, garments known as "beach cover ups" are sold alongside swimwear. Does your company market beach wear? How do you define that term? Do you consider this garment to be beach wear?

If you decide to resubmit your request, please include all of the material that we have returned to you, and mail your request to U.S. Customs and Border Protection, Customs Information Exchange, 10th Floor, One Penn Plaza, New York, NY 10119, attn: Binding Rulings Section.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on World Wide Web at http://www.usitc.gov/tata/hts/.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. If you have any questions regarding the ruling, contact National Import Specialist Natalie Hanson via email at natalie.hanson@cbp.dhs.gov.

ADD34

Sincerely,


Gwenn Klein Kirschner
Director
National Commodity Specialist Division

ADD35

N284761

April 19, 2017

CLA-2-63:OT:RR:NC:N3:351

CATEGORY: Classification

TARIFF NO.: 6307.90.9889

Ms. Linda Bentley
JS Royal Home USA
13451 South Point Boulevard
Charlotte, NC 28273

RE: The tariff classification of a sleeping bag liner/sleep sack with carry bag from China

Dear Ms. Bentley:

In your letter dated March 24, 2017, you requested a tariff classification ruling.

You submitted a description of a sleeping bag liner/sleep sack with a carry bag. The sleeping bag liner and the carry bag are both composed of 100 percent polyester. The sleeping bag liner has no zipper for closure but the carry bag can be closed with a drawstring and spring lock. The carry bag and sleeping bag liner/sleep sack both measure 78 inches in length and 33.5 inches in width. The sleeping bag liner/sleep sack can be used in conjunction with a sleeping bag for extra warmth and to keep the sleeping bag clean. It can also be used as a personal sheet in hotel rooms.

The applicable subheading for the sleeping bag liner/sleep sack with carry bag, will be 6307.90.9889, Harmonized Tariff Schedule of the United States (HTSUS), which provides for other made up textile articles, other. The rate of duty will be 7 percent ad valorem.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on the World Wide Web at https://hts.usitc.gov/current.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. If you have any questions regarding the ruling, contact National Import Specialist Adleasia Lonesome via email at adleasia.a.lonesome@cbp.dhs.gov.

Sincerely,


Steven A. Mack
Director
National Commodity Specialist Division

ADD36

ADD37

N302193

February 5, 2019

CLA-2-63:OT:RR:NC:N3:351

CATEGORY:    Classification

TARIFF NO.: 6307.90.9889

Ms. Suzanne Lagay Kay
Franco Manufacturing Company, Inc.
555 Prospect Street
Metuchen, NJ 08840-2293

RE: The tariff classification of a hooded blanket from China

Dear Ms. Kay:

In your letter dated November 30, 2018, you requested a tariff classification ruling. The sample will be retained.

Style A4655W, Hooded Step In Blanket is a hooded sleep sack composed of 100 percent polyester fleece fabric and constructed from two pieces of fleece fabric sewn together on three sides. Two additional pieces of fleece fabric are sewn to the back of the sleep sack to create a hood. The sleep sack measures approximatly 30" x 54". The step in blanket is for a child between the ages of 3 to 8 to nestle in.

The applicable subheading for the hooded step in blanket, Style A4655W will be 6307.90.9889, Harmonized Tariff Schedule of the United States (HTSUS), which provides for other made up textile articles, other. The rate of duty will be 7 percent ad valorem.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on World Wide Web at https://hts.usitc.gov/current.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. If you have any questions regarding the ruling, please contact National Import Specialist Adleasia Lonesome via email at adleasia.a.lonesome@cbp.dhs.gov.

Sincerely,

Steven A. Mack
Director
National Commodity Specialist Division

ADD38

N345888

February 27, 2025

CLA-2-62:OT:RR:NC:N3:354

CATEGORY: Classification

TARIFF NO.: 6212.90.0030

Ms. Min Xie
PVH Corp
285 Madison Ave New York, NY 10017

RE:  The tariff classification of a support bodysuit from Sri Lanka

Dear Ms. Xie:

In your letter dated February 12, 2025, you requested a tariff classification ruling.  The sample will be returned as requested.

Style 3438FQ is a woman's support bodysuit constructed of 44% elastane, 33% cotton, and 23% polyamide knit fabric. The undergarment extends from above the bust to the leg opening and can be worn either strapless or with straps.  The undergarment is tight fitting, supportive throughout and has been designed to shape the upper body.  It features an approximately 1 ½-inch wide knit band at the top of the garment, a change in knit patterns with different levels of compression, a thong styled rear bottom that has no opening, and removable adjustable elasticized narrow shoulder straps. The undergarment will be marketed as shapewear to be worn under clothing. The applicable subheading for this style will be 6212.90.0030, Harmonized Tariff Schedule of the United States (HTSUS), which provides for Brassieres, girdles, corsets, braces, suspenders, garters and similar articles and parts thereof, whether or not knitted or crocheted: Other: Of man-made fibers or man-made fibers and rubber or plastics.  The duty rate will be 6.6% ad valorem.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided at https://hts.usitc.gov/.

The holding set forth above applies only to the specific factual situation and merchandise description as identified in the ruling request. This position is clearly set forth in Title 19, Code of Federal Regulations (CFR), Section 177.9(b)(1). This section states that a ruling letter is issued on the assumption that all of the information furnished in the ruling letter, whether directly, by reference, or by implication, is accurate and complete in every material respect. In the event that the facts are modified in any way, or if the goods do not conform to these facts at time of importation, you should bring this to the attention of U.S. Customs and Border Protection (CBP) and submit a request for a new ruling in accordance with 19 CFR 177.2. Additionally, we note that the material facts described in the foregoing ruling may be subject to periodic verification by CBP.

This ruling is being issued under the provisions of Part 177 of the Customs and Border Protection Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the

ADD39

time this merchandise is imported. If you have any questions regarding the ruling, please contact National Import Specialist Karen Sikorski at karen.sikorski@cbp.dhs.gov.

Sincerely,

Steven A. Mack
Director
National Commodity Specialist Division

ADD40