**Appeal No. 2025-1889**

# United States Court of Appeals
# For The Federal Circuit

COZY COMFORT COMPANY LLC,

*Plaintiff-Appellant*,

—v.—

UNITED STATES,

*Defendant-Appellee*.

Appeal from the United States Court of International Trade in Case No. 1:22-cv-00173-SAV, Judge Stephen A. Vaden

## BRIEF FOR DEFENDANT-APPELLEE, UNITED STATES

author

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

BEVERLY A. FARRELL
Senior Trial Counsel
Civil Division, U.S. Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
Tel. No. (212) 264-9230
*Attorneys for Defendant-Appellee*

*Of Counsel*
MICHAEL ANDERSON
Office of Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

Dated: December 19, 2025

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Fed. Cir. R. 47.5, no other appeal in or from the present civil action has previously been before this or any other appellate court.  The following cases in the U.S. Court of International Trade will be affected by this Court's decision in this matter:

1. Cozy Comfort Company LLC v. United States, Court No. 22-00173 (Ct. Int'l Trade); and

2. Cozy Comfort Company LLC v. United States, Court No. 22-00003 (Ct. Int'l Trade)

# TABLE OF CONTENTS

STATEMENT OF ISSUES ................................................................. 1

STATEMENT OF THE CASE ........................................................... 1

I.  Statutory and Regulatory Background ...................................... 1

A.  The Tariff System ................................................................. 1

B.  HTSUS Headings 6110, 6301, and 6114 ........................... 2

II.  Procedural History ................................................................. 4

III.  The Trial Court's Findings of Fact ......................................... 5

A.  Stipulated Facts .................................................................... 5

B.  Facts Found at Trial .............................................................. 8

1.  Witnesses ......................................................................... 8

2.  Marketing of The Comfy® ............................................... 8

3.  The Comfy®'s design, intended use, and physical characteristics ........... 9

4.  The trial court was more persuaded by the testimony of Professor Ferro and Ms. Concannon than by the testimony of Mr. Crumley and Mr. Speciale ........................................................................ 13

SUMMARY OF THE ARGUMENT ............................................... 16

ARGUMENT ................................................................................... 17

I.  STANDARD OF REVIEW ........................................................ 17

II.  LEGAL FRAMEWORK FOR TARIFF CLASSIFICATION ........ 18

III.  ON THE BASIS OF THE RECORD MADE DURING A WEEK-LONG TRIAL, THE TRIAL COURT CORRECTLY DETERMINED THAT THE

i

COMFY® IS A PULLOVER CLASSIFIABLE UNDER SUBHEADING 6110.30.30, HTSUS ................................................................................................. 20

A.    The Trial Court Properly Construed Heading 6110, HTSUS, And This Court's Binding Precedent in *Rubies II* To Hold That The Comfy® Is A Pullover of Heading 6110 And Does Not Protect From Extreme Cold ............................................................................................................. 20

B.    The Trial Court Properly Considered Use When Construing The HTSUS To Determine The Proper Classification Of The Comfy® ..... 23

C.    The Explanatory Notes To Heading 6110 Do Not Exclude The Comfy® From Heading 6110 ...................................................................... 24

D.    The Trial Court Is Not Required To Give Deference To CBP's Apparel Informed Compliance Publication ........................... 26

E.    The Trial Court Did Not Misinterpret *Rubies II* To Mean That An Article Covered By Heading 6110 May Cover The Whole Body ........... 28

F.    The Trial Cout Did Not Misinterpret *Arnold* ........................................... 29

G.    The Trial Court Properly Determined That The Comfy® Is Not A Blanket Of Heading 6301 ........................................................................... 30

CONCLUSION ............................................................................................................ 32

# TABLE OF AUTHORITIES

**Cases**

*Allstar Mktg. Grp., LLC v. United States,*
211 F. Supp. 3d 1319 (Ct. Int'l Trade 2017) ........................................................... 5, 9, 31

*Anderson v. City of Bessemer City,*
470 U.S. 564 (1985) ........................................................................................... 17-18

*Arnold, Constable & Co. v. United States,*
147 U.S. 494 (1893) .................................................................................... 2, 29, 30

*Azteca Milling Co. v. United States,*
890 F.2d 1150 (Fed. Cir. 1989) ........................................................................ 17-18

*Baxter Healthcare Corp. v. United States,*
182 F.3d 1333 (Fed. Cir. 1999) ........................................................................... 18

*Chemtell, Inc. United States,*
878 F.3d 1012 (Fed. Cir. 2017) ........................................................................... 19

*Carl Zeiss, Inc. v. United States,*
195 F.3d 1375 (Fed. Cir. 1999) ...................................................................... 18, 19

*Deckers Corp. v. United States,*
752 F.3d 949 (Fed. Cir. 2014) ............................................................................ 19

*Degussa Corp v. United States,*
508 F.3d 1044 (Fed. Cir. 2007) ...................................................................... 18, 25

*Ford Motor Co. v. United States,*
286 F.3d 1335 (Fed. Cir. 2002) ........................................................................... 17

*Fresenius USA, Inc. v. Baxter Intern., Inc.,*
582 F.3d 1288 (Fed. Cir. 2009) ........................................................................... 26

*GRK Canada, Ltd. v. United States,*
761 F.3d 1354 (Fed. Cir. 2014) ...................................................................... 11, 14

*Honda of America Mfg., Inc. v. United States,*
    607 F.3d 771 (Fed. Cir. 2010) ........................................................ 27

*Irwin Indus. Tool Co. v. United States,*
    920 F.3d 1356 (Fed. Cir. 2019) ............................................. 3, 18, 23-24

*LeMans Corp v. United States,*
    34 CIT 156 (2010) .......................................................................... 21

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024) ....................................................................... 26

*Meyer Corporation, U.S. v. United States,*
    920 F.3d 1356 (Fed. Cir. 2019) ...................................................... 17

*Orlando Food Corp. v. United States,*
140 F.3d 1437(Fed. Cir. 1998)……………………………………………………1

*Riley & Co. v. United States,*
    8 U.S. Cust. App. 116 (1917) ........................................................ 3-4

*R.T. Foods, Inc. v. United States,*
757 F.3d 1349 (Fed. Cir. 2014)……………………………………………17, 19

*Rubies Costume Co. v. United States,*
922 F.3d 1337 (Fed. Cir. 2019) ................................................. *passim*

*Rubie's Costume Co. v. United States,*
337 F.3d 1350 (Fed. Cir. 2003) ..................................... 2, 18, 20, 26

*Sigma-Tau HealthScience v. United States,*
    838 F.3d 1272 (Fed. Cir. 2016) ...................................................... 18

*Schlumberger Tech. Corp v. United States,*
    845 F.3d 1158 (Fed. Cir. 2017) ...................................................... 19

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ....................................................................... 26

*United States v. United States  Gypsum Co.*,
    333 U.S. 364 (1948) .......................................................................................... 17

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ......................................................................................... 2

## Rules and Regulations

USCIT Rule 30(b)(6) ......................................................................................... 8

19 C.F.R. § 141.90(b) ....................................................................................... 2

19 C.F.R. § 174.25 ............................................................................................ 2

19 C.F.R. § 177.1(c) .......................................................................................... 2

19 C.F.R. § 177.9(a) .......................................................................................... 2

## Other Authorities

INFORMED COMPLIANCE PUBLICATION
CLASSIFICATION: APPAREL TERMINOLOGY UNDER THE HTSUS (JUNE 2008) ...... 26, 27

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1840, 2309 (2002) ................... 21

Customs Modernization Act, Pub. L. No. 103-182, 107 Stat. 2057 (1993) ................... 1

## STATEMENT OF THE ISSUES

1.    Whether, after considering the evidence adduced during a week-long trial including the testimony of experts, the trial court properly determined that the garment at issue known commercially as The Comfy® is classified in subheading 6110.30.30, HTSUS.

## STATEMENT OF THE CASE

## I.    STATUTORY AND REGULATORY BACKGROUND

### A.    The Tariff System

Duties on goods imported into the United States are levied according to the rates set by the HTSUS.  *See* 19 U.S.C. § 1202.  The HTSUS's classification headings denote "general categories of merchandise."  *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998). The subheadings within each heading "provide a more particularized segregation of the goods within each category."  *Id.* Customs is required by statute to "fix the final classification and rate of duty applicable" to imported merchandise.  19 U.S.C. § 1500(b).

All imported goods must be declared at the border and made available for inspection by CBP officials.  Under the Customs Modernization Act, Pub. L. No. 103-182, 107 Stat. 2057 (1993), the importer of record is responsible for classifying imported goods and providing necessary information to Customs.  Specifically, the importer must "fil[e] with the Customs Service the declared value, classification and rate of duty applicable to the merchandise," along with information necessary to

enable CBP to assess the applicable duty and collect accurate statistics. 19 U.S.C. §

1484(a)(1)(B); *see* 19 C.F.R. § 141.90(b).

An importer uncertain about the correct classification of its merchandise may

request a ruling letter from Customs Headquarters. *See* 19 C.F.R. § 177.1(c). This

ruling "represents the official position of the Customs Service with respect to the

particular transaction or issue described therein and is binding on all Customs Service

personnel." *Id.* § 177.9(a); *see United States v. Mead Corp.*, 533 U.S. 218, 222 (2001). In

addition, an importer may submit an application for further review in connection with

a protest. *See* 19 C.F.R. § 174.25.

### B.    HTSUS Headings 6110, 6301, And 6114

This case concerns two HTSUS headings (6110 and 6114) providing different

rates of duty for various articles of apparel and one HTSUS heading (6301) for

blankets. Headings 6110 and 6114 fall within Chapter 61 of the tariff, which covers

various articles of apparel. To be classifiable under either of these headings, an article

must be "wearing apparel." *Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1357

(Fed. Cir. 2003) (*Rubie's I*); *see also* Statistical Note 2, Ch. 61, HTSUS (all items in

Heading 6110 are "garments"). This Court explained in *Rubie's I* that wearing apparel

covers "all articles which are *ordinarily* worn—dress in general." *Id.* at 1357 (quoting

*Arnold v. United States*, 147 U.S. 494, 496 (1893)). Under *Rubie's I*, articles such as

certain Halloween costumes worn only on certain rare occasions, "of a flimsy nature

and construction" are not "normal articles of apparel." *Id.* at 1358, 1360.

2

In *Rubies Costume Co. v. United States*, 922 F.3d 1337 (Fed. Cir. 2019) (*Rubies II*), this Court explained that a "well-made" and "durable" Santa Suit jacket was an article of apparel that would satisfy heading 6110 as a "similar article" if it "covered the upper body"; provided "some warmth"; did not "protect against wind, rain, or extreme cold"; and could be worn over "undergarments or other clothing." *Id.* at 1345-46.

Heading 6301 is an *eo nomine* provision that covers blankets and traveling rugs. However, because the term traveling rug suggests a use or design for a specific purpose, use should be taken into consideration when construing that term. *See Irwin Indus. Tool Co. v. United States*, 920 F.3d 1356, 1361 (Fed. Cir. 2019). The U.S. Court of Customs Appeals (the predecessor of this Court[1]), after construing the meaning of the terms "blanket" and "traveling rugs," determined "that the word 'blankets,' standing alone, applies only to appropriate bed coverings and to coverings for horses or like

---

[1] According to the Federal Judicial Center:

> In 1909, Congress created the U.S. Court of Customs Appeals, with five authorized judgeships, to hear appeals from the Board of General Appraisers (later the U.S. Customs Court). In 1929 the court was renamed the U.S. Court of Customs and Patent Appeals, in 1958 Congress declared it to be a court established under Article III of the Constitution, and in 1980 it began to hear appeals from the U.S. Court of International Trade when that court replaced the U.S. Customs Court. The U.S. Court of Appeals for the Federal Circuit, upon its creation in 1982, absorbed the U.S. Court of Customs and Patent Appeals.

https://www.fjc.gov/history/timeline/us-court-customs-appeals

animals" and that "traveling rug[s] are used to cover passengers in automobiles, carriages and other transportation. *Riley & Co. v. United States*, 8 U.S. Cust. App. 116, 117-18 (1917).

## II.   PROCEDURAL HISTORY

This case concerns the proper classification of The Comfy® also known as The Comfy® Original, a novel product manufactured and imported by Cozy Comfort Company, LLC (Cozy). Appx78. In its patent applications D859,788 and 10,420,431, filed well before this classification dispute, Cozy described The Comfy® as a garment or overgarment with an elevated marsupial pocket but did not refer to the product as a blanket or claim that the item was for protection against extreme cold. Appx8.

Although Cozy believed its product to be novel, it did not seek a ruling letter from U.S. Customs and Border Protection (CBP or Customs). *See* Appx3. Instead, when Cozy first imported The Comfy® in January 2018, it declared that the product was properly classified as a blanket under subheading 6301.40.00, Harmonized Tariff Schedule of the United States (HTSUS).[2] Appx2-3. In July 2019, Cozy made another entry of The Comfy® again declaring it under subheading 6301.40.00. CBP reclassified the product as a pullover under subheading 6110.30.30, HTSUS.[3] Appx3.

---

[2] Subheading 6301.40.00, HTSUS, provides: Blankets and traveling rugs: Blankets (other than electric blankets) and traveling rugs, of synthetic fibers.

[3] Subheading 6110.30.30, HTSUS, provides: Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: Of man-made fibers: Other: Other: Other.

Cozy protested this decision and filed an Application for Further Review resulting in a May 21, 2021 headquarters ruling letter determining that the classification of The Comfy® was as a pullover under subheading 6110.30.30. Appx3. Cozy's protest was denied. Appx3.

In January 2021, Cozy made the entry of merchandise at issue here under subheading 6110.30.30 and protested its liquidation, which CBP denied. Appx3. Cozy then commenced this action in the U.S. Court of International Trade. Appx3.

Although the Government moved for summary judgment, Cozy did not cross-move and instead opposed the motion by contending for the first time through an affidavit that The Comfy® protected against extreme cold. Appx3-4. Finding a disputed issue of material fact, the trial court denied the motion for summary and set the case for trial asking the parties to focus on three issues: (1) whether The Comfy® protects against extreme cold, (2) how The Comfy® compares to the Snuggie®, and (3) the use factors identified in *GRK Canada*[4] and applied in *Allstar Marketing*.[5] Appx4.

## III.   THE TRIAL COURT'S FINDINGS OF FACT

### A.   Stipulated Facts

In February 2017, two brothers, Michael Speciale and Brian Speciale, invented The Comfy®. Appx6. A picture of The Comfy® from the box in which it is sold is

---

[4] *GRK Canada, Ltd. v. United States*, 761 F.3d 1354 (Fed. Cir. 2014).

[5] *Allstar Mktg. Grp., LLC v. United States*, 211 F. Supp. 3d 1319 (Ct. Int'l Trade 2017).

depicted. Appx7. The product was "inspired by a men's [extra-large] hooded sweatshirt and a sherpa blanket." Appx6. To produce, market, and sell The Comfy®, the two brothers founded Cozy Comfort in April 2017. Appx6.

The Comfy® is made "using two separate knitted fabrics: a microfiber fabric (microfleece) for the exterior and a sherpa fabric for the interior that provides extra warmth to the user." Appx7. These fabrics are "100% man-made fibers, specifically polyester." Appx7. The Comfy® has an "opening for the head, a hood, long sleeves, ribbed wrist cuffs, a wide, un-ribbed, hemmed bottom opening, and a frontal marsupial or kangaroo pocket." Appx7. It is intended to be worn over clothes or undergarments. Appx7. It does not protect users from rain or wind. Appx7.

The Comfy® is reversible and comes in one-size regardless of gender. Appx7. The front panel of The Comfy® measures "approximately 36 inches wide and 33 inches long from the bottom of the neck hole to the bottom of the panel" and the back panel measures "approximately 36 inches wide and 41 inches long from the bottom of the neck hole to the bottom of the panel." Appx7-8.

Cozy obtained numerous design patents for The Comfy®. Appx8. On September 19, 2019, the U.S. Patent and Trademark Office (USPTO) issued Design Patent No. D859,788 to Cozy for an "ENLARGED OVER-GARMENT WITH AN ELEVATED MARSUPIAL POCKET." Appx8. That patent refers to the product as an "enlarged over-garment" and does not describe the product as a blanket. Appx8. On September 24, 2019, USPTO issued Patent No. 10,420,431 to Cozy for

6

an "OVERGARMENT WITH AN ELEVATED MARSUPIAL POCKET." Appx8. In that patent, Cozy described the invention as relating to blankets or large, wearable blankets, and the product was referred to as a "garment" or an "overgarment" throughout the patent. Appx8. No patents for The Comfy® "include a description that it is for 'protection against extreme cold.'" Appx8. On November 15, 2022, after the start of the tariff classification dispute, here, USPTO issued Design Patent No. D969,458 to Cozy for a "WHOLE BODY BLANKET." Appx8.

Cozy marketed The Comfy® in different ways such as being described as a "blanket that's a sweatshirt," "a giant blanket that's really a giant sweatshirt," and "The Blanket ... That's A Sweatshirt." Appx8. Cozy also marketed the product as a "wearable blanket," noting that The Comfy® allows users who wear it to perform activities that an ordinary blanket would not allow. Appx8. Cozy also designed a logo (depicted Appx9) featuring "an image of a standing panda bear wearing a hooded sweatshirt to the left of the words 'THE COMFY' all of which is above the words 'THE BLANKET ... THAT'S A SWEATSHIRT!' " to help market the product. Appx9. On February 19, 2019, USPTO registered Trademark No. 5,678,126 to Cozy for that logo, noting that it fell under "Class 24, 'Blanket throws, namely whole body blankets,'" and "Class 35, 'On-line retail store services featuring blanket throws, namely whole body blankets[.]'" Appx9.

### B.     Facts Found at Trial

*1.     Witnesses*

The trial court heard testimony from three witnesses it accepted as experts: James Crumley, an outdoorsman and garment designer (on behalf of Cozy); Mary Ann Ferro, an experienced garment designer (on behalf of the Government); and Patricia Concannon, an experienced clothing marketing professional (on behalf of the Government). Appx10-11.

Cozy also presented testimony from Michael Speciale, co-founder of Cozy and co-inventor of The Comfy®, and designated testimony from Tatiana Matherne as a Rule 30(b)(6) witness for the Government. The Government also presented testimony from Renee Orsat, a national import specialist at CBP, and designated testimony from Michael Speciale as a Rule 30(b)(6) witness for Cozy. Appx10-11.

*2.     Marketing of The Comfy®*

Mr. Speciale conceived of The Comfy® one morning when he saw his young "[seven]-year-old" nephew "wearing one of [Brian Speciale's] old hoodies" while lying next to a sherpa-lined, microfleece throw blanket. Appx11. Because Brian Speciale was "six [foot] one" and "about 200 pounds," his sweatshirt was oversized on the nephew and inspired Mr. Speciale to combine an oversized sweatshirt and a throw blanket to create a new product for adults. Appx11-12.

The trial court found Mr. Speciale's testimony that The Comfy® was always a blanket first and was sold as a blanket both unpersuasive and contradicted by other

evidence.  Appx12.  The *Shark Tank* video admitted into evidence established that the initial marketing strategy was to describe The Comfy® as a blanket that's a sweatshirt and to distinguish it from a well-known product, The Snuggie®.[6]  Appx12.

3.    *The Comfy®'s design, intended use, and physical characteristics*

Pre-importation patents Cozy filed note that, although traditional "[t]hrow blankets are great at keeping a person warm and comfortable on the couch, ... sadly, eventually, one must get up from the couch ... [and] must leave the warm blanket behind ...."  Appx19.  The Comfy® was intended to be "[a]n improved, cozy, comfortable blanket" that was "practically portable" because it could be worn. Appx19.

The "background of the invention" section of Cozy's patent describes indoor activities such as "get[ing] up from the couch ... to grab a hot chocolate, adjust the fire, or go to bed" as the context for why Cozy created The Comfy®.  Appx19.  Mr. Speciale testified that The Comfy® was mainly meant for lounging at home and Professor Ferro agreed that The Comfy® was designed primarily for indoors. Appx19.

---

[6] In 2017, the U.S. Court of International Trade held that The Snuggie® was designed, used, and functioned as a blanket and that the introduction of sleeves was not so substantial as to transform it into something other than a blanket.  *Allstar Marketing Group, LLC v. United States*, 211 F. Supp. 3d 1319 Ct. Int'l Trade 2017).

Mr. Speciale demonstrated that The Comfy® is designed for users to put it on by pulling it over their heads and, once on, it may be worn whether the wearer is seated or standing. Appx19-20. The product's patent states that The Comfy® is used "as worn by a person in a standing position" and photographs of users show customers wearing the item while standing or in a seated position. Appx20. This information was verified by the Court when it donned The Comfy® in open court and showed that the item fell about to the trial judge's knees. Appx20-21.

The trial court found that The Comfy® was not primarily intended to be used in a "cocooning" position, *i.e.*, where users in a seated position can pull their arms and legs into the product with their hands and knees pulled into the chest area. Appx21. First, the trial court's *in camera* and in court reviews of The Comfy® found the cocooning position uncomfortable, constricting, and immobilizing and in tension with how the patents described the products intended uses: portable, suitable for indoor use, and worn by a person in standing position. Appx22. This conclusion was further reinforced by the pictures on the box in which The Comfy® is sold depicting users wearing the item in a variety of standing positions and does not mention or show the cocooning position. Appx23.

The trial court found that The Comfy® provides users with some warmth primarily because the item is lined with a sherpa-type curly pile fabric modeled after real shearling and helps to trap some body heat for warmth in indoor environments. Appx23. However, the lining is made by threading synthetic sherpa through a mesh

fabric with visible holes thereby rendering the lining porous and allowing airflow into and out of the product. Appx23-24. The trial court confirmed that the sherpa lining was not thick and was porous with hundreds of holes inside the lining. Appx23-24.

Similarly, the open bottom and open hood allow cold air to enter the item and The Comfy® lacks a drawstring to permit a tight fit around the head to retain heat. This renders The Comfy® unsuitable for extreme cold. Appx36-37. Ms. Ferro explained that garments keep users warm by insulating them with trapped air between layers and that outerwear made for extreme cold weather has to more or less be snugly fit. Appx37. Cozy's expert, Mr. Crumley, confirmed that a garment protecting against "colder weather" needs to trap air and body heat. Appx37. Further, the trial court noted that Professor Ferro explained that her understanding of extremely cold is consistent with that defined by the National Weather Service: a range of temperatures that includes near freezing temperatures. Appx38-39.

Based on this information, the trial court found that The Comfy® lacks the common characteristics of clothing that protects against extreme cold such as an elastic band or drawstring to keep the bottom tight to the body and its hood close to the face. Appx40. Moreover, The Comfy® not only lacks water resistance but also absorbs water when wet and stays wet for hours. Appx40. Unlike Mr. Crumley who did not test The Comfy®, Professor Ferro conducted a water test that the trial court found is the product of reliable principles and methods and reflected a reliable application of the principles and methods to the facts of the case. Appx40-41.

Because moisture is the enemy of heat preservation, whether from exterior influences or a wearer's perspiration, and The Comfy® does not wick moisture away from the body, this will cause heat to leave the body.  Appx41.

Further, the trial court found that The Comfy® is not marketed like products that protect against the extreme cold.  Appx41.  Ms. Concannon explained that such products are typically marketed with certain features including tags or websites detailing the technical features that produce protection from extreme cold, including a temperature range of the level of cold for which the user would be protected.  Appx41-42.  Similarly, such garments are advertised in ways that show the garment being worn in extremely cold conditions with temperatures at, near, or slightly below freezing such as when skiing or hiking.  Appx41 .

Unlike the extreme cold marketing, The Comfy® is primarily marketed as an indoor product with some mention of outdoor activities such as walking the dog or going to a sporting event.  Appx42.  Nor does the box that The Comfy® is sold in contain any indication or statement that it offers protection from extreme cold.  Appx42.  Mr. Speciale confirmed Ms. Concannon's testimony when he explained that The Comfy® was marketed "as more of a loungewear product" rather than one that protects against the elements and had never been marketed for extreme cold.  Appx42.  Indeed, Mr. Speciale testified on direct examination that The Comfy® is "mainly for lounging on the couch at home."  Appx43.

From this evidence, the trial court found that:

> [a] product that protects against the extreme cold would
> keep in too much body heat, causing the user to become too
> hot for room temperature conditions. The opposite is true
> for a product designed for indoor use, like The Comfy®,
> which would be too loose and non-insulating to protect
> users from the extreme cold.

Appx43.

4.    *The trial court was more persuaded by the testimony of Professor Ferro and Ms. Concannon than by the testimony of Mr. Crumley and Mr. Speciale*

At trial and in its findings of fact and conclusions of law, Cozy made four main arguments why The Comfy® protects against extreme cold: (i) Mr. Crumley's expert testimony that he believes the article protects against extreme cold; (ii) that the product was designed to protect against extreme cold; (iii) customers use the product in extreme cold; and (iv) customer reviews confirm the product is used in extreme cold. Appx43-44.

With respect to Mr. Crumley, the trial court found unpersuasive his opinion that The Comfy® protects against extreme cold because of "the construction and the fabrics used in the construction and the way the patents show that it should be worn to maximize warmth." Appx44. Both Mr. Crumley and Mr. Speciale focused on the cocooning position to support this argument as a way to protect extremities from the cold. Appx44. This opinion was based on Mr. Crumley's belief that the sherpa lining traps body air to maximize warmth. Appx44. However, Mr. Crumley's analysis was simply conclusory as to the construction of the fabrics whereas Professor Ferro's

testimony provided a detailed analysis of the porousness of the lining and the open

design and lack of closures for the bottom or hood portions of the garment.  Appx44-

45.  Thus, the trial court found Professor Ferro's detailed analysis more persuasive

and credible than that of Mr. Crumley.  Appx45.  As to the cocooning point, while it

would keep a user warmer than if standing, even in the cocooning position it lacked

the features to protect against extreme cold because the fabrics are not touching the

body, the hood is still open, the sherpa is still porous, the item is not water repellent,

and it does not have a finish.  Appx46.  Thus, even in a position to provide

protection, The Comfy®'s flaws prevent it from being able to protect in extreme cold

conditions.

The trial court found that the evidence adduced at trial did not support the

assertion that The Comfy® was designed to protect from extreme cold.  Appx47.

First, the inspiration for the product occurred from Mr. Speciale seeing his nephew

cocooning in a sweatshirt lying next to a blanket while indoors.  Appx47.  Using items

appropriate for indoor use, a protype of The Comfy® was made but no extra steps

were taken to assure that this item could protect against extreme cold outdoors.

Appx47.  Nor was any testing performed to confirm that The Comfy® protects from

extreme cold.  Appx48.  Indeed, a patent for the item describes how The Comfy®

allows someone to "stay warm inside a cool building."  Appx48.  The patent contains

no mention of how The Comfy® is, can be, or should be used outdoors.  Appx48.

14

And the cool room temperatures described in the patent do not approach near freezing.  Appx48.

Cozy also entered photographs into evidence that purport to show customers using the product in the extreme cold because there was snow on the ground in five of the around 100 photographs submitted.  Appx48.  After reviewing all the photographs comprising Cozy's exhibit P-13, the trial court determined that these photos have little evidentiary value on whether The Comfy® protects from extreme cold conditions because they provide little evidence of the weather conditions at the time they were taken and do not depict the temperature or wind speed.  Appx48-49.  Moreover, the court observed that snow can remain on the ground once temperatures rise above what could be described as extremely cold.  Appx49.  Further, Cozy's photographic exhibit included only about 100 photos when Mr. Speciale testified that the number of customer photographs would be in the thousands, and he did not know how this sampling was selected.  Appx49.  Therefore, it was impossible to gauge how frequently customers may wear The Comfy® outside as opposed to inside.  Appx49.

When comparing the photographs and reviews with the objective evidence such as the design of The Comfy® and Cozy's statements in the patent applications, the trial court found that the item does not protect against extreme cold.  Appx49-50.

Accordingly, as a result of the foregoing, the trial court concluded that the persuasive and credible documentary and testimonial evidence cannot support a finding that The Comfy® protects from extreme cold.

## SUMMARY OF THE ARGUMENT

The trial court properly determined that The Comfy® is classifiable as a pullover of heading 6110, HTSUS, and specifically under subheading 6110.30.30, HTSUS.  After conducting a week-long trial, the trial court determined that persuasive and credible evidence supported classifying The Comfy® under heading 6110.  First, the trial court found that The Comfy® satisfies the common and commercial meaning of the tariff term "pullover."  Next, the trial court reviewed this Court's precedent in *Rubies II* and recognized that it needed to discern whether The Comfy® protected the wearer from extreme cold because if it did classification under heading 6110 would be foreclosed.

The trial court properly determined that "extreme cold," as that term is used in *Rubies II*, is consistent with the National Weather Service's definition of extreme cold and covers a range of temperatures that goes no higher than "near freezing temperatures" when experienced in the "southern U.S" and in the northern states means temperatures well below zero."  This range from near freezing to well below zero and aligns with the context of *Rubies II*.

16

Because the trial court found that The Comfy® was a pullover of heading 6110, it could not be a blanket of heading 6301 because Note 2(a) to Chapter 63 provides that headings 6301 to 6307 do not cover the goods of chapters 56 to 62.

Finally, because Cozy's other suggested headings, 6114 and 6307, are basket provisions, classification therein is improper because heading 6110 covers the merchandise more specifically. *See R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1354 (Fed. Cir. 2014) (classification in a basket provision is proper only if there is no tariff category that covers the merchandise more specifically.)

Because the trial court properly classified The Comfy® as a pullover of heading 6110, its judgment should be affirmed.

## **ARGUMENT**

## I.    **STANDARD OF REVIEW**

This Court reviews the trial court's conclusions of law *de novo*. *Meyer Corporation, U.S. v. United States*, 43 F.4th 1325, 1330 (Fed. Cir. 2022) (citing *Ford Motor Co. v. United States*, 286 F.3d 1335, 1340 (Fed. Cir. 2002)). However, after a trial, this Court reviews the trial court's "findings of fact for clear error." *Ford*, 286 F.3d at 1340.

Under the clear error standard, this Court is required "to accept the Court of International Trade's findings of fact unless we are left with a 'definite and firm conviction that a mistake has been committed.'" *Ford*, 286 F.3d at 1340 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). "If the trial court's findings are 'plausible in light of the record viewed in its entirety, the court of appeals

17

may not reverse it.'" *Azteca Milling Co. v. United States*, 890 F.2d 1150, 1151 (Fed. Cir. 1989) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)).

## II.    LEGAL FRAMEWORK FOR TARIFF CLASSIFICATION

When conducting this *de novo* review regarding classification determinations, this Court conducts two steps.  The Court first ascertains the meaning of the applicable tariff terms—a question of law reviewed *de novo*.  *Sigma-Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1276 (Fed. Cir. 2016).  "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).

In construing the common and commercial meaning, the Court "may consult lexicographic and scientific authorities, dictionaries, and other reliable information" or may rely on its "own understanding of the terms used" if the tariff term lacks a clear definition.  *Baxter Healthcare Corp. v. United States*, 182 F.3d 1333, 1337–38 (Fed. Cir. 1999).  Although not legally binding, the Court may also turn to the Explanatory Notes for the Harmonized Commodity Description and Coding System (ENs), which "are generally indicative of the proper interpretation of a tariff provision.*"* *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing *Motorola Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006)).  However, an EN cannot be used "to narrow the language of the classification heading itself." *Rubie's I*, 337 F.3d at 1359; *Irwin Indus.*, 920 F.3d at 1360.

Additional consideration is given to whether a tariff heading is *eo nomine, i.e.,* describing merchandise by a specific name, or principal use, *i.e.*, describing merchandise by its use. *Carl Zeiss,* 195 F.3d at 1379. An *eo nomine* provision covers all forms of the named article, even improved forms, "as long as the improved article performs the same essential function as the named exemplar." *Deckers Corp. v. United States*, 752 F.3d 949, 957 (Fed. Cir. 2014). A named exemplar ceases to perform the same essential function when it has "features *substantially in excess* of the those within the common meaning of the [named] term." *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1354 (Fed. Cir. 2014) (internal quotation marks omitted) (emphasis in original).

After interpreting the tariff headings, the Court applies the General Rules of Interpretation (GRI) beginning with GRI 1. GRI 1 states that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." The classification analysis ends at GRI 1 if there is a single heading that describes a good in whole. *R.T. Foods*, 757 F.3d at 1353.

The Court "accord[s] deference to a classification ruling by Customs to the extent of its power to persuade," *Chemtall, Inc. v. United States*, 878 F.3d 1012, 1018 (Fed. Cir. 2017) (citation and quotation marks omitted), and "give[s] great weight" to the Trade Court's "informed opinion[s]," *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1162 (Fed. Cir. 2017). The Court then assesses whether the trial court properly determined that a particular product fits within the tariff term at issue—a question of fact reviewed for clear error. *Id.*

19

III.  **ON THE BASIS OF THE RECORD MADE DURING A WEEK-LONG TRIAL, THE TRIAL COURT CORRECTLY DETERMINED THAT THE COMFY® IS A PULLOVER CLASSIFIABLE UNDER SUBHEADING 6110.30.30, HTSUS.**

A.  **The Trial Court Properly Construed Heading 6110, HTSUS, And This Court's Binding Precedent in *Rubies II*, To Hold That The Comfy® Is A Pullover of Heading 6110 And Does Not Protect from Extreme Cold.**

Based on the evidence adduced at a week-long trial, including in camera and in court reviews of a sample of The Comfy®, the trial court concluded that the article is a pullover and properly classified under heading 6110 which covers "[s]weaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted." Appx59.  Cozy contends that the trial court erred in reaching this decision because it misinterpreted this Court's analysis of heading 6110 provided in *Rubies II* and applied a disfavored subjective test.  Blue Br. at 28.  Cozy is wrong.

In its thorough and well-reasoned decision, the trial court observed that for an article to be classified in Chapter 61 (headings 6101 to 6114 including heading 6110), it first must be "wearing apparel."  *Rubie's I*, 337 F.3d at 1357; Appx54.  In *Rubie's I*, this Court explained that wearing apparel are "all articles which are ordinarily worn— dress in general."  *Id.* at 1357.  If an article is only worn for limited occasions, such as Halloween, and it is of a flimsy nature and construction, then it should not be perceived as being ordinarily worn and thus it is not a normal article of apparel of Chapter 61.  *Id.* at 1358, 1360.

In its order denying the Government's motion for summary judgment, Appx99 (ECF No. 48), the trial court determined that four "essential characteristics" applied to all goods of heading 6110, including pullovers. Specifically, those characteristics are that these goods (1) cover "the upper body," (2) provide "some warmth," (3) do not "protect against wind, rain, or extreme cold," and (4) can be worn over "undergarments or other clothing." *Id.* The trial court did not create these four factors from whole cloth. Rather, it reviewed this Court's binding precedent in *Rubies II*, 922 F.3d at 1345-46 describing the essential characteristics of the exemplars of heading 6110 and concluded that for an article to be is classifiable in heading 6110, it must satisfy these four factors.

The trial court found that goods covered by heading 6110 have openings for the waist, head, and arms. Appx55. Further, the court provided definitions for the exemplars of heading 6110, including a pullover ("[A] pullover comprises 'a garment (as a sweater, shirt, or blouse) that is put on by being pulled over the head and is usu[ally] made without a placket or similar opening.'"). Appx55 (quoting *LeMans Corp. v. United States*, 34 CIT 156, 162-63 (2010), which quotes WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1840, 2309 (2002)).

With respect to the factor that goods of heading 6110 do not protect against wind, rain, or extreme cold, the court noted that the parties agreed that The Comfy® does not protect against wind or rain. Appx67. The only disputed issue was whether The Comfy® protected against extreme cold. Because *Rubies II* did not specifically

define the term "extreme cold," the trial court accepted evidence from the parties as to the meaning of that term.  Appx31-33.

Cozy claims that the trial court "unilaterally defined [extreme cold] without any legal support as 'a range of temperatures at, near, or below freezing.'"  Blue Br. at 29. Cozy suggests that this determination equates to a subjective standard based on actual use.  *Id.*  Again, Cozy is wrong.  The court rejected Cozy's approach to understanding the meaning of extreme cold as a subjective depending on an individual's sensitivity to cold.  Appx31 (Mr. Speciale testified that extreme cold "depends on the person and the individual"; "Somebody that's on the equator may consider 68 degrees extremely cold;" Cozy's expert, Mr. Crumley experienced extreme cold with 5 to 10 degrees air temperature and wind blowing 25 to 30 miles an hour.").

Instead, because the concept of "extreme cold" was raised in *Rubies II,* and the meaning or interpretation of precedent is a question of law whose language should not be parsed as though it were a statute, the trial court took a measured approach and looked to the National Weather Service's definition.  Appx32-33.  The trial court reasoned that:

> The term "extreme cold" in *Rubies Costume II* instead refers to a range of temperatures at, near, or below freezing.  No bright line separates the ordinary cold from the extreme cold, because, as the National Weather Service recognizes, "[w]hat constitutes extreme cold varies in different parts of the country."  Ex. D-30.  Still, there are limits to what temperatures are extremely cold.  The National Weather Service's definition of "extreme cold" goes no higher than "near freezing temperatures" when experienced in the "southern U.S."  *Id.*  Elsewhere, such as in the northern states, "extreme cold [only] means temperatures

well below zero." *Id.* The National Weather Service's range — from "near freezing" down to "well below zero" — aligns with both common sense and the context of *Rubies Costume II.* 922 F.3d at 1345–46 ("Like a sweater or sweatshirt, the jacket ... provides some warmth to the wearer but does not protect against wind, rain, or extreme cold."). Temperatures in this range present a similar degree of inclement weather as "wind" and "rain." *Id.* They also involve the kind of weather against which an ordinary sweater, sweatshirt, or pullover cannot protect — the precise inquiry that motivated the Federal Circuit to write the phrase in question. *See id.* at 1345 ("Although the precise term for the type of jacket included with the Santa Suit does not appear in the list of items in heading 6110, the jacket shares the characteristics of the named articles in the heading.").

Appx33-34.

The trial court's determination of the meaning of extreme cold is not speculative or subjective. Rather, it is reasoned, supported, and consistent with *Rubies II.* Accordingly, the trial court's analysis of extreme cold does not constitute a legal error.

### B. The Trial Court Properly Considered Use When Construing The HTSUS To Determine The Proper Classification Of The Comfy®

Cozy claims that the trial court erred by considering use when determining whether The Comfy® is properly classified as a pullover of heading 6110. Blue Br. at 32-35. Cozy is incorrect.

The trial court recognized that heading 6110 is an *eo nomine* provision. Appx56. However, even when construing an *eo nomine* term, use may be a relevant metric to understand the true nature of a good. Appx56. Courts will look to the language of a particular heading to determine whether it "impl[ies] that use or design is a defining

characteristic." *Irwin Indus. Tool Co. v. United States*, 920 F.3d 1356, 1361 (Fed. Cir. 2019).

Because *Rubies II* revealed that determining whether an article is covered by heading 6110 turns on an "assessment that users can 'wear the jacket over either undergarments or other clothing' and that the jacket 'provides some warmth to the wearer but does not protect against the wind, rain, or extreme cold," the trial court properly concluded that use was a relevant consideration. Appx56-57. Thus, the trial court properly recognized that it needed to consider not just the article's physical characteristics but also its design, intended use, and marketing. Appx57.

Indeed, the trial court's close review of The Comfy®'s design, intended use, and marketing revealed a product designed for use inside of a cool building, a lack of persuasive evidence that customers use the product for protection from extreme cold, and a lack of marketing to customers indicating that the product is for use in extreme cold. Accordingly, the consideration of design and use established that The Comfy® would not be removed from heading 6110 because it protected from extreme cold.

It was not legal error to consider use for heading 6110 in the face of this Court's precedent in *Rubies II.*

## C.   The Explanatory Notes To Heading 6110 Do Not Exclude The Comfy® From Heading 6110

Cozy contends that the trial court erred as a matter of law by failing to consider the Explanatory Notes (ENs) for heading 6110. Blue Br. at 35-36. Cozy is wrong.

Although "generally indicative of the proper interpretation of a tariff provision," the Explanatory Notes are not legally binding. *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing *Motorola Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006)). Here, Cozy complains that the trial court did not consider the note that heading 6110 "also excludes padded waistcoats generally worn over other clothing for protection against the weather." But the EN is not directed to all the exemplars of heading 6110, only the waistcoats (vests). The Comfy® is not a waistcoat (vest). Therefore, this EN is inapplicable. Rather, *Rubies II* provides the salient conditions for all the exemplars of heading 6110, including pullovers. By not applying an inapplicable Explanatory Note for waistcoats to a pullover, the trial court did not commit reversible legal error.

However, even if the trial court had considered this EN, it would not produce the result for which Cozy hopes. Cozy suggests that the mere presence of the synthetic sherpa as an interior fabric equates it with a padded waistcoat that is worn for protection from the weather. Yet, the stipulated facts in this case establish that The Comfy® does not protect users from rain or wind and the credited testimony of Ms. Ferro established that it does not protect the wearer from extreme cold. Appx7, 34-35. Rain, wind, and extreme cold all constitute weather conditions. Appx33.

### D.   The Trial Court Is Not Required To Give Deference To CBP's Apparel Informed Compliance Publication

Continuing its quest to find some legal error in the trial court's judgment, Cozy next claims that the trial court was required to give deference to CBP's Informed Compliance Publication "Classification: Apparel Terminology under the HTSUS" published in June 2008 (Apparel ICP).  Blue Br. at 36-43.  In its findings of fact and conclusions of law submitted after trial, Cozy did not argue that the trial court was obligated to give deference to the Apparel ICP.  Appx1923-1987.  This Court should find that this argument has been waived.  *Fresenius USA, Inc. v. Baxter Intern., Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009) ("If a party fails to raise an argument before the trial court, or presents only a skeletal or undeveloped argument to the trial court, we may deem that argument waived on appeal.")

But even if the Court considers this argument, Cozy oversells its position in two ways.  First, any deference owed by a trial court to a CBP pronouncement concerning interpreting a tariff term, whether as a ruling or in a compliance publication, is not mandatory.  *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 403 (2024) (agency's statutory interpretation cannot bind a court, but an agency's expertise may give it the power to persuade).  Thus, any deference given by a court necessarily turns on the agency 's power to persuade.  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (deference turns on the agency's power to persuade based on, among other things, its "body of experience and informed judgment"); *Rubie's I*, 337 F.3d at

1355 (classification determination merits deference because of its power to persuade);

*Honda of America Mfg., Inc. v. United States*, 607 F.3d 771, 776 (Fed. Cir. 2010) (even an agency ruling inconsistent with earlier and later pronouncement may be entitled to deference to the extent it has the power to persuade).

Next, Cozy argues that the Apparel ICP stands for the proposition that any garment described by heading 6110 will be excluded from that heading if it possesses a sherpa lining. But that is not what the Apparel ICP states. Instead, it mentions sherpa only twice: under Anoraks, windbreakers and similar articles (6101, 6102, 6113, 6201, 6202, 6210) it states "Garments similar to sweaters with full front opening, which have a sherpa lining or heavy weight fiberfill lining (including quilted linings), that are used to provide warmth to the wearer; Appx2393, and under Sweaters (6110, 6110) its states that "[t]his term [*i.e.*, Sweaters] excludes garments that have a sherpa lining or a heavyweight fiberfill lining (including quilted lining), which are used to provide extra warmth to the wearer." Appx2404. Sherpa is not mentioned in the discussion of pullovers, sweatshirts, or waistcoats (vests), which are exemplars of heading 6110. Appx2400-2408.

Finally, the Apparel ICP was issued in 2008. Appx2383. In 2019, this Court in *Rubies II* held that articles were covered by heading 6110 if they "covered the upper body"; provided "some warmth"; did not "protect against wind, rain, or extreme cold"; and could be worn over "undergarments or other clothing." 922 F.3d at 1345-46. Thus, notwithstanding anything provided in the Apparel ICP, the trial court was

bound to follow this Court's determination in *Rubies II*. The trial court faithfully did and should be affirmed.

### E. The Trial Court Did Not Misinterpret *Rubies II* To Mean That An Article Covered By Heading 6110 May Cover The Whole Body

Cozy contends that the trial court misconstrued *Rubies II* to mean that articles of heading 6110 may cover the whole body. Blue Br. at 43-47. Cozy is incorrect. First, the trial court found that The Comfy® falls between the thighs and knees of a user, depending on the user's height, not to the feet of a user. Appx67. Further, it did not hold that articles of heading 6110 can cover the whole body. Rather, the trial court observed that a waistcoat (vest), one of the exemplars of heading 6110, is "an item of wearing apparel extending to the waist or below." Appx67-68 (citation and emphasis omitted).

Recognizing that *Rubies II* noted that the typical sweater, sweatshirt, or pullover "covers the upper body," the trial court observed that there is no prohibition for such goods to cover more than simply the upper body. Appx68. Relying on this Court's precedent, the trial court found that only a significant difference, *i.e.*, giving an *eo nomine* item features that are substantially in excess of those within the common meaning of the term could remove the item from the heading. Appx68.

Here, the trial court found that oversized sweaters, sweatshirts, and pullovers are familiar items in the apparel market. Appx69. Indeed, the trial court recalled that The Comfy® was inspired by his nephew wearing his brother's old hoody, which was

oversized on the nephew but was still a sweatshirt.  Appx69.  The trial court

concluded that the oversized nature of The Comfy® was an incidental to its essential

characteristics as a pullover because the article is worn like an ordinary pullover,

covered the upper body, provides some warmth without protecting from inclement

weather, and users can wear it over other clothing.  Appx69-70.  The trial court's

analysis comports with *Rubies II* and does not constitute reversible error.

### F.    The Trial Cout Did Not Misinterpret *Arnold*

In yet another make-weight argument to find an error, Cozy contends that the

trial court erred by misinterpreting *Arnold, Constable & Co. v. United States*, 147 U.S.

494 (1893), and only analyzing the first criterion of the *Arnold* test.  Blue Br. at 47-51.

Cozy misunderstands *Arnold*.  The Supreme Court did not pronounce a test, or

multiple criteria or factors for the issue of whether knit woolen shirts, drawers, and

hosiery were "clothing, ready made, and articles of wearing apparel of every

description" and, thus, exempt from duties for persons arriving in the United States.

*Id.* at 496.  The Supreme Court noted that the term "wearing apparel" was "not an

uncommon one for statutes" and that it "is used in an inclusive sense embracing all

articles ordinarily worn, -dress in general."  *Id.* at 496.  The Supreme Court concluded

that the provision was intended to cover "every article which is ordinarily worn *or*

recognized as an article of dress."  *Id.* at 497.  Contrary to Cozy's attempt to use this

statement to narrow and exclude an article like The Comfy® from "wearing apparel

of every description, the Supreme Court used this language to capture a broad swath

of apparel for the duty exemption. Had the Supreme Court intended to require

exempt goods to satisfy two conditions, being ordinarily worn and recognized as an

article of dress, it would not have used the conjunction "or." The Supreme Court was

not setting up a narrow, exclusionary two-factor test.

Cozy's suggestion that there is no evidence that The Comfy® is a pullover is

refuted by the undisputed trial evidence. Indeed, the record is replete with users

depicted wearing The Comfy®. This Court in *Rubie's I* explained that wearing apparel

are articles that are not flimsy in nature and construction and encompass all articles

ordinarily worn. 337 F.3d at 1357. The undisputed factual findings in this case,

discussed above, prove that The Comfy® is ordinarily worn and thus is an article of

apparel.

### G.    The Trial Court Properly Determined That The Comfy® Is Not A Blanket Of Heading 6301

Finally, Cozy argues that the trial court misclassified The Comfy® as a pullover

instead of a blanket. Blue Br. at 51-56. Cozy is wrong.

As discussed above, after a week-long trial with the benefit of credible expert

testimony from Ms. Ferro and Ms. Concannon, the trial court determined that The

Comfy® is classifiable as a pullover of heading 6110. As such, Cozy's preferred

classification under heading 6301 ("blankets and travelling rugs") is rendered

impossible by Note 2(a) to Chapter 63, which states that headings 6301 to 6307 do

not cover the "[g]oods of chapters 56-62." The trial court properly found that if an

article is properly classified under heading 6110, it cannot be classified in heading

6301.  Appx57.

Further, the trial court noted and gave credence to Cozy's admission that The

Comfy® is designed to provide for some warmth and protection from the cold, but it

is not a "covering ... like a blanket."  Appx74.  The trial court also accepted the *Allstar*

court's determination that the "essential characteristic" of a blanket is that a blanket is

"a large piece of fabric providing a warm covering" and that reference to the term

"covering" is linked to the fact that people drape a blanket over their front.  Appx74.

Moreover, the trial court noted the contrast between a blanket being draped

over the front of a person and The Comfy®, which is not draped over the front but

is, instead, worn by pulling it over their head, sliding their arms into the item, and then

pulling it down.  Appx 74.  The court concluded that this does not constitute how a

blanket serves to cover a person and found that the character and function of The

Comfy® is different than that of a blanket and not classifiable under heading 6301.

For the above reasons, the trial court properly classified The Comfy® under

subheading 6110.30.30 and should be affirmed.

## CONCLUSION

For the foregoing reasons, we respectfully request that judgment of the trial court be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

| | |
|---|---|
| *Of Counsel* | By: /s/ Beverly A. Farrell |
| MICHAEL A. ANDERSON | BEVERLY A. FARRELL |
| Office of Assistant Chief Counsel | Senior Trial Attorney |
| International Trade Litigation | Civil Division, Dept. of Justice U.S. |
| Customs and Border Protection | Commercial Litigation Branch |
| | 26 Federal Plaza – Suite 346 |
| | New York, NY 10278 |
| | Tel. (212) 264-9230 or 0483 |
| | Attorneys for Defendant-Appellee |

Dated: December 19, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of December, 2025, a copy of the foregoing Brief for Defendant-Appellee was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/ Beverly A. Farrell</u>
Senior Trial Attorney
International Trade Field Office
Civil Division
United states Department of Justice
26 Federal Plaza—Room 346
New York, New York 10278

CERTIFICATE OF COMPLIANCE PURSUANT TO FRAP 32(a)(7)(C)

_____
                                        )
KING MAKER MARKETING, INC.,             )
                                        )
                    Plaintiff,          )
                                        )
          v.                            )          Appeal No. 25-1819
                                        )
UNITED STATES,                          )
                                        )
                    Defendant.          )
_____)

     I, Beverly A. Farrell, a senior trial attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the foregoing brief, relying upon the Microsoft Word word count feature of the word processing program used to prepare the brief, certify that this brief complies with the type-volume limitation under Rule 32(a)(7)(B), and contains 7878 words.

                            /s/ Beverly A. Farrell
                            Beverly A. Farrell